## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE:<br><br>ALL MATTERS RELATED TO NORTH AMERICAN REFRACTORIES COMPANY, et al. in Case No. 02-20198, as affected by the May 24, 2013 Order Entering Final Decree entered at Doc. No. 7940<br>　　　Debtors | Misc. Case No. 15-00204-TPA<br><br><br><br>Chapter 11 |
| HONEYWELL INTERNATIONAL INC.,<br>　　　*Plaintiff*,<br>　　v.<br><br>NORTH AMERICAN REFRACTORIES COMPANY ASBESTOS PERSONAL INJURY SETTLEMENT TRUST,<br>　　　*Defendant*. | Adv. No. 21-2097 |

## HONEYWELL INTERNATIONAL INC.'S PRE-TRIAL BRIEF

## INTRODUCTION

The last time the parties were before this Court, the Trust represented that it would no longer accept form affidavits that utilize identical language across claimants to establish exposure to a NARCO asbestos-containing product.    The reason the Trust did so was its own acknowledgment of an obvious point:  If claimants are simply signing affidavits with identical form language, those affidavits are not competent or credible evidence of exposure.  Less than two years later, the Trust abandoned its commitment and now considers and pays claims that rely on formulaic exposure allegations.  That is the crux of Honeywell's complaint in this case, and Honeywell asks the Court to hold the Trust to its promise, bar reliance on form affidavits, and make clear that claimant law firms need to secure affidavits that are based on firsthand knowledge and facts provided by the claimants themselves, instead of a copy of a law firm form.

Ultimately, the Trust's activities are governed by the NARCO Asbestos Trust Agreement and the NARCO Asbestos Trust Distribution Procedures ("TDP"), both of which were the product of extensive negotiations among the various constituents with interests in the Plan.  The text of those governing documents, as well as their negotiating history, make clear that the Trust must ensure that individuals submitting claims to the Trust satisfy specific and rigorous requirements for payment.  The Trust is nevertheless violating both the Trust Agreement and the TDP in at least three ways.

*First*, the Trust accepts "form" affidavits that do not constitute competent or credible evidence of exposure to a specific NARCO asbestos-containing product.  The Trust Agreement requires that the Trust pay only "valid . . . claims in accordance with the provisions of the NARCO Asbestos TDP."  Ex. A, Trust Agreement § 3.5, at HON Tr. 00014–15.  The TDP, in turn, imposes two separate and independent criteria that claimants must meet in order to establish valid claims: establishing by competent and credible evidence first, the ***presence*** of a specific NARCO asbestos-

containing product ("NACP") at the claimant's worksite, and second, claimant's occupational *exposure* to that specific NACP. Ex. IF, TDP § 4.7(b)(1), at HON Tr. 09463–64. Boilerplate "form" affidavits are not competent or credible evidence of exposure sufficient to meet the criteria set forth in the TDP.

*Second*, the Trust has re-implemented a "refractory inference," which is also contrary to the TDP's unambiguous requirement that claimants show exposure to a specific NARCO asbestos-containing product. Ex. IF, TDP § 4.7(b)(1), at HON Tr. 09463–64. By assuming that evidence of exposure to generic refractory products is enough to show exposure to asbestos-containing refractory products made by NARCO, the Trust is paying thousands of claims that do not meet the requirements of the TDP.

*Third*, the Trust is violating the TDP provisions governing the process for "individual review." Individual review or "IR" is intended only for a claimant who "has extenuating circumstances," Ex. IF, TDP § 4.3, at HON Tr. 09449, but the model that the Trust uses to calculate liquidated values for claimants that seek individual review does not consider whether such claimants have extenuating circumstances. As a result, the Trust is paying IR claimants significantly more than the Scheduled Value, even in cases where the claimant lacks the extenuating circumstances required by the TDP.

The Trust acknowledges that the TDP imposes certain standards for claims but, in its view, the governing documents leave the Trust with expansive discretion to decide what satisfies those standards. The Trust's position is contrary to the plain terms of the TDP, which are the product of extensive negotiation between the Trust constituents and were entered by order of the Court. And while it is true that the TDP allows the Trust to exercise judgment in certain circumstances, those

2

circumstances are limited and expressly laid out in the TDP itself.  The far-reaching "discretion" that the Trust seeks here would write the negotiated, agreed-upon terms out of the TDP.

Unable to meaningfully defend against the core claims in the case, the Trust deflects to its counterclaims against Honeywell, which focus on Honeywell's attempts to settle claims outside of the Trust and to negotiate a buyout of Honeywell's funding obligations.  But the Trust can point to only one settlement with one claimant law firm that Honeywell entered into in 2018, of which the Trustees became aware years ago but raised no objection at the time.  And though Honeywell's prior attempt to negotiate a buyout was not successful, all three Trustees acknowledged under oath during their depositions in this proceeding that a buyout, in principle, would be an acceptable way to resolve the parties' disputes.  The Trust otherwise points to a 2006 pre-confirmation liability projection by Dr. Francine Rabinovitz to argue that its current policies—and the resulting claim payouts—are consistent with what Honeywell expected to pay in 2006.  The Trust's argument rests on a number of unsupported assumptions, but more fundamentally, the Trust's and Honeywell's experts have since performed up-to-date valuations that estimate the liability at an amount significantly less than Dr. Rabinovitz's sixteen-year-old projection.  The Trust offers no sound justification, based on its governing documents or otherwise, to ignore the requirements of the TDP.

