**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE: | Misc. Case No. 15-00204-TPA |
| ALL MATTERS RELATED TO NORTH AMERICAN REFRACTORIES COMPANY, et al. in Case No. 02-20198, as affected by the May 24, 2013 Order Entering Final Decree entered at Doc. No. 7940 | Chapter 11 |
| Debtors | |
| | Adv. No. 21-2097 |
| HONEYWELL INTERNATIONAL INC., *Plaintiff*, | |
| v. | Related to Doc. No. 388 |
| NORTH AMERICAN REFRACTORIES COMPANY ASBESTOS PERSONAL INJURY SETTLEMENT TRUST, *Defendant*. | |

**PLAINTIFF HONEYWELL INTERNATIONAL INC.'S POST-TRIAL BRIEF**

## **INTRODUCTION**

Honeywell sought the Court's intervention to address a series of decisions by the NARCO Trust that significantly increase Honeywell's exposure as the evergreen funder of the Trust. Honeywell presented evidence to support those claims and seeks guidance from the Court to clarify the limits of the Trustees' discretion and ensure that claims are supported by competent and credible evidence as required by the TDP. *First*, Honeywell demonstrated, and the Trust agrees, that formulaic allegations of exposure submitted by law firms on behalf of hundreds of disparate claimants pose reliability concerns. Yet the Trust has paid more than $128 million in reliance on copy-and-paste exposure allegations. And while the Trust hired Mazars to audit these practices, Mazars passed 99% of the audited claims, relying on the say-so of those same claimant firms (including, most notably, the Nicholl firm). This was not an effective audit and did not resolve the concerns raised by formulaic exposure allegations across the affidavits. *Second*, the Trust has effectively reintroduced the refractory inference, paying thousands of claims based on allegations that the claimant was exposed to products "of the same type" as NARCO products. The text of the TDP requires competent and credible evidence of exposure to a specific NARCO asbestos-containing product. *Third*, the Trust's Individual Review ("IR") Model fails to account for language in the TDP requiring "extenuating circumstances" and improperly rewards the vast majority of claimants simply for choosing the IR process. And *fourth*, the Trust spends excessively and fails to provide Honeywell with sufficient detail to explain its inflated budget.

The facts set forth at trial warrant the Court's intervention and guidance to ensure that the Trust's policies align with the TDP, particularly those that pertain to formulaic exposure allegations. Honeywell therefore respectfully requests that the Court enter the attached Proposed Order, granting Honeywell the relief described therein.

1

## ARGUMENT

**I.     The Trust's Policies Regarding Form Affidavits Should Be Amended To Conform To The TDP And The Court's Guidance.**

### A.     The Parties Agree That Formulaic Exposure Allegations Raise Competence And Credibility Concerns.

To establish a valid claim under the NARCO TDP, claimants must satisfy two evidentiary prongs: (1) the presence of a specific NARCO asbestos-containing product at the claimant's worksite, and (2) the claimant's occupational exposure to that NARCO product on a regular basis. Tr. (5/25 PM) 97:20–98:1 (Gleason); Tr. (5/23 AM) 91:1–92:9 (Zimmerman). These are separate requirements, and each must be established by "competent and credible evidence." Tr. (5/25 AM) 101:8–17 (Gleason); *see* Ex. 384 at Trust-Trial-11008.

Shortly after the Trust began processing claims in 2014, claimant firms started submitting "form affidavits" as evidence of occupational exposure. Ex. Z at HON Tr. 01149. A form affidavit is "an affidavit that contains exposure allegations that use identical descriptive language as the language contained in other exposure affidavits submitted to the Trust." Ex. AA at HON Tr. 01166 n.5. As the Court observed, form affidavits may have some variation across certain allegations. Tr. (5/24 AM) 80:7–24 (Bekker). However, the critical exposure language that serves as proof of the required occupational exposure element is simply copied by the claimant's lawyer from another affidavit without modification. *See* Tr. (5/25 AM) 112:16–24 (Gleason); Tr. (5/26 PM) 29:4–9 (Kawaichi); Tr. (5/24 AM) 68:23–25, 75:11–20 (Bekker). The Trust agrees that copying exposure allegations makes an affidavit a form, and its claims processor CRMC identifies and tracks form affidavits on this basis. Tr. (5/26 AM) 146:13–25 (Wetherald).

Honeywell provided the Court with several examples of form affidavits at trial, including a summary chart compiled by Honeywell's expert, Louis Dudney, that compares formulaic exposure and worksite language submitted by multiple claimants. *See* Appendix A, *infra*; *see also*

2

Courtroom Ex. 19.   As demonstrated by the chart, fifteen different claimants submitted affidavits that contained identical, or nearly identical, language describing their worksites.   And eleven out of those same fifteen claimants submitted nearly identical exposure language.   *Id.*

While the occupation, dates of exposure, and worksite can vary by claimant, it is those variations that underscore the problem: it is implausible that different claimants in different occupations at different sites at different times had both an identical exposure experience and an identical recollection of that experience.   *See* Ex. Z at HON Tr. 01149.   The Trust shares these concerns.   As it once explained to the mediator, "the Trustees were unable to conclude that a pipe insulator at Champion Paper Company in Sheldon, Texas, a steamfitter at Targa Midstream Services in Mont Belvieu, Texas, and a boilermaker at Hershey Chocolate Corporation in Hershey Pennsylvania all had . . . ***identical*** exposure to NARCO products."   *Id.* at HON Tr. 01149–50 n.8.