## ARGUMENT

### I.    The TDP Imposes Rigorous and Specific Exposure Standards.

The Trust's policies with respect to exposure evidence are contrary to the plain terms of the Trust's governing documents.  In particular, the TDP sets out the various requirements that claimants must meet in order to establish valid NARCO Trust claims.  The Trust does not have the authority to write those negotiated and agreed-upon terms out of the TDP.  Nor can the Trust ignore the circumstances surrounding the creation of the Trust, all of which confirm that the TDP was

meant to impose stricter exposure standards than what was accepted in the tort system before the Trust's creation.

### A.    The text of the TDP makes clear that claimants must satisfy specific requirements to establish a valid claim.

As is the case in contract disputes, an assessment of what the TDP requires must start with its text. *See Murfey v. WHC Ventures, LLC*, 236 A.3d 337, 355 (Del. 2020) ("[T]he starting point" for "approaching a contract dispute" is "a contract's express terms."). That principle applies to the interpretation of the TDP because Delaware courts interpret trust documents in the same way that they interpret other written contracts, relying first and foremost on "the unambiguous language of [the] trust instrument to establish the parties' intent." *Wilmington Trust Co. v. Mills*, 2021 WL 2620585, at *8 (Del. Ch. June 25, 2021).

The TDP sets out the criteria that claimants must satisfy in order to establish a valid claim. ***First***, they must identify the specific NACP to which they were exposed. Ex. IF, TDP § 4.7(b), at HON Tr. 09463. That requirement applies to all seven of the various disease levels contemplated by the TDP, and it applies to claimants pursuing both expedited and individual review. *Id.* § 4.3(a)(3), at HON Tr. 09445, § 4.3(b)(2), at HON Tr. 09452.

***Second***, claimants must establish the "requisite evidence of exposure" to that specific NACP, which is defined as "evidence which satisfies ***all*** of the criteria of Section 4.7(b)" of the TDP. Ex. IF, TDP § 4.3(a)(3) n.3, at HON Tr. 09445 (emphasis added). Section 4.7(b)(1), in turn, sets out two separate and independent evidentiary prongs that a claimant must meet: (1) the "presence prong" and (2) the "occupational exposure prong." To satisfy the presence prong, a claimant must "demonstrate that a specific asbestos-containing product manufactured or distributed by NARCO or its predecessors was present at a site, . . . [by] either: a) submit[ting] competent evidence that he or she worked at a site on the Worksite List . . . or . . . b) submit[ting]

4

credible evidence that a specific asbestos-containing product manufactured or distributed by NARCO or its predecessors was present at a worksite at which the claimant was employed." *Id.* § 4.7(b)(1), at HON Tr. 09463.  To satisfy the occupational exposure prong, "a claimant must submit competent evidence that he or she worked on a regular basis with the NARCO asbestos containing product or worked on a regular basis in close proximity to workers engaged in the activities set forth in Section 4.7(b)(2)(a) through (c)." *Id.* at HON Tr. 09464.

Those terms set out clear requirements for exposure:  a claimant must (1) identify a specific NACP; (2) establish by competent or credible evidence that the specific NACP identified was present at the claimant's work site; and (3) establish by competent evidence that the claimant was actually exposed on a regular basis to the specific NACP.  The Trust has defined these terms in its directives as follows: competent evidence means "evidence that is relevant and reliable," and "[c]redible evidence of exposure" means evidence that "is believable based on a review of the evidence submitted as a whole.  Ex. AN, Jan. 17, 2019 Email from Esserman to Calandra, at HON Tr. 01468.

**B.    The plain meaning of the TDP's exposure requirements is confirmed by the circumstances surrounding the Trust's creation.**

Even if there is some ambiguity in the TDP's exposure requirements, Delaware courts are permitted to consider extrinsic evidence to clarify ambiguous terms and "shed light on the expectations of the parties at the time they entered into the Agreement." *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1233 (Del. 1997); *see also* Dkt. No. 265 (Case No. 15-00204) at 25 ("The 'seminal rule' of construction in trust cases under Delaware law is that the settlor's intention controls the interpretation of the agreement.").  Here, the circumstances surrounding the Trust's creation, including the negotiations and eventual adoption of the TDP, all confirm that the TDP was intended to impose rigorous exposure standards.