Honeywell and the Trust have long agreed that form affidavits raise concerns about the "accuracy and the credibility" of the recycled exposure allegations contained therein.   Tr. (5/25 AM) 112:9–15 (Gleason).   The Trust had this concern with form affidavits in 2015 when it represented to the Court that it would stop accepting them.   *Id.* at 112:9–24 (Gleason).   It had this concern in 2016 when it issued directives prohibiting CRMC from relying on them.   Ex. X at HON Tr. 01111.   And it has the same concern today.   *See* Tr. (5/23 AM) 26:15–23 (Trust Opening Statement).   Indeed, according to the Trust, its concern with form affidavits has "existed every day as the settlement trust matured" since the 2015 litigation.   *Id.*

The problem with form affidavits, as the Trust has articulated, is that "claimants blindly will sign affidavits without personalization."   Ex. V at HON Tr. 01066; Tr. (5/26 PM) 76:18–22 (Schiro).   In fact, the Trust argued to the mediator during the Standstill Period that form affidavits are "functionally the same" as check-the-box affidavits, which allow a claimant to put a checkmark

next to a pre-printed allegation and which all parties agree are insufficient to demonstrate exposure to a NARCO asbestos-containing product under the TDP. *See* Ex. 384 at Trust-Trial-11027. To this day, the Trust prohibits CRMC from relying on check-the-box affidavits as NARCO exposure evidence because check-the-box affidavits "prevent the claimant from using his own language to describe exposure." Ex. V at HON Tr. 01066. Form affidavits are marginally different from check-the-box affidavits only because there may be immaterial variations across the same forms. *See* Tr. (5/23 PM 1) 150:9–22 (Calandra). But the reliability problem with form affidavits is the same: they rely on pre-printed exposure allegations that the claimant cannot personalize as proof of a requisite element of the claim.

After 2015, the Trust developed two policies that were responsive to these shared concerns. *First*, it implemented Directive 7(a), instructing CRMC to "disregard those portions of the affidavits that were copied across dozens of unrelated claims." Ex. Z at HON Tr. 01150. *Second*, it instructed CRMC to track the various types of forms that were being submitted. Tr. (5/26 PM) 73:21–74:2 (Schiro). The Trust later added a computer program to assist CRMC's human reviewers in recognizing forms and assigning each type of form a "form identifier." Tr. (5/26 AM) 146:13–25 (Wetherald). As Mr. Gleason testified, that tracking system was developed because the Trust had "concern" and wanted to conduct "an initial screening" to identify the formulaic exposure language in form affidavits. Tr. (5/25 PM) 92:23–93:8 (Gleason).

Despite these concerns, in February 2018, the Trust reversed course on its form policy by making two revisions to its directives: it eliminated Directive 7(a), which previously prohibited CRMC's reliance on form affidavits, and it added Directive 16, which mandates that CRMC consider form affidavits in three specific circumstances. Ex. 260 at Trust-Trial-06151. As a result of these changes, the Trust went on to pay more than $128 million in reliance on formulaic

4

exposure allegations.  *See* Ex. BP at HON Tr. 02204.  This increased reliance on form affidavits left Honeywell no choice but to seek the Court's guidance on whether form affidavits are, in fact, competent and credible evidence under the TDP.

### B. The Trust's Policy Change Does Not Address The Concerns Raised By Form Affidavits.

There is an inherent implausibility in hundreds of differently situated claimants alleging identical recollections of exposure to NARCO products, and the Trust has consistently expressed "concern" about this type of exposure evidence.  *See* Tr. (5/23 AM) 26:15–23 (Trust Opening Statement).  Honeywell has sought the Court's guidance through this litigation because the Trust's Directive 16 "fix" for deficiencies does not address the underlying competence and credibility problems that motivated the ban on formulaic exposure evidence in the first place.

Directive 16(b)(i) requires consideration of a form affidavit submitted by a claimant who was on an Approved Worksite during the stipulated time frame.  Ex. 260 at Trust-Trial-06151.  But the gating item of an Approved Worksite shows only that a NARCO product was ***present*** somewhere on the worksite, not that the claimant was actually exposed to it on a regular basis, as the TDP requires. Tr. (5/25 PM) 98:7–10, 99:2–9 (Gleason).  Presence alone is not sufficient proof of exposure.  *Id.* at 97:20–98:6 (Gleason).  This bootstrapping of the exposure prong through the presence prong is not permitted by the TDP.

Directive 16(b)(ii) applies to claimants on Approved Worksites ***after*** the stipulated timeframe.  Ex. 260 at Trust-Trial-06151.  For these claimants, there is not even a presumption of NARCO presence.  Tr. (5/25 PM) 99:25–100:5 (Gleason).  Nevertheless, their form affidavits will be considered if they contain an eyewitness statement of the claimant's exposure.  Ex. 260 at Trust-Trial-06151.  But as Mr. Gleason testified, the same eyewitness statement can be copied and pasted across 20, 30, or 40 different affidavits, and it will be credited under Directive 16(b)(ii).  Tr. (5/25

PM) 100:6–13 (Gleason).  These recycled eyewitness statements pose the same reliability concern as form affidavits more generally: they raise the "question [of] whether that purported eyewitness really was an eyewitness . . . or did they blindly sign."  Tr. (5/23 PM 1) 50:7–15 (Calandra).