That story begins with Honeywell's decision to remove NARCO asbestos claims from the tort system and seek a channeling injunction, under which such claims would be directed to the NARCO Asbestos Trust. *See* 11 U.S.C. § 524(g). The impetus for Honeywell's decision was that courts in the tort system were permitting asbestos claims to move forward on flimsy exposure evidence. As Craig Zimmerman, the primary negotiator of the TDP on behalf of Honeywell, explained, "Honeywell was interested in pursuing the Chapter 11 procedure . . . in large part because its view was [that] the prepetition tort litigation's environment was broken," meaning "courts were not enforcing minimal evidentiary standards on claimants, primarily . . . because there were just too many of them to manage and courts were overwhelmed." Honeywell Statement of Fact ("SOF") Ex. 3, Zimmerman Dep. Tr. at 303:16–304:2; *see also id.* at 56:4–10 (Zimmerman was the "principal person day-to-day responsible for the shepherding of the TDP" on behalf of Honeywell). In particular, Honeywell was concerned that in the tort system, "all a claimant had to do was to say in an affidavit, [or] a deposition that I worked with a refractory product that had an Indian head logo" to survive summary judgment. *Id.* at 304:2–11. In Honeywell's view, "that sort of minimal exposure evidence" was not acceptable, and "it was the fact that [NARCO] could not dispose of claims like that in the tort system in an efficient and economic manner that led to the need to find a more robust and different strategy for resolving NARCO claims than the tort system." *Id.* at 304:14–23.

That new strategy resulted in the formation of the NARCO Asbestos Trust, as well as the drafting and negotiating of the Trust's governing documents: the Trust Agreement and the TDP. With respect to the TDP, Honeywell intended to include the rigorous requirements that were not being applied in the tort system. *See* SOF Ex. 3, Zimmerman Dep. Tr. at 77:7–17 ("[I]t was our intent to limit those claims compensable under the NARCO Trust to those claims from claimants

who could identify a specific NARCO product for which the company was prepared to acknowledge that it had responsibility in the tort system or would have had responsibility in the tort system, and to not pay claims where such evidence was not available, and in the tort system that had not been the case.").

In drafting the TDP, the negotiating parties—namely, Honeywell, the Asbestos Claimants Committee ("ACC," a predecessor to the Trust Advisory Committee), and the Future Claimants Representative ("FCR")—also understood that the NARCO TDP would impose "more rigorous" requirements than those in ***other*** asbestos trusts' TDPs.  SOF Ex. 3, Zimmerman Dep. Tr. at 61:16–24.  In Honeywell's view, those other trusts were not requiring claimants to demonstrate by "competent and believable evidence that they had been exposed to a specific NARCO asbestos-containing product." *Id.* at 63:25–64:13.  With that concern in mind, it was a "necessary condition" for Honeywell that the TDP incorporate more rigorous requirements, *id.* at 61:25–62:3, especially given the evergreen nature of Honeywell's funding obligation.  Honeywell accordingly made clear in its discussions with the ACC and FCR that, "in contrast to other TDPs," it expected "that the exposure criteria in the NARCO TDP would be more exacting or more rigorous and, for instance, require the identification of a specific NARCO asbestos-containing product." *Id.* at 63:7–18.

## C. During TDP negotiations, the parties developed an understanding of key terms relating to exposure evidence.

The parties negotiating the TDP discussed the key exposure requirements relevant to this litigation.  For instance, Honeywell made clear—and the parties all agreed—that claimants would have to identify a ***specific NARCO asbestos-containing product*** to which they were exposed.  SOF Ex. 3, Zimmerman Dep. Tr. at 70:8–24; *see also id.* at 72:16–73:10 ("I do recall that we reached agreement with regard to the use of the word 'specific NARCO asbestos containing product' []and agreed to include a product list as part of the plan documents.").

The parties negotiating the TDP also had an understanding of the meaning of "competent" and "credible" evidence.  With respect to "credible," the parties discussed the term's meaning throughout the course of the TDP negotiations.  Indeed, the initial version of the TDP from 2003 contained two Scheduled Values for the various disease levels depending on whether a claimant provided (1) "compelling" evidence that a specific NACP was present at the claimant's worksite or (2) "credible," but not compelling, evidence that a specific NACP was present at the relevant worksite.  The 2003 TDP contained footnotes defining both "compelling" and "credible."[1]  Ex. E, NARCO TDP Draft n.1 & n.2, at HON Tr. 00250–51.

In 2005, the parties amended the TDP, replacing the two-tiered Expedited Review values with a single Scheduled Value.  Ex. F, NARCO Alternative TDP, at HON Tr. 00328.  As part of that negotiation, Honeywell proposed, and the parties discussed, the inclusion of what is essentially now Section 4.7(b): the two-prong standard requiring a showing of both presence and occupational exposure (which had not been included in the 2003 TDP).  And, although the footnote defining "credible" was removed from later versions of the TDP, Honeywell understood that definition to carry forward.   SOF Ex. 3, Zimmerman Dep. Tr. at 112:6–23; *see also id.* at 82:19–83:13.  Substantively, the parties understood "credible" evidence to mean "believable on its face:"

> For instance, it is credible for someone to say; I worked at a specific site and I was exposed, I used a specific product. It is not credible for someone's daughter who was either not born or three-year-old at the time of the alleged exposure to say; my dad worked at a particular site and was exposed to a particular product. . . . [I]t's a believability factor.

*Id.* at 82:25–83:13.