Finally, Directive 16(b)(iii) addresses non-Approved Worksites and Approved Worksites before the stipulated timeframe (Ex. 260 at Trust-Trial-06151)—that is, sites where there is no evidence that NARCO was present at the time the claimant was there.  Tr. (5/23 PM 1) 51:10–22 (Calandra).  In that circumstance, the claimant need only include an eyewitness statement (even if it is copied verbatim from another affidavit) and show that he worked in an occupation where he had presumptive "significant occupational exposure" or "SOE."  Ex. 260 at Trust-Trial-06151. SOE means that the claimant had five years of exposure to asbestos generally—not to NARCO asbestos products specifically.  Tr. (5/23 PM 1) 51:10–52:4 (Calandra).  And there are twice as many SOE presumptive occupations as there are NARCO presumptive occupations, meaning that many claimants are benefitting from Directive 16(b)(iii) even though they worked in an occupation that has no presumptive exposure to NARCO.  *Id.* at 51:10–52:19 (Calandra).

While each of the three subparts of Directive 16(b) raises individual concerns, the fundamental problem with all of them is that they do not address the underlying reliability concern that formulaic exposure allegations are signed blindly by hundreds or even thousands of claimants. Tr. (5/26 PM) 32:7–11 (Kawaichi) & 76:18–22 (Schiro).  Copy-and-paste exposure allegations (or eyewitness allegations) taken from someone else's affidavit do not confirm that the affiant actually had the personal knowledge he or she is attesting to.  The Trust acknowledges that the purpose behind Directive 16 was to reduce the number of deficiencies it was issuing. Tr. (5/26 PM) 81:20– 24 (Schiro).  Indeed, Directive 16 was intended to and does have a "maximum reach" to justify the Trust's reliance on formulaic exposure allegations in the "vast majority" of circumstances.  Tr.

(5/23 PM 1) 52:11–19, 66:16–21 (Calandra); *see* Ex. 260 at Trust-Trial-06151.

Compounding this concern is the fact that the Trustees have not monitored the effects of Directive 16 on the volume of claims paid based on forms, even though CRMC has this data available. Since the policy change, the Trustees have not received regular reporting on CRMC's review of form affidavits. Tr. (5/25 PM) 104:19–105:3 (Gleason). As a result, they did not know which firms were the top filers of form affidavits (*id.* at 103:16–23 (Gleason); Tr. (5/26 PM) 29:19–23 (Kawaichi); *id.* at 75:2–76:17 (Schiro)), which firms had received the most payments in reliance on form affidavits (*id.* at 76:3–6 (Schiro)), which form affidavit was most commonly used or which firm submitted it (*id.* at 75:24–76:2 (Schiro)), how many forms CRMC had identified (*id.* at 74:23–75:1 (Schiro)), or that some firms had been paid based on the same formulaic exposure allegations hundreds—even thousands—of times (*id.* at 30:20–24 (Kawaichi)); *see also* Ex. BM at HON Tr. 02190. The Trust's failure to monitor the prevalence of formulaic exposure language in affidavits, despite its admitted concerns, underscores the need for increased vigilance around exposure evidence.

### C. The Trust's New Policy Has Resulted in the Overpayment of Claims Relying on Affidavits With Formulaic Exposure Language.

The Trust's new policy has led to the payment of a large number of claims that rely on affidavits using formulaic exposure language with no meaningful check on the reliability of those affidavits. Since CRMC began tracking form identifiers in 2017, the Trust has relied on affidavits with formulaic exposure language to pay over $128 million in claims. Ex. BP at HON Tr. 02204; Tr. (5/24 AM) 83:10–84:5 (Bekker) & 93:12–94:3 (Bekker); Ex. BM. *See also* 4/29/22 Stip. Facts ¶ 79 (Dkt. No. 347). To date, CRMC has identified over 300 different types of forms. Some of those individual forms have supported hundreds and even thousands of paid claims using virtually identical exposure allegations. Ex. BM at HON Tr. 02190–95; Tr. (5/26 AM) 123:9–11

7

(Wetherald).   The parties agree that the Trust has paid over 13,800 claims that include form identifiers.  4/29/22 Stip. Facts ¶ 79 (Dkt. No. 347).

Form affidavits are concerning to the Trust and Honeywell for their marked similarities, despite some differences.  *See* Ex. BR.  As discussed above, while each form includes specific biographical details that correspond to the affiant—such as the claimant's name, occupation, and location—in many cases, the differences stop there.  *See id.*  A closer look at a single form identifier, Form-269, is telling.  Honeywell submitted five examples of Form-269 into evidence. Ex. BR at HON Tr. 02216–25.  All five affiants worked at different locations and in different roles: a laborer at Pangborn in Maryland (Ex. BR at HON Tr. 02217), a Boiler Worker at U.S. Silica in Pennsylvania (*id.* at HON Tr. 02219), an Insulator at Lohmann Supply Company in Missouri (*id.* at HON Tr. 02221), a sheetmetal worker at General Dynamics in Texas (*id.* at HON Tr. 02223), and a Boiler Worker for the Department of Defense in South Carolina (*id.* at HON Tr. 02225). Despite these varied worksites and occupations, all five affiants had the ***exact same*** recollection of their NARCO exposure and their interaction with NARCO asbestos-containing products:

> "We knew this [Product Type] cement was [Product Name] because we called it that.   We knew it contained asbestos because we referred to it as asbestos."