---

[1]    The definition of "credible" provided: "For purposes of this TDP, 'credible evidence' means that evidence which does not satisfy the standard of 'compelling,' but which includes, at a minimum, competent sworn testimony of the claimant or that of one or more Co-workers . . . that the claimant was exposed to a specific NARCO asbestos-containing product at a specific worksite at the relevant period of time."  Ex. E, NARCO TDP Draft n.2, at HON Tr. 00251.

Although the discussion of the meaning of "competent" was "fairly limited," the parties "focused on . . . the fact that the evidence had to reflect its own foundation," meaning "it had to be evident from whatever was submitted that . . . it was a source of information reliable or in a position to actually speak to the issue on which it was being presented." SOF Ex. 3, Zimmerman Dep. Tr. at 78:15–25.

In addition to discussions relating to "competent" and "credible" evidence specifically, Honeywell made the broader point throughout TDP negotiations that claimants would have to state the *facts* underlying their claim, rather than just the *conclusion* that they had been exposed to asbestos. SOF Ex. 3, Zimmerman Dep. Tr. at 147:8–22; *see also id.* at 148:6–10 (explaining that exposure standards required a claimant to "state the setting; the when, where, what, how…of [a] claimant's use or proximity to the use of a specific NARCO asbestos-containing product"); *id.* at 152:19–25 ("We had a number of negotiating sessions. And whenever a question came up about what Honeywell's expectations were with regard to the exposure requirements, I think we . . . certainly I would have said we were expecting to see the facts.").

**D.    The fact that Honeywell entered into post-petition settlements does not loosen the TDP's exposure requirements.**

The Trust focuses on the fact that after NARCO filed for bankruptcy, Honeywell entered into various post-petition settlements with claimant law firms to resolve portions of claimants' asserted liability against Honeywell (as opposed to NARCO). SOF Ex. 3, Zimmerman Dep. Tr. at 20:15–23. Under those agreements, Honeywell accepted lower quality exposure evidence than the TDP requires. But contrary to the Trust's assertions, these settlements do not demonstrate that Honeywell intended to loosen or lower the rigorous exposure standards *under the TDP*.

Importantly, the TDP and Honeywell's post-petition settlements "perform significantly different functions." SOF Ex. 3, Zimmerman Dep. Tr. at 231:2–20. The post-petition settlements

"were intended and a necessary step for the purposes of obtaining sufficient claimant support for a 524(g) resolution." *Id.* at 231:23–232:2. The TDP, however, was "intended to [e]nsure, to the extent possible, that only valid NARCO asbestos claims would be paid," meaning it was intended "to achieve a resolution of the asbestos docket going forward, . . . appl[ying] a standard that Honeywell had thought ***should*** have been applied in the tort system and was not[,] going forward in perpetuity." *Id.* at 231:18–232:13 (emphasis added). In light of those different functions, Honeywell "did not believe that the standards in the postpetition Settlement Agreements could be or would be as rigorous as the standards that were applied in the Trust Distribution Procedures by the Trust." *Id.* at 230:25–231:12.

## II.      Form Affidavits Are Not Competent and Credible Exposure Evidence.

The Trust's acceptance of "form" affidavits breaches its obligation to accept only competent and credible evidence of exposure to a specific NACP. Ex. IF, TDP § 4.7(b)(1), at HON Tr. 09463. Form affidavits are "templates" prepared by claimant law firms that contain exposure allegations using identical or substantially similar descriptive language as the language contained in other exposure affidavits that were submitted to the Trust. SOF at 4–5. Some form affidavits are submitted hundreds and even thousands of times. *Id.* at 1.

During the 2015 litigation between the parties, the Trust committed to Honeywell and to the Court that it would not accept form affidavits as sufficient to state a valid claim under the TDP. SOF at 6. And the Trust abided by that representation for a period of time. In its directives, the Trust identified form affidavits as evidence that "raises competence and/or credibility concerns," and instructed CRMC to disregard them. *Id.* at 1, 6. But when the Trust realized that banning form affidavits slowed its rate of payment, the Trust reversed course and ***mandated*** that the claims processor consider form affidavits in most circumstances without providing any actual data to support this decision. *Id.* at 10–11.

Form affidavits are inconsistent with the TDP's requirements.  They do not constitute **competent** evidence of exposure to a specific NACP because they do not reflect the personal knowledge of the affiant.  *See* SOF at 4–5.  Instead, they rely on formulaic, boilerplate allegations of exposure, which the Trust has previously admitted might be "blindly…sign[ed]" by claimants.  Ex. V, March 11, 2016 Letter from Esserman to Honeywell, at HON Tr. 01066.  Nor do form affidavits constitute **credible** evidence because they do not allow affiants to use their own language to describe their exposure.  *See* SOF at 4–5.  The idea that hundreds of claimants, working different jobs at different times and locations, could all accurately testify to the exact same exposure in the exact same language is not credible on its face.  The unreliability of form affidavits is further confirmed by inconsistencies across claimants' submissions in other litigation.  *See* SOF at 12–14.