> "In order to [Job Description], we had to cut off the asbestos-containing [Product Name].   To reapply it, we poured it in a bucket and mixed it with water.  These processes made asbestos dust go airborne. When we swept up after this work, asbestos dust went airborne as well."

Ex. BR at HON Tr. 02216–25 ¶¶ 4, 6.  All five of these claims were paid by the NARCO Trust, and in total, 126 claims relying on this same form identifier, Form-269, were paid—for a total of $1,428,000.  Ex. BM at HON Tr. 02190.  It strains credulity to think that such a diverse set of claimants—from different professions at disparate job sites around the country—had the same word-for-word experience with NARCO asbestos-containing products.  As noted above, the Trust identified this same incredulity to the mediator, and the same concerns hold here.

### D. Inconsistencies Between Tort System Statements and Form Affidavits Demonstrate the Reliability Problems with Form Affidavits.

Beyond their facial implausibility, affidavits with formulaic exposure language present another reliability problem: in many instances, they contradict other sworn statements made by the same individuals, typically in depositions or interrogatory responses offered in the tort system against other defendants. Both the Trust and Honeywell have identified various discrepancies and inconsistencies between form affidavits, on the one hand, and statements made by that same individual in depositions and interrogatories, on the other hand.

By way of example shown at trial (Tr. (5/24 AM) 96:18–100:8 (Bekker)), a 2014 NARCO Trust affidavit submitted by a claimant's daughter (Ex. CO at HON Tr. 04641) is inconsistent with that affiant's earlier deposition testimony (Ex. CP at HON Tr. 04642). In 2008, the affiant testified that her mother "never" told her that she worked with or around asbestos-containing products, she had "no personal knowledge as to any asbestos-containing products [her mother] may have worked with or around," and admitted that she "wouldn't be able to identify any manufacturers of asbestos containing products" and "wouldn't happen to know the names of any suppliers of asbestos-containing products to Great Lakes Steel while [her] mother worked there." *Id.* at HON Tr. 04665. Yet, six years later, the affiant submitted a detailed affidavit to the NARCO Trust stating that her mother "would have assisted bricklayers by dumping and mixing numerous bags of the castable and gunnite materials manufactured by NARCO" and "had to remove the castable and gunnite materials manufactured by NARCO after it had been used and required to be replaced." Ex. CO at HON Tr. 04641. Both cannot be true. These discrepancies between form affidavits and the affiant's personal knowledge raise serious questions about the reliability of the affidavits. Honeywell provided the Trust with 738 examples of form affidavits submitted to the Trust that were inconsistent with tort system statements, along with the underlying documentation, including

the claim IDs and the inconsistent litigation documents.  Ex. AU at HON Tr. 01578–01581.

II.    **The Trust's Audit Program Has Failed To Reconcile Many Of The Issues That Honeywell And The Trust Itself Have Identified In Claims Filings.**

The Trust's Claims Audit Program ("CAP") has failed to achieve its goal of providing a meaningful check on form affidavits and other problematic exposure evidence.  Under the CAP, the Trust engaged Mazars to conduct a series of random and targeted audits.  *See* Ex. HQ (Nicholl Targeted Audit Report) at HON Tr. 08549; Tr. (5/23 PM 1) 107:11–14 (Calandra).   For both types of audits, Mazars was charged with evaluating "all documentation" provided by the law firm to answer questions such as: "Is there ***documentation*** within the law firm's file to support the reliability of the exposure and medical information submitted to the Trust?" *See* Ex. HG at HON Tr. 08370 (emphasis added); Tr. (5/24 PM 1) 126:11–127:4 (Dudney); Tr. (5/24 PM 2) 16:5–17:3 (Dudney).  But as set forth below and at trial, Mazars frequently "passed" audited claims without reviewing any additional documentation called for by the CAP, undermining Mazars' conclusions and calling into question whether supporting documentation exists within the law firm's files.

The core problem with Mazars' reports stems from Mazars' acceptance of claims of privilege by claimant law firms and their decision to "pass" audited claims based on verbal and written representations by those claimant law firms, without reviewing documentation in the files. Honeywell's expert, Louis Dudney, concluded these reports had serious reliability issues as a result.  *See* Tr. (5/24 PM 1) 135:2–18; *id.* at 144:6–17.  Mr. Dudney and his team reviewed 1,482 random audit reports and determined that Mazars "passed" more than 99% of those claims, with only 13 out of the 1,482 audited claims "fail[ing]" the audit and over half of them relying exclusively on testimonial evidence to pass.  Tr. (5/24 PM 1) 122:17–123:21 (Dudney); Ex. EW at HON Tr. 06838–06873.   As Mr. Dudney explained, the lack of independently verifiable information means there was "no way for Mazars to really test" the claims submitted to the Trust.

Tr. (5/24 PM 1) 135:2–18 (Dudney).

The Peter T. Nicholl Firm Targeted Audit Report suffered from similar deficiencies, and Mr. Dudney concluded that it, too, had serious limitations. *Id.* at 148:5–18 (Dudney).  In the Nicholl Audit, Mazars assessed issues identified by the Trust and Honeywell including form language across multiple affidavits and inconsistencies between the affidavits and litigation documents.  The Nicholl Audit was important because the Nicholl Firm is by far the most prolific filer of affidavits using formulaic exposure language.  The Nicholl Firm has been paid in excess of $75 million in reliance on such affidavits since CRMC began using form identifiers in 2017. Tr. (5/25 PM) 104:7–9 (Gleason); Ex. BP at HON Tr. 02204; Tr. (5/24 AM) 93:18–94:7 (Bekker).