Form affidavits also are not made any more "competent" or "credible" by the fact that claimants submitting these statements may have worked at approved worksites that satisfy the "presence" prong of Section 4.7(b)(1).  *See* Ex. BJ, Feb. 1, 2019 Email from Esserman to Metzfield, at HON Tr. 02166.  The text of the TDP makes clear that the "occupational exposure" and "presence" requirements are separate and distinct:  Section 4.7 of the TDP requires "**both**" (i) presence, "**and**" (ii) occupational exposure, not just one or the other.  Ex. IF, TDP 4.7(b)(1), at HON Tr. 09463 (emphasis added).  This "conjunctive phrasing" underscores that the "terms are separate and distinct" and thus both must be satisfied.  *Century Surety Co. v. Euro-Paul Constr. Corp.*, 2017 WL 4338790, at *7 (E.D.N.Y. Sept. 29, 2017); *see also Concord Steel, Inc. v. Wilmington Steel Processing Co.*, 2008 WL 902406, at *7 (Del. Ch. Apr. 3, 2008) ("Usually, one would interpret 'and' only in the conjunctive, joining two or more elements in a list and requiring all of those elements."); *Castlepoint Nat'l Ins. Co v. Ins. Co. of Pa.*, 2015 WL 2339092, at *7 (M.D. Pa. May 13, 2015) (discussing "conjunctive" contract terms).

Nor can the Trust justify its reliance on form affidavits by pointing to pre- and post-petition claims paid by Honeywell that involved formulaic or check-the-box evidence of exposure, both of which are irrelevant to the Trust's claim-processing requirements as set out in the TDP. The Trust Agreement provides that the Trust is to use its assets and income "to promptly pay holders of valid NARCO Asbestos Trust Claims in such a way that holders of similar NARCO Asbestos Trust Claims are paid in substantially the same manner." Ex. A, Trust Agreement § 2.2, at HON Tr. 00004; *see also* Ex. IF, TDP § 1.1, at HON Tr. 09425. That provision requires the Trust to treat claims submitted to *the Trust* in substantially the same manner; it does not require that the Trust pay claims based on evidence that does not meet the requirements of the TDP, simply because Honeywell settled claims pre- and post-petition based on similar evidence.[2]

## III.    The Trust's Re-Introduction of the "Refractory Inference" Violates the TDP.

Section 4.7(b)(1) of the TDP unambiguously provides that "the claimant must submit requisite evidence of exposure to a *specific* asbestos-containing product manufactured, sold or distributed by NARCO" (emphasis added). Despite that clear requirement, the Trust continues to employ a "refractory inference," under which the Trust pays claims for claimants on an Approved Worksite who are non-presumptive for NARCO exposure, even where the claimant provides evidence of exposure to a *generic* refractory product, rather than a *specific* NARCO asbestos-containing product. *See* SOF at 15–17. In a stipulation "so ordered" by this Court, the Trust previously agreed to forego this inference, representing that "the Trust will not, as a matter of

---

[2]   Section 524(g) does not impose a different requirement. *See* 11 U.S.C. § 524(g)(2)(B)(ii)(V) (noting that a Section 524(g) trust will pay "present claims and future demands that involve similar claims in substantially the same manner"). Again, the relevant question is whether the *Trust* is treating claimants in the same manner. The Trust cannot articulate how future claimants were prejudiced by Honeywell's pre- and post-petition settlements, especially given that the NARCO Trust is an evergreen trust. Nor did the Trust or any other party raise any kind of "inequity" objection to the NARCO Plan, which was entered by this Court years ago.

blanket policy, accept a bare assertion that the claimant worked around refractory products as sufficient to meet the exposure standard under the . . . ('TDP')." *See* Ex. JP, Stipulation, at HON Tr. 10214.  In 2019, however, the Trust provided a new "Exposure Review Worksheet" to its claims processor, instructing the claims processor to ask whether a claimant's evidence ███████

███████████████████████████████████████████████████████████████

████████████████████████████████████████    *See* Ex. BA, Jan. 21, 2019

Email from Esserman to Sacripanti, at HON Tr. 02086 (emphasis added).  The Trust's reinstitution of the refractory inference is contrary to the plain terms of the TDP.

The refractory inference also runs counter to the intent of the parties that negotiated the TDP.  As Honeywell made clear throughout discussions with the ACC and FCR, one of the ways in which the NARCO TDP exposure requirements would be "more rigorous" than other trusts' TDPs was by "requir[ing] the identification of a specific NARCO asbestos-containing product." SOF Ex. 3, Zimmerman Dep. Tr. at 63:7–18.  The parties also specifically discussed what evidence a claimant on an Approved Worksite would have to provide in order to demonstrate occupational exposure:  The expectation was that the claimant would submit "an affidavit that would provide the facts relating to how [the] claimant had used the NARCO product and come to be exposed…to it." *Id.* at 159:21–160:8.  The parties did not contemplate an "inference" of occupational exposure based on satisfaction of the "presence" prong.  Nor did Honeywell see a "need to discuss the Trustees' ability to infer compliance" with the exposure requirements "because someone who didn't submit evidence that satisfied the criteria wouldn't qualify" for payment. *Id.* at 148:21–149:21.