Throughout the course of the audit, Mazars was "stymied in [its] efforts to obtain additional documentation" that would verify the affidavits submitted by the Nicholl Firm, and the Nicholl Firm similarly refused Mazars' requests for on-site visits.  Tr. (5/24 PM 1) 162:13–163:13 (Dudney).  The CAP requires that the auditor collect "non-privileged documentation" from these law firms as part of the audit, but the Nicholl Firm claimed privilege over certain documentation and factual information that it purportedly keeps in its files that could provide additional support for its clients' claims.  Ex. HQ at HON Tr. 08553.  Some of the claimant information, such as facts about work history and other biographical information, is plainly not privileged, but the Nicholl Firm refused to provide it anyway.  Tellingly, in other situations, the Nicholl Firm freely disclosed attorney-client communications.  *See* Ex. HQ at HON Tr. 08561 (Nicholl explaining that claimants are "advised to avoid naming all product exposures during depositions" and are "instructed to answer only in respect to the product manufacturer the questioning attorney is representing").  Mazars accepted these broad privilege assertions by the Nicholl Firm, even after Nicholl informed them (and the Trust) that "'[p]ersonal knowledge' as referenced in affidavits can include attorney

discussions regarding product placement and job roles." *See* Ex. HQ at HON Tr. 08553 ("Privilege was determined by the Nicholl Firm."); Ex. GA at HON Tr. 07743 (draft Nicholl representation letter sent to Mazars and Trustees).

Ultimately, Mazars relied on written and oral representations by the Nicholl Firm to issue a clean CAP assessment. *See* Ex. HQ at HON Tr. 08577; Tr. (5/24 PM 1) 164:24–165:7 (Dudney). The assessment provides little comfort, however, as even Mazars recognized significant limitations to its work, stating: "Mazars are not able to verify the representations made by the Nicholl Firm, first hand." Ex. HQ at HON Tr. 08554. While Mazars sought to verify the reliability of these claims, it ultimately relied on "representations by a party in interest to the outcome of the claim," and Mr. Dudney himself acknowledged that he "would have pushed harder." Tr. (5/24 PM 2) 15:19–16:4 (Dudney); *id.* at 58:1–16 (Dudney). The CAP should provide a real check on the claims and the evidence submitted to the Trust, but it has not achieved that stated goal.

### III.       The Trust Has Effectively Reintroduced the Refractory Inference.

The evidence also showed that the Trust is approving a large number of claims where the claimant fails to identify a NARCO asbestos-containing product, as required by the TDP. The Trust now asserts that it reviews such claims on a case-by-case basis for other indications that the claimant was exposed to a NARCO asbestos-containing product, but it remains unclear following trial what information the Trust relies on in those instances.

In 2015, the Trust's claims processor relied on an "exposure decision tree" to process claims. Ex. BD at HON Tr. 02115; *see also* Tr. (5/23 PM 1) 111:21–112:5 (Calandra). That decision tree allowed for what the parties call a "refractory inference": if a claimant was on an "Approved Worksite" (but not also in a presumptive NARCO occupation or industry), the claimant was ***not*** required "to identify a specific NARCO product." Ex. BD at HON Tr. 02116. Instead, the claimant needed only to "provide a generic product name that fits the description of a NARCO

asbestos-containing product (e.g. - brick, trowel, finishing cement)" to establish exposure. *Id.* Such an inference is not permitted under the TDP because, among other provisions, Section 4.7(b) requires a claimant to "submit requisite evidence of exposure to a ***specific*** asbestos-containing product manufactured, sold or distributed by NARCO or its predecessors . . . ." Ex. B at HON Tr. 00088 (emphasis added); *see also* Tr. (5/23 AM) 109:2–11 (Zimmerman) ("The TDP requires the identification of a specific NARCO asbestos-containing product . . . .").

In light of the TDP's requirements, the Trust agreed in 2016 to stop employing an inference when a claimant on an Approved Worksite fails to allege exposure to a NARCO asbestos-containing product. Ex. 112 at Trust-Trial-02838. And it implemented worksheets for CRMC to use that were consistent with that commitment. Ex. AZ at HON Tr. 02028-29. Those worksheets did ***not*** permit claimants to establish exposure by stating they worked with refractory products of the same type that NARCO made, as the 2014 decision tree had allowed. *Id.*

In January 2019, however, the Trust changed course. It amended its worksheets to again permit a refractory inference with the same effect as the inference previously contained in the 2014 decision tree. *See* Ex. BA at HON Tr. 02032. Those changes, which are still in effect today, allow claims reviewers to consider allegations of exposure "to one or more asbestos-containing products ***of the same types*** as NARCO asbestos-containing products" when a claimant on an Approved Worksite fails to identify a NARCO product by name or even a NARCO product generally. *Id.* at HON Tr. 02099 (emphasis added); *see* Ex. 305 at Trust-Trial-07313-14 (current worksheets using same language). The worksheets go on to ask "[i]f after review of all the exposure evidence submitted in support of the claim," the reviewer "consider[s] it ***likely*** that the claimant was exposed to a NARCO asbestos containing product." Ex. BA at HON Tr. 02099 (emphasis added). At the time of the change in 2019, Honeywell was hopeful the additional follow-on question would ensure

13

that the Trust, as it promised in 2016, would meaningfully evaluate claims on a case-by-case basis. *See* Tr. (5/23 PM 1) 120:3–18, 121:14–122:4 (Calandra); Ex. BB at HON Tr. 02105.