## IV.    The Trust's "IR Model" Violates the TDP.

The Trust's policies with respect to the individual review process violate the express provisions of the TDP.  Section 4.3(b)(1) "provides a claimant with an opportunity for individual

consideration and evaluation of a NARCO Asbestos Trust Claim…where the claimant **has extenuating circumstances** that he or she believes warrant a liquidated value above the applicable Scheduled Value" (emphasis added).  In the Trust's view, any claimant who "believes" he or she has extenuating circumstances qualifies for individual review.  But that contention ignores the plain text of the TDP, which states in full that the IR process is available "where the claimant **has** extenuating circumstances that he or she believes warrant a liquidated value above the applicable Scheduled Value."  Ex. IF, TDP § 4.3(b)(1), at HON Tr. 09449 (emphasis added).  "Has" is the operative term.  Without that prerequisite, it is irrelevant what the claimant believes about it; the claimant's "belief" is only relevant to the decision whether to seek individual review, assuming the claimant satisfies the condition that he or she actually "has extenuating circumstances."  The Trust would write out the first clause of the provision, but its clear import is that a claimant must have "extenuating circumstances" that substantiate the belief that he or she is entitled to a higher liquidated value.

The TDP further directs the Trust to value IR claims "based on" various objective factors, including "age, disability, employment status, disruption of household, family or recreational activities, [and] dependencies," as well as special damages and "pain and suffering."  TDP § 4.3(b)(2).  Under IR, a claimant can—and almost always does—receive higher payment amounts, which are often multiples of those permitted under expedited review.  Ex. DS, Choi Rpt. ¶¶ 38–40, at HON Tr. 06050–51.  The TDP does, however, also "allow[] the Trust to award **less** than the matrix value in the event that the . . . claimant's claim warrants a lesser award than average."  SOF Ex. 3, Zimmerman Dep. Tr. at 167:2-6; *see also* Ex. IF, TDP § 4.3(b)(1), at HON Tr. 09450 ("[T]he liquidated value of any NARCO Asbestos Trust Claim that undergoes Individual Review may be determined to be less than the Scheduled Value the claimant would have received

14

under Expedited Review.").  When the parties negotiating the TDP considered this feature, they "discussed the fact that in order for someone to get more than the matrix value[,] they needed to show some form of extenuating circumstance or significant plus factor . . . ."  SOF Ex. 3, Zimmerman Dep. Tr. at 167:8–17.

Other TDP provisions were likewise intended to cabin IR payments.  Section 4.3(b)(3) of the TDP directs the Trustees to "use their best efforts such that the amounts offered through Individual Review . . . shall annually arithmetically average" to the "Average Value" schedule for claims, which is also set out in the TDP.  Ex. IF, TDP § 4.3(b)(3) & n. 8, at HON Tr. 09454.  In making that determination, however, the Trustees are required to "exclude from its computations any amounts that were at or below the Scheduled Value for the relevant Disease Levels of such claims."  *Id.* § 4.3(b)(3) n. 8, at HON Tr. 09454.  This provision ensures that the Trust can offer below-Scheduled-Value amounts to claimants through Individual Review without such offers or payments impacting the Average Value calculations—an important mechanism to ensure that such below-Scheduled-Value offers would indeed occur.  *See* SOF Ex. 3, Zimmerman Dep. Tr. at 169:12–22 ("There was a concern, an abiding concern that Honeywell had, that because the Individual Review value for [a] claim, on average, was significantly higher than the matrix value, that . . . claimants were incentivized to file for Individual Review even in those individual instances where there wouldn't be a good faith belief that there was extenuating circumstances or a particularly strong claim.").  By including such provisions in the TDP, "Honeywell was seeking to avoid a situation where everyone [who] . . . entered into Individual Review automatically got a significantly higher amount."  *Id.* at 170:21–25.

The Trust is violating these provisions by permitting claimants to participate in IR and to receive higher payouts well above scheduled values even where their circumstances are objectively

15

average, not extenuating.  In particular, the Trust's current IR model admittedly does not consider whether a claimant has extenuating circumstances at all, nor does it adequately account for all of the objective factors set forth in the TDP.  *See* SOF at 19.   Instead, the IR model simply pays claimants more than Scheduled Value the great majority of the time—regardless of whether their circumstances are extenuating.  *See id.*; *see also* Ex. DS, Choi Rpt. ¶ 39, at HON Tr. 06050–51 (noting that for an average expedited review claimant, the IR model would generate a "Hypothetical Claim Value of approximately $166,000, which is 2.2 times the Scheduled Value"). If the IR Model were truly measuring and paying for "extenuating circumstances," then an average claimant—with average age and other significant characteristics—would receive only an average payout, or roughly the same payout as is available under expedited review.  The fact that the IR model nevertheless pays more is inconsistent with the TDP.[3]