That is not what happened.  After changing its worksheets, the Trust began paying claims even without reference to a NARCO asbestos-containing product anywhere in the claimant's file. *See, e.g.*, Ex. BU at HON Tr. 02534-02608; *see also* Tr. (5/24 AM) 103:4–23, 105:1–22 (Bekker). In those situations, the Trust's claims processor codes the claim file as "no product identified," meaning it does not reference a NARCO product.  Tr. (5/24 AM) 106:5–20 (Bekker).  Honeywell has reviewed over 1,000 claims coded as such, all of which have been paid by the Trust.  *Id.* at 106:21–107:7 (Bekker).  The volume of claims paid where the claim file contains no reference to a NARCO product confirms what the Trust is doing: inferring exposure to a NARCO asbestos-containing product when a claimant identifies only generic refractory products that are similar in kind to NARCO products.  That practice is inconsistent with the TDP, and the Trust should explain what additional information in those files is sufficient to establish that the claims are valid.

## IV.    The IR Model Violates the TDP.

The Trust has also violated the TDP by utilizing an IR Model that fails to consider whether and to what extent an IR claimant "has extenuating circumstances" in determining payment values. Ex. B at HON Tr. 00074 (TDP § 4.3(b)(1)).  As a result, even claimants with typical circumstances generally receive much more than Scheduled Value, and the Trust's IR Model thus rewards the vast majority of claimants simply for choosing IR.  *See* Tr. (5/24 PM 1) 47:7–15 (Choi).   That approach contradicts the TDP's express language and is at odds with its negotiating history.

The key problem with the IR Model is that it ignores the "extenuating circumstances" requirement set forth in Section 4.3(b)(1) of the TDP, which states that the IR process "provides a claimant with an opportunity for individual consideration and evaluation of a NARCO Asbestos Trust Claim … where the claimant ***has extenuating circumstances*** that he or she believes warrant

14

a liquidated value above the applicable Scheduled Value." Ex. B at at HON Tr. 00074 (emphasis

added).   Under Section 4.3(b)(1), then, a claimant must actually and objectively *have* some

"extenuating circumstances" that justify a payment above Scheduled Value.  The provision does

go on to allow a claimant to pursue a claim through the IR process where they "believe" their

circumstances warrant a higher payment, but that belief alone is not sufficient to secure an

increased payment under IR.  A payment above Scheduled Value is available only "where the

claimant has extenuating circumstances."  But, as Dr. Choi testified, under the current IR Model

"a claimant is rewarded simply for choosing IR as opposed to having distinctive characteristics,"

Tr. (5/24 PM 1) 57:4–6 (Choi).  By rewarding typical claimants that have typical circumstances

with payments far above Scheduled Value, the IR Model violates the TDP's express terms.

The TDP's negotiation history reinforces that conclusion.  Under Delaware law, "the

seminal rule of construction in trust cases [is] that the settlor's intent controls the interpretation of

the instrument."  *Annan v. Wilmington Tr. Co.*, 559 A.2d 1289, 1292 (Del. 1989).  Here,

Honeywell's chief negotiator of the TDP, Craig Zimmerman, testified that "[i]ndividual review

was intended to be for those claimants who had some -- form of extenuating circumstance," and

that the TDP requires "the trustees['] evaluation of those factors [set forth in Section 4.3(b)(2)] to

determine whether extenuating circumstances were there."  Tr. (5/23 AM) 109:22–110:6

(Zimmerman).  As Mr. Zimmerman testified, "Individual Review was intended to include only

those folks . . . who actually had extenuating circumstances."  *Id.* at 115:4–6 (Zimmerman).

Moreover, contemporaneous documents confirm Honeywell communicated its understanding of

IR to the Trust stakeholders.  In January 2005, Mr. Zimmerman explained to the ACC and FCR

that IR was intended for "those claims in which extenuating circumstances warranted a liquidated

value in excess of Scheduled Values."  Ex. 49 at Trust-Trial-01076.  The Trust, TAC, and FCR

15

offered no testimony in response from anyone else who played a part in the TDP's formation.

Yet, the IR Model was not designed to distinguish claimants with extenuating circumstances from typical claimants.  *See* Tr. (5/26 AM) 80:12–21 (Wyner).  The historical data bears that out.  Tr. (5/24 PM 1) 56:20–22 (Choi).  Instead, as Dr. Choi testified, "if you're an average claimant, if you're a claimant that has average characteristics based on historical data or based on ER comparisons, you're primarily going to stay in that vicinity of the starting value"— which, for mesothelioma claims, means receiving about $220,000, almost triple the Scheduled Value.  *See* Tr. (5/24 PM 1) 40:17–20 (Choi).  Thus "a claimant is rewarded simply for choosing IR as opposed to having distinctive characteristics." *Id.* at 57:4–6 (Choi).  In short, the IR Model fails to consider whether a claimant has extenuating circumstances before assigning claim values that are usually multiples of the Scheduled Value.