## V.      The Trust's Expenses Breach the Trust Agreement.

The Trust mismanages its assets and expenditures in violation of its governing documents. In particular, the Trust Agreement permits the Trust to "pay employees, legal, financial, accounting, investment, audit, forecasting and other consultants, advisors and agents, ***reasonable*** compensation…." Ex. A, Trust Agreement § 3.1(c)(xi), at HON Tr. 00010 (emphasis added).  The Trust's expenses are not reasonable.  In fact, they are "on average 6.0 times" as much as several other asbestos trusts are expending, amounting to ***$15,472,971*** per year in operating expenses alone.  Ex. EW, Dudney Rpt., at HON Tr. 06820.  These expenses have added up to enormous

---

[3]   The Trust may argue that claimants that proceed to IR are entitled to higher liquidated values—regardless of whether their circumstances are extenuating—because IR might take longer or impose greater burdens.  Even assuming such considerations actually impact a claimant's decision to proceed with IR instead of expedited review (and assuming IR in fact imposes greater burdens), those considerations are not among the factors explicitly listed in the TDP, *see* Ex. IF, TDP § 4.3(b)(2), at HON Tr. 09452, and therefore have nothing to do with the TDP's requirements for IR.

sums; "[t]he Trust reported total expenses from 2013 through December 31, 2020 of more than

$123 million, or nearly $60 million excluding reported legal expenses." *Id.*

## VI.    The Trust's Policies Cannot Be Justified As An Exercise Of Discretion.

The Trust has suggested that its policies regarding exposure evidence and individual review

are within the discretion afforded it by the Trust Agreement.  The Trust relies on Article 3.1 of the

Trust Agreement, titled "Powers," which provides that "the Trustees shall have the power to take

any and all actions that, in the judgment of the Trustees, are necessary or proper to fulfill the

purposes of the NARCO Asbestos Trust."  Ex. A, Trust Agreement § 3.1(a), at HON Tr. 00009.

But neither that provision nor any other provision in the Trust Agreement overrides the Trust's

obligations to "implement the NARCO Asbestos TDP," and "pay holders of valid NARCO

Asbestos Trust Claims in accordance with the . . . TDP." *Id.* § 3.5, at HON Tr. 00014.  To conclude

otherwise would "render [those] provision[s] . . . meaningless or illusory," contrary to Delaware

law.  *Osborn ex. rel. Osborn v. Kem*p, 991 A.2d 1153, 1159 (Del. 2010); *see also Duncan v.

STTCPL, LLC*, 2017 WL 816477, at *4 (Del. Super. Feb. 28, 2017) ("[T]he Court is required to

give effect to every term of the instrument, if at all possible.").  The better reading of Article 3.1(a)

is that the Trustees have the authority to exercise discretion to fulfill the Trust's purposes where

doing so would not violate another provision of the Trust Agreement or the TDP.  *See Woolard v.

Woolard*, 547 F.3d 755, 758 n.1 (7th Cir. 2008) ("A trustee does not have discretion to violate the

trust agreement.").  For instance, Article 3.1(c)(ii) of the Trust Agreement grants the Trust the

power to invest monies.  That provision, on its face, leaves room for Trustee discretion as to what

investments are prudent and fulfill the purposes of the NARCO Trust.  But accepting thousands of

boilerplate form affidavits that use identical or substantially similar language to establish exposure

violates Section 4.7(b) of the TDP, which requires evidence of exposure based on personal

knowledge.  The Trust's exposure directives cannot be salvaged as permissible exercises of discretion.

## VII.    The Trust's Counterclaims Are Without Merit.

The Trust's four counterclaims all fail as a matter of law.  And even ignoring those deficiencies, discovery has otherwise confirmed that the Trust cannot prove any of its four counterclaims at trial.

The Trust's first counterclaim seeks a declaratory judgment that Honeywell cannot exercise contractual rights beyond those granted it in the Trust Agreement and the TDP.  Dkt. No. 171 (Adv. No. 21-2097) (Count 1) at 68–70.  The Trust asserts that Honeywell "routinely attempts to exercise rights that it does not have," including by settling claims outside the Trust, demanding that the Trust reject certain exposure evidence, and attempting to negotiate a buyout of Honeywell's evergreen funding obligation.  *See id.* ¶ 139.  But nothing in the Trust Agreement or the TDP prohibits Honeywell from negotiating a buyout or settling claims with claimant law firms.  Nor can the Trust explain how it is harmed by the possibility of a buyout or by Honeywell entering into **one** settlement with **one** claimant law firm years ago.  *See*, *e.g.*, *Kuroda v. SPSJ Holdings, L.L.C.*, 971 A.2d 872, 883–84 (Del. Ch. 2009) (holding that "resultant damage to the plaintiff" is an essential element of a breach-of-contract claim).  To the contrary, all three Trustees have acknowledged under oath that a buyout could provide a reasonable resolution here, and the parties' experts have submitted updated, similar valuations that suggest a buyout acceptable to both sides might be achievable.  *See* SOF at 21–22.  And discovery has also shown that the Trust became aware of Honeywell's one law-firm settlement but made no objection or any attempt to unwind it. *Id.* at 20–21.  Finally, Honeywell's insistence that the Trust comply with the TDP's requirements is consistent with its rights as a party to the Trust's governing documents, as well as its express and broad audit rights under the TDP.  *See* Ex. IF, TDP § 4.8(b), at HON Tr. 09466.  Two of the

trustees conceded that Honeywell has not done anything inappropriate in exercising those rights. SOF Ex. 1, Gleason Dep. Tr. at 168:18-22; SOF Ex. 5, Schiro Dep. Tr. at 152:3-15.