The Trust appears to assert that whether "extenuating circumstances" exist is a matter claimants decide for themselves before choosing IR.  *See* Tr. (5/26 AM) 79:4–15 (Wyner).  But that effectively negates the phrase "has extenuating circumstances" and replaces it with a subjective requirement that a claimant need only believe, however unreasonably, that he or she has circumstances that warrant a payment above Scheduled Value.  Delaware law does not permit negotiated language to be set aside in that way.  *See Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010) ("We will read a contract as a whole and we will give each provision and term effect, so as not to render any part of the contract mere surplusage.").  Understanding Section 4.3(b)(1) to instead refer to a claimant's objective circumstances gives effect to the "extenuating circumstances" language and avoids the surplusage problem presented by the Trust's approach.

Nor does any other part of the TDP allow the Trust to disregard whether IR claimants have extenuating circumstances.  The Trust appears to view Footnote 8 as a requirement to hit certain

yearly average values for IR claimants, currently about $220,000 for Level 7 (Mesothelioma) claims. *See* Tr. (5/26 AM) 75:6–7 (Wyner); Tr. (5/25 PM) 66:14–23 (Gleason). But Footnote 8 does not operate that way. Instead, it expressly ***excludes*** claims "at or below the Scheduled Value" from the calculations of annual averages. Ex. B at HON Tr. 00079. In doing so, Footnote 8 indicates that the Trustees' duty to "use their best efforts" to ensure that annual claims values average out to certain amounts applies only to those claimants who have extenuating circumstances. *See id.* This conforms to the rest of the TDP and the evidence establishing that IR's higher payouts were intended for claimants "who actually had extenuating circumstances." *See* Tr. (5/23 AM) 115:5–6 (Zimmerman). Accordingly, the Court should order the Trust to implement an IR model that comports with the TDP and takes into account whether a claimant has extenuating circumstances that justify a payment above Scheduled Value.

## V.   The Trust Should Budget and Spend More Responsibly.

For years, the Trust has failed to provide Honeywell with an operating budget that "set[s] forth in ***reasonable detail*** the proposed Trust Expenses." Ex. 2, Trust Agreement § 3.4, at Trust-Trial-00145 (emphasis added). Instead, the Trust provides Honeywell with a two-page summary of projected costs by vendor to support its budgets that often exceed $20 million. Exs. JS, DP, DQ. Honeywell has many times requested additional support for the Trust's budgets. Tr. (5/24 AM) 16:8–10; 17:2–9 (Kelly). 2018 was the first and only time the Trust provided that detail. Tr. (5/24 AM) 20:25–21:4; 22:13–16; 23:22–24:4 (Kelly). In response to a request from Bob Kelly, Honeywell's assistant corporate controller, the Trust provided backup it receives from its vendors—including projected tasks, hours, and rates—as well as the Trustees' estimates of their hours. Ex. 197; Tr. (5/24 AM) 16:8–21:4 (Kelly). That level of detail is necessary, particularly because the annual budgets include $500,000 or more for each trustee's fees and expenses. *See, e.g.*, Ex. JS at HON Tr. 10228; Ex. DP at HON Tr. 06018; Ex. DQ at HON Tr. 06021. While the

Trust claims that it would have provided this information if Honeywell had asked for it, Mr. Kelly

recalls that Honeywell did ask, and the Trust did not always provide the requested data.  Tr. (5/25

PM) 84:2–85:13 (Gleason); Tr. (5/24 AM) 17:2–9 (Kelly).  Honeywell nonetheless appreciates the

offer implicit in Mr. Gleason's testimony to provide this level of detail going forward.  That

commitment, if honored, resolves the dispute with respect to delivering budget information.

Beyond providing more detailed budgets, however, the Trust must also reduce its actual

operating expenses.  The Trust has spent, on average, over $15 million a year on expenses.

Courtroom Ex. 15 (HON Tr. 10343).  The Trust points to Honeywell's involvement with the Trust

and the parties' disputes to justify its expenses.  But after removing all legal expenses—not just

litigation expenses—the Trust still spends an average of almost $7.5 million per year.  Courtroom

Ex. 16 (HON Tr. 10344).  And although the Trust attributes its high spending to Honeywell, as

discussed above, the Trustees have not been fully engaged in monitoring the concerns that

Honeywell has raised with respect to the Trust's operations.  *See supra* I.C.  In all events, with

years of experience paying claims, the Trust can and should run at greatly reduced cost.

## VI.    The Trust's Counterclaims Should Be Denied.

Although the Trust makes various allegations against Honeywell in its four counterclaims,

its affirmative case boils down to two primary assertions.  *First*, the Trust contends that by

considering filing suit against the Trust at various times in the past and by bringing the instant

lawsuit, Honeywell is violating its obligations under Section 524(g) of the Bankruptcy Code and

the Trust's governing documents.  *Second*, the Trust insists that Honeywell's previous settlement

of claims outside the Trust process was improper and likewise violates Section 524(g).  The

evidence presented at trial cannot sustain either claim.[1]

---

[1] In addition to a lack of sufficient evidence, the Trust's counterclaims suffer from the same legal
deficiencies identified in Honeywell's pre-trial brief.  Dkt. No. 335 at 18–20; *see also* Adv. No.

With respect to Honeywell's contemplated litigation, it is true that at various points since the Trust's creation, Honeywell and the Trust have disputed what constitutes a valid claim that should be paid under the TDP.  And it is also true that Honeywell—consistent with its broad audit rights—has raised various issues with the Trust about how the Trust processes claims.  As the Trust acknowledges, there was nothing improper about Honeywell exercising those audit rights. Tr. (5/25 PM) 126:8–23 (Gleason); Tr. (5/26 PM) 93:2–9 (Schiro).  When those issues could not be resolved between the parties, Honeywell has at times informed the Trust of its intention to initiate litigation.  But each time, the parties agreed to pursue other options short of court intervention, including mediation and a buyout.[2]  Those options were not successful, and Honeywell brought this suit to ensure the Trust is processing claims in accordance with the TDP.