The Trust's second counterclaim, which requests a declaratory judgment that "Honeywell cannot interfere with the contractual rights the Trust Agreement and the TDP grant to Trustees," similarly fails. Dkt. No. 171 (Count 2) at 71. As was the case at the motion-to-dismiss hearing, none of the contractual provisions cited by the Trust impose affirmative obligations on Honeywell; rather, as the Trust accurately describes them, those provisions only "vest the Trust and the Trustees with certain powers and discretion." *Id.* ¶¶ 145, 146 (citing Trust Agreement §§ 3.1(a), 3.1(c), 5.8, 5.10). To assert a breach-of-contract claim under Delaware law, however, the Trust must "identify [an] express contractual obligation that was breached." *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 901 A.2d 106, 116 (Del. 2006); *see also Pacira Biosciences, Inc. v. Fortis Advisors LLC*, 2021 WL 4949179, at *12 (Del. Ch. Oct. 25, 2021) (granting dismissal, where contract terms "d[id] not impose any obligations on . . . Defendants").

The Trust's third counterclaim requests a declaratory judgment that "Honeywell has violated and is continuing to violate Section 524(g) of the Bankruptcy Code." Dkt. No. 171 (Count 3) ¶ 153. That claim fails at the outset because the Trust does not have a private right of action to pursue a Section 524(g) claim in an adversary proceeding like this one. *In re Joubert*, 411 F.3d 452, 456 (3rd Cir. 2005); *Pertuso v. Ford Motor Credit Co*., 233 F.3d 417, 423 (6th Cir. 2000) ("[Section] 524 does not impliedly create a private right of action"); *Walls v. Wells Fargo Bank, N.A.*, 276 F.3d 502, 510 (9th Cir. 2002) ("[W]e cannot say that Congress intended to create a private right of action under § 524, and we shall not imply one.").[4] To the extent that the Trust

---

[4]   Courts have debated whether a violation of Section 524 may be remedied under Section 105(a), which authorizes the bankruptcy court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). But the Trust is not proceeding under Section 105. And even if it

relies on Honeywell's prior attempt to negotiate a buyout or its settlement with one claimant law firm, this counterclaim fails for the same reasons as the first.

The Trust's fourth and final counterclaim, which asks that the Court "permanently enjoin Honeywell from further violations of the Trust Agreement, the TDP, and Section 524(g)," fails for all the same reasons as its underlying counterclaims. The Trust has also failed to show that it faces any harm based on Honeywell's purported misconduct, particularly with respect to a years-old settlement and a previous attempt to resolve the dispute between the parties through a negotiated buyout. *See*, *e.g.*, *In re North Am. Refractories Co.*, 542 B.R. 350, 363 (Bankr. W.D. Pa. 2015) (recognizing that courts should consider "current circumstances" and whether they "make the injunction unnecessary or inappropriate"); *see also Providence Pediatric Med. Daycare Inc. v. Alaigh*, 672 F. App'x 172, 175 (3d Cir. 2016) (courts may deny injunctive relief as moot where the "defendant has discontinued challenged activities" and "there is no reasonable expectation that the wrong will be repeated").

## CONCLUSION

For the reasons set forth above, Honeywell respectfully submits that the Trust's policies and procedures are contrary to the previous commitments it made to this Court and violate both the Trust Agreement and the TDP. The Court should enjoin those practices and direct the Trust to comply with its prior commitments, the Trust Agreement, and the TDP.

---

was, the better statutory reading is that Section 524 does not itself create adversary proceedings, and Section 105 does not allow for end-runs around that limitation. *In re Frambes*, 454 B.R. 437, 441 (Bankr. E.D. Ky. 2011).

Dated: April 22, 2022

KIRKLAND & ELLIS LLP

Craig S. Primis, P.C.
(admitted *pro hac vice*)

Ronald K. Anguas, Jr.
(admitted *pro hac vice*)

1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone: (202) 389-5000
Facsimile: (202) 389-5200

Nicole L. Greenblatt, P.C.
(admitted *pro hac vice*)

601 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-4800

MCDERMOTT WILL & EMERY LLP

Michael R. Huttenlocher

One Vanderbilt Avenue
New York, New York 10017-3852
Telephone: (212) 547-5400
Facsimile: (212) 547-5444

QUINN, BUSECK, LEEMHUIS, TOOHEY & KROTO, INC.

*/s/ Michael P. Kruszewski*
Michael P. Kruszewski
(Pennsylvania Supreme Court ID #91239)

Arthur D. Martinucci
(Pennsylvania Supreme Court ID #63699)

2222 W. Grandview Blvd.
Erie, Pennsylvania 16506
Telephone: (814) 833-2222
Facsimile: (814) 833-6753
amartinucci@quinnfirm.com
mkruszewski@quinnfirm.com

*Counsel for Honeywell International Inc.*