The Trust failed to put forward any evidence that Honeywell's exercise of its audit rights has interfered with the operation of the Trust.  Without context, the Trust presented a few excerpts from a 2018 letter from Honeywell to the Securities & Exchange Commission about Honeywell's 2017 10-K.  That letter nowhere states that Honeywell had suppressed the filing of *valid* claims,

---

21-2096, Dkt. No. 111 at 4–18 (Honeywell's Motion to Dismiss).  To the extent the Trust contends that Honeywell is violating Section 524(g), those claims fail because the Trust does not have a private right of action to pursue a Section 524(g) claim in this adversary proceeding. *In re Joubert*, 411 F.3d 452, 456 (3rd Cir. 2005); *Walls v. Wells Fargo Bank, N.A.*, 276 F.3d 502, 510 (9th Cir. 2002) ("[W]e cannot say that Congress intended to create a private right of action under § 524, and we shall not imply one."); *Pertuso v. Ford Motor Credit Co.*, 233 F.3d 417, 423 (6th Cir. 2000).  To the extent that the Trust seeks a permanent injunction based on the attempted buyout or Honeywell's previous settlement with one claimant law firm, it fails to show what harm it *currently* faces based on Honeywell's purported misconduct.  *See, e.g.*, *In re North Am. Refractories Co.*, 542 B.R. 350, 363 (Bankr. W.D. Pa. 2015) (recognizing that courts should consider "current circumstances" and whether they "make the injunction unnecessary or inappropriate").

[2] Each of the Trust's counterclaims refer to Honeywell's prior attempt to negotiate a buyout. Although the Trust objects to the process by which Honeywell pursued that buyout, all three Trustees have since expressed openness to the concept of a buyout as a means to resolve the parties' disputes.  Tr. (5/25 PM) 126:1–7 (Gleason); Tr. (5/26 PM) 53:2–4 (Kawaichi); Tr. (5/26 PM) 92:12–15 (Schiro).

as the Trust suggests. Rather, the letter noted that Honeywell had heard, anecdotally, that the parties' disputes and Honeywell's vigilance had led some firms to adopt what amounts to a wait-and-see approach. From 2015 to 2018, the Trust frequently changed its policies, so it stands to reason that that firms might have, for a time, held off on filing claims in order to gain clarity as the Trust and its policies adjusted. The Trust offers no evidence that this wait-and-see approach has continued and, as both the Trust's and Honeywell's valuation experts testified, claims against the Trust have trended higher in recent years. Tr. (5/26 AM) 21:23–22:15 (Finch); Tr. (5/26 PM) 10:16–12:1 (Horewitz). Mr. Gleason also confirmed that the Trust is promptly and efficiently paying 100% of the claims it deems valid. Tr. (5/25 PM) 126:24–127:11 (Gleason).

With respect to Honeywell's attempts to settle with claimant law firms outside of the Trust process, the Trust's claims fail on multiple fronts. *First*, Honeywell only settled with ***one*** claimant law firm, the Goldberg firm, in 2018—four years ago. Tr. (5/23 PM 1) 125:16–17 (Calandra). Since late 2018, Honeywell has not settled with any other claimant law firms, nor has it attempted to do so. *Id*. at 126:7–10 (Calandra). *Second*, Honeywell informed the Trust of the negotiations with the Goldberg firm in early 2018, and it provided the Trust with a copy of the executed agreement later that year. *Id.* at 125:11–126:2 (Calandra). The Trust made no objection at the time, nor does it now ask the Court to unwind that settlement. *Id.* at 126:3–6 (Calandra); *see* Dkt. No. 171 at 75–77. There is good reason for that: the claimants covered by the Goldberg settlement were represented by sophisticated counsel and chose to settle their claims according to that agreement's terms. The Trust has no basis for its claims against Honeywell.

## **<u>CONCLUSION</u>**

For all of the foregoing reasons, the Court should enter judgment in favor of Honeywell on its pending claims and enter the Proposed Order attached hereto.

Dated: June 14, 2022

KIRKLAND & ELLIS LLP

Craig S. Primis, P.C.
(admitted *pro hac vice*)

Ronald K. Anguas, Jr.
(admitted *pro hac vice*)

1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone: (202) 389-5000
Facsimile: (202) 389-5200

Nicole L. Greenblatt, P.C.
(admitted *pro hac vice*)

601 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-4800

MCDERMOTT WILL & EMERY LLP

Michael R. Huttenlocher

One Vanderbilt Avenue
New York, New York 10017-3852
Telephone: (212) 547-5400
Facsimile: (212) 547-5444

QUINN, BUSECK, LEEMHUIS, TOOHEY & KROTO, INC.

*/s/ Michael P. Kruszewski*
Michael P. Kruszewski
(Pennsylvania Supreme Court ID #91239)

Arthur D. Martinucci
(Pennsylvania Supreme Court ID #63699)

2222 W. Grandview Blvd.
Erie, Pennsylvania 16506
Telephone: (814) 833-2222
Facsimile: (814) 833-6753
amartinucci@quinnfirm.com
mkruszewski@quinnfirm.com

*Counsel for Honeywell International Inc.*