**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE:<br><br>ALL MATTERS RELATED TO NORTH AMERICAN REFRACTORIES COMPANY, et al.<br><br>     Debtors.<br><br>HONEYWELL INTERNATIONAL INC.,<br><br>     Plaintiff,<br>v.<br><br>NORTH AMERICAN REFRACTORIES COMPANY ASBESTOS PERSONAL INJURY SETTLEMENT TRUST,<br><br>     Defendant. | Misc. Case No. 15-00204 TPA<br><br><br>Adversary Proceeding No. 21-02097 TPA |

**THE NARCO SETTLEMENT TRUST'S**
**<u>POST-TRIAL BRIEF</u>**

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................. 1

ARGUMENT ........................................................................................................................... 4

I.      HONEYWELL'S BURDEN OF PROOF .......................................................................... 4

II.    HONEYWELL FAILED TO PROVE THAT THE TRUST'S EXPOSURE
DIRECTIVES CONSTITUTE AN ABUSE OF DISCRETION. ....................................... 4

     A.   Honeywell Failed to Prove That the Trustees Abuse Their Discretion by Considering
"Form Affidavits" with Indicia of Reliability.................................................................. 4

     B.   Honeywell Failed to Prove That Considering "Check-the-Box" Affidavits for the
Limited Purpose of Proving SOE Is an Abuse of Discretion........................................ 9

     C.   Honeywell Failed to Prove That Accepting Exposure Affidavits Containing the
Words "Regular Basis" or "Close Proximity" Is an Abuse of Discretion. ................. 10

III.   HONEYWELL FAILED TO PROVE THAT THE TRUST HAS INSTITUTED A
"BLANKET REFRACTORY INFERENCE."................................................................. 10

IV.   HONEYWELL FAILED TO PROVE THAT THE TRUST HAS "ACCEPTED"
NARCO EXPOSURE AFFIDAVITS WITH MATERIAL INCONSISTENCIES.......... 12

V.    HONEYWELL FAILED TO PROVE THAT THE TRUST'S IR MODEL IS AN
ABUSE OF DISCRETION............................................................................................ 14

VI.   HONEYWELL FAILED TO PROVE THE TRUST MISUSES ITS FUNDS. ............... 15

VII.  HONEYWELL IS NOT ENTITLED TO A DECLARATORY JUDGMENT................ 19

VIII. THE TRUST PROVED ITS ENTITLEMENT TO A DECLARATION AND
INJUNCTION CONCERNING HONEYWELL'S FUTURE CONDUCT. ..................... 19

CONCLUSION...................................................................................................................... 20

## PRELIMINARY STATEMENT

1.      Honeywell failed to prove that the Trustees abused their discretion or violated the Trust Agreement and TDP in any respect.  After the close of Honeywell's case, the Court dismissed Counts V and VI entirely, and Count VII to the extent it challenged the Trust's employment of consultants from Gleason & Associates.  The result for the remaining Counts should be the same.

2.      The crux of Honeywell's case was that the Trustees abused their discretion when they revised the Trust's Directives concerning "form affidavits"[1] and certain formulaic phrases more than four years ago.  At the outset of this case, Honeywell promised "substantial evidence" that hundreds, if not thousands, of NARCO Trust claimants that used form affidavits have made representations to the Trust that are inherently unreliable and materially inconsistent with representations they made in the tort system.  To that end, Honeywell served non-party subpoenas on thirteen law firms that Honeywell claimed were the most frequent filers of "form affidavits."  Before he was identified as one of Honeywell's "fact" witnesses, John Calandra, acting as Honeywell's trial counsel, told this Court that the subpoenas would uncover "important" and "meaningful" evidence undermining the reliability of form affidavits.

3.      In stark contrast to its promises of overwhelming proof and allegations of rampant fraud, Honeywell's evidence was virtually non-existent.  Honeywell offered *one example* of an alleged "material inconsistency," *no proof* as to the unreliability of "form affidavits" generally or the use of terms like "regular basis" or "close proximity," and *zero analysis* of the documents produced by the subpoenaed non-party law firms.  In contrast, the Trust demonstrated the Trustees'

---

[1]      The testimony by Honeywell witnesses as to the definition of a "form affidavit" was vague, ever-shifting, and inconsistent.  The Trust demonstrated in its responsive case that there was only one definition of a "form affidavit" that it consistently used over the years:  "A 'form' affidavit means an affidavit that contains exposure allegations that use identical descriptive language as the language contained in other exposure affidavits submitted to the Trust . . . ."  (Ex. AA, HON Tr. 01166; 5/25 AM Tr. 124:19-125:10.)  This definition was published on the Trust's website and is a stipulated fact.  (Stipulated Facts ¶ 72.)

1

reasoned determination that a blanket rejection of all such affidavits was unjustified and punitive, particularly in the presence of other, non-formulaic language offered by claimants that bolstered the credibility of their exposure allegations.  Count I, which challenged the Trust's claims processing directives, and Count III, which alleged the Trust "accepted" affidavits with "material inconsistencies," should be dismissed.

4.    Honeywell did not fare better proving its other allegations related to claims processing.  In Count II, Honeywell claimed that the Trust "re-instituted" a "blanket policy" of accepting "a bare assertion that the claimant worked around refractory products" as sufficient to satisfy the TDP's exposure standard.  Here again, Honeywell did not offer any credible evidence to support its claim, relying instead on self-serving, conclusory testimony offered by its outside counsel witnesses.  The Trust, however, provided extensive and uncontroverted evidence through its witnesses that the Trust has no such blanket policy, and walked the Court through the detailed worksheets that identify and evaluate specific evidence well beyond a bare assertion that the claimant worked around refractory products.  Count II should be dismissed.

5.    Count IV likewise should fail.  There, Honeywell challenged the validity of the Individual Review (IR) Model that the Trustees, Trust consultants, and an outside statistical expert carefully constructed over a year-long process to value claims submitted for Individual Review. Honeywell's principal complaint, presented through Dr. William Choi, is that valid IR claimants receive significantly higher payments than ER claimants with similar circumstances and disease characteristics.  But the TDP itself, which was agreed to by Honeywell, the TAC, and the FCR, dictates that result.  The mandated Average Values for claimants who elect the more burdensome IR process are substantially higher than the Scheduled Values for those who elect Expedited Review (ER).

6.      Honeywell similarly offered no evidence that the Trust mismanaged its operating expenses, as alleged in the surviving allegations of Count VII.  Honeywell's former Assistant Corporate Controller, Robert Kelly, offered no testimony that the Trust made any improper or excessive payments to anyone at any time.  Neither Mr. Kelly nor Honeywell's financial expert, Louis Dudney, offered any evidence that the Trust mismanaged its assets in any way.  In contrast, Trustee Mark Gleason testified in detail about the work the Trustees, acting collectively and with their consultants, undertook and completed to develop the Trust's claims processing machinery. And the Trustees did so with Honeywell second-guessing their decision-making and repeatedly threatening or conducting baseless litigations—a significant driver of Trust expenses.  Count VII should be dismissed as well.[2]

7.      The Trust, by contrast, proved that it is entitled to the relief sought in its Counterclaims.  The Trust demonstrated that Honeywell constantly and wrongfully attempted to reduce its financial obligations under the Trust Documents.  Honeywell's campaign included threatening the Trustees with massive, baseless litigation if they did not do as Honeywell commanded.  Honeywell's intimidation tactics included threatening the removal of the Trustees if they did not maintain an across-the-board prohibition against all "form affidavits," promising litigation if the Trust continued to pay mesothelioma victims at the Average Values required by the TDP, and besmirching Trustee Gleason's reputation by alleging a conflict of interest on his part that does not exist.  These deeply misguided tactics—as well as Honeywell's attempts to settle claims outside the judicially established Trust—must be stopped.

---

[2]      Count VIII, which sought a declaratory judgment concerning the allegations supporting Counts I-VII, should also be dismissed because Honeywell failed to prove any of its other claims.

3

## ARGUMENT

### I.    HONEYWELL'S BURDEN OF PROOF

8.    To satisfy its burden of proof, Honeywell was required to prove that the Trustees abused the discretion granted to them under the Trust Documents.  Under Delaware law, "[w]here discretion is conferred upon the fiduciary with respect to the exercise of power, its exercise by the fiduciary shall be considered to be proper unless the court determines that the discretion has been abused within the meaning of § 187 of the Restatement (Second) of Trusts[.]"  12 Del. C. § 3315. Section 187 of the Restatement (Second) of Trusts declares that, "[w]here discretion is conferred upon the trustee with respect to the exercise of a power, its exercise is not subject to control by the court, except to prevent an abuse by the trustee of his discretion."  RESTATEMENT (SECOND) OF TRUSTS § 187 (1992).  An "abuse of discretion" does not occur unless a trustee acts "dishonestly, or with an improper even though not a dishonest motive, or fails to use his judgment, or acts beyond the bounds of a reasonable judgment."  *Id.* cmt. e.  Honeywell failed to meet its burden of proof across every Count in its Complaint.

### II.    HONEYWELL FAILED TO PROVE THAT THE TRUST'S EXPOSURE DIRECTIVES CONSTITUTE AN ABUSE OF DISCRETION.

9.    Count I of Honeywell's Complaint alleged that the Trust's policies concerning three categories of affidavits—form affidavits, check-the-box affidavits, and affidavits that use the phrases "regular basis" or "close proximity"—violate the Trust Agreement and TDP and constitute an abuse of discretion.  (Honeywell Compl. ¶¶ 214-222.)

#### A.    Honeywell Failed to Prove That the Trustees Abuse Their Discretion by Considering "Form Affidavits" with Indicia of Reliability.

10.    The Trust published its current form affidavits policy on February 1, 2018; that policy has remained substantively identical since then.  (Stipulated Facts ¶¶ 75-76.)  The evidence demonstrated that the Trust adopted its current form affidavits policy based on years of experience

4

evaluating such affidavits and extensive consultations with the Constituents.  Since at least 2015,

the Trustees have had concerns about so-called form affidavits that appear to contain identical

attorney-drafted language.  (5/25 AM Tr. 112:9-24.)  But the Trustees have also since learned that

addressing these concerns by banning all such affidavits is draconian and impracticable.[3]

11.     In 2016, the Trust instructed its claims reviewers that they "shall not consider

exposure allegations that use identical descriptive language as the language highlighted" in

examples of "form affidavits" provided to CRMC.  (Ex. 384, Trust-Trial 11008.)  At that time, the

Trust was not even **_considering_** whether claims supported by form affidavits were potentially

compensable.  Mr. Gleason testified that, after gaining experience with that policy, the Trustees

saw that it was "just shut[ting] the door on a lot of claimants that were potentially compensable,

or valid claimants, that we weren't considering."  (5/25 AM Tr. 114:19-25.)

12.     The Trustees' concerns about shutting the door on valid claimants were reinforced

when, during the litigation standstill, the Mediator confirmed that "a 'form' affidavit is not

inherently unreliable just because it was prepared by a lawyer who, like most if not all lawyers,

copied the 'latest and greatest' version of the affidavit as a starting point for drafting."  (Ex. AA,

HON Tr. 01181.)  After the initial years of processing and carefully evaluating claims, the Trustees

also recognized that there were certain indicia of reliability in claim files that helped the Trust "to

understand whether that form affidavit should be considered," such as whether (a) the claimant

worked on an approved worksite during the stipulated timeframe, (b) the affiant was an eyewitness

of the exposure, or (c) the claimant worked in an occupation or industry with significant

occupational exposure ("SOE").  (5/25 PM Tr. 31:3-7.)

---

[3]      As the Court also observed at trial, even where an affidavit is identified as a "form," the affidavit
often includes non-formulaic, personalized allegations.  (5/25 PM Tr. 24:23-25:8; 5/23 AM Tr. 142:4-24;
5/24 AM Tr. 110:21-114:16.)

13.    With these observations in mind, the Trustees developed a new form affidavit exposure directive that not only recognized potential issues raised by identical exposure allegations but also took into account whether the affidavits were personalized by including specific, individualized allegations provided by claimants in their filings.  The new directives, published more than four years ago, instructed claims reviewers to consider a form affidavit ***only if***:

(i)    exposure occurred on an Approved Worksite during the stipulated time frame, or

(ii)    exposure occurred on an Approved Worksite after the stipulated time frame, and the affiant was an eyewitness of the exposure, or

(iii)    exposure occurred on a non-qualified site or on an Approved Worksite before the stipulated time frame, and the affiant was an eyewitness of the exposure, and the injured party had an SOE presumptive occupation when exposed.

(Ex. 260, Trust-Trial-06151; Stipulated Facts ¶ 78; 5/25 PM Tr. 31:3-34:11.)  If a form affidavit meets the requirements of this directive, the claims reviewer must still determine whether the claim file as a whole meets the requirements of the TDP and whether the claim file contains material inconsistencies.  (5/25 PM Tr. 34:1-10.)

14.    The evidence that Honeywell submitted contradicted its own allegations about the form affidavit directives.  Craig Zimmerman, Honeywell's "principal negotiator" of the TDP, testified that the Trust's evidentiary standards were "heavily negotiated."  (5/23 AM Tr. at 69:8-11; 80:6-11; 82:3-5; 97:4-7; 126:23-25.)   Mr. Zimmerman could not "recall anyone from Honeywell saying at any point in TDP negotiations that form affidavits would not be acceptable evidence under the TDP," or that any party stated that form affidavits would not constitute "credible evidence" under the TDP.  (5/23 AM Tr. at 127:11-14, 129:17-24.)

15.    Between 2002 and 2006, while Honeywell was negotiating the TDP, Honeywell also executed settlement agreements with plaintiffs that required "credible" evidence and attached TDP drafts.  (5/23 AM Tr. 133:6-134:21; 149:7-152:25; Exs. 24, 32 & E.)  Under those settlements,

Honeywell paid claims supported by affidavits that had identical language or were prepared using preprinted, fill-in-the-blank forms. (CR#2; CR#4; Stipulated Facts ¶¶ 16-20.) Mr. Zimmerman conceded that he is "not aware of any instance in which Honeywell refused to pay a claim under a post-petition settlement agreement" because it was supported by a form or check-the-box affidavit and that he is not aware of Honeywell ever saying that it was accepting exposure evidence under those settlements that the Trust would not be able to accept under the TDP. (5/23 AM Tr. 163:1-10, 163:25-164:15.) He was shown 72 fill-in-the-blank affidavits that were prepared using an identical form, and testified that was not enough information for him to conclude that those affidavits are not competent and credible. (5/23 AM Tr. 156:23-157:15; CR#4.)

16.    Conspicuously absent from Honeywell's trial presentation was any analysis of the documents that it subpoenaed from the non-party law firms, some of which Honeywell has characterized as the highest-volume filers of form affidavits with the Trust. (12/13/21 Hr'g Tr. 77:10-25; Exs. BM & BN.) During the December 13, 2021 hearing, Mr. Calandra argued that Honeywell was "seeking to prove that forms are not reliable on their face" and that the purpose of subpoenaing the non-party law firms was to tell the Trust: "These are the documents you should be looking at, they're important, they're meaningful." (12/13/2021 Hr'g Tr. 74:6-17.) At trial, Honeywell offered *zero* of these "important" and "meaningful" documents, questioned *zero witnesses* about Honeywell's conclusions, and called *zero witnesses* from the non-party law firms.

17.    The evidence at trial also demonstrated that the Trust's current form affidavits policy has resulted in claim payment amounts consistent with those estimated by Dr. Francine Rabinovitz, Honeywell's claims projection expert during NARCO's bankruptcy. Dr. Rabinovitz projected that "future NARCO claims that will qualify for payment" would have a value of up to

$2.28 billion over the entire life of the Trust.[4]   (Stipulated Facts ¶ 30; Ex. T, HON Tr. 01021.)

The Trust's claim projection expert, Charles Finch, estimated the Trust's *future* claims liability in

one scenario to be approximately ***$1.4 billion***.  (5/26 AM Tr. 26:9-24; CR# 22.)  He also assumed

in that scenario that only 25% of the ballot holders who were eligible to file claims, but had not

yet done so, would file claims in the future.  Mr. Finch's estimate is based on the Trust's claims

processing since 2018, meaning the projection assumes the Trust's current form affidavits policy

continues to apply to future claims.  Importantly, the projected $1.4 billion dollars does not include

any amounts that have already been paid to claimants prior to the trial.  It also does not include

any costs of Trust administration that Honeywell is required to fund under the Trust Agreement.

18.    The evidence also established that additional factors realistically could push the

Trust's total claims liability higher.  For example, absent Honeywell's wrongful conduct, filings

will almost certainly increase, perhaps dramatically.  Honeywell itself has recognized the negative

impact the "Honeywell factor" has historically had on claims filings.  In August 2018, Honeywell

told the SEC its ongoing disputes with the Trust and its purported "vigilance" toward the Trust

"have had an impact on the plaintiffs' bar's claims filing approach," and "several significant

plaintiffs' firms have said that their approach to filing claims with the NARCO Trust is different

than with other trusts[.]"  (Ex. 237, Trust-Trial-05611.)  Some firms, therefore, are likely to

continue to hold their claims until these issues are resolved.  (*Id.*)  As an additional example, both

experts projected the mix of ER/IR claims based on recent experience.  But as the evidence

showed, the IR averages continue to diverge from ER scheduled values over time due to inflation

adjustments.  (5/26 AM Tr. 69:20-70:6.)  It is reasonable to expect more claimants to pursue higher

---

[4]    Dr. Rabinovitz's projections did not include any additional amounts that Honeywell is required to
provide to fund the Trust's administrative expenses in perpetuity.

recoveries in IR as that spread increases.  Neither expert has accounted for the impact of all potential contingencies affecting future claims liability, however likely such contingencies may be, nor have the experts estimated the Trust's future operating costs, which over time may amount to hundreds of millions of additional dollars.  Still, the resulting total amount for all liabilities should fall below Dr. Rabinovitz' claims liability estimate of approximately $2.3 billion.

**B.    Honeywell Failed to Prove That Considering "Check-the-Box" Affidavits for the Limited Purpose of Proving SOE Is an Abuse of Discretion.**

19.    Honeywell also alleged in Count I that the Trust's "acceptance" of "check-the-box affidavits" violates the Trust Agreement and TDP because "such affidavits do not reflect 'competent' and 'credible' evidence of exposure."  (Honeywell Compl. ¶¶ 100, 101, 217.)

20.    The Trust considers check-the-box affidavits *only* to evaluate significant occupational exposure ("SOE"), not as proof of NARCO exposure.  (Stipulated Facts ¶ 81; 5/23 PM 1 Tr. 40:13-16.)[5]  The Trust's exposure directives instruct claims reviewers to "not consider allegations of exposure to a NARCO-asbestos containing product that use a 'check-the-box' format" but that they "may consider exposure allegations in 'check-the-box' format to determine if a claimant has established Significant Occupational Exposure (if applicable)."  (Stipulated Facts ¶ 81; Ex. 260, Trust-Trial-06149; Ex. 305, Trust-Trial-07161-62.)  The Trust began developing this policy after the Mediator noted that "establishing SOE is much more formulaic under the TDP than is establishing exposure to a NACP" and that the "parties should consider whether a check-off process would benefit prompt review by the Trust and provide the required information regarding SOE."  (Ex. AA, HON Tr. 01171.)

---

[5]    SOE is just one component of claims review for select disease levels.  Every claim must demonstrate exposure to a NARCO asbestos-containing product before an offer is extended.

21.    The trial testimony that Honeywell elicited on check-the-box affidavits did not establish that considering such affidavits solely for SOE is inappropriate, let alone an abuse of discretion.  (5/23 PM 1 Tr. 11:6-10, 21:5-13, 25:22-26:11, 39:22-41:1; 5/26 AM Tr. 119:15-25.)

C.    **Honeywell Failed to Prove That Accepting Exposure Affidavits Containing the Words "Regular Basis" or "Close Proximity" Is an Abuse of Discretion.**

22.    Honeywell's final contention in Count I is that the Trust abused its discretion by "allowing consideration of affidavits" that use the words "regular basis" or "close proximity." Both of these phrases are in the TDP.  (Honeywell Compl. ¶¶ 117, 218.)  The Trust's current directives instruct claims reviewers that those phrases "need not be paraphrased to be credible," but they do not "automatically satisfy any TDP requirements" either.  (Ex. 260, Trust-Trial-06150; 5/25 PM Tr. 10:4-11:17.)  "Exposure allegations must always make sense in the context of each individual claim."  (Ex. 260, Trust-Trial-06150.)  The Trust implemented this policy after determining that its prior policy resulted in the claims reviewers issuing deficiencies on potentially valid claims simply because the exposure affidavits used the phrase "regular basis" or "close proximity."  (5/25 AM Tr. 121:7-122:22; 5/25 PM Tr. 16:16-21:10.)

23.    The evidence showed that the Trust's current policy is that using the words "regular basis" or "close proximity," standing alone, neither qualifies nor disqualifies a claim from receiving an offer.  (5/25 PM Tr. 10:6-11:3; 16:16-21:10.)  Honeywell offered no evidence as to why that policy constitutes an abuse of discretion.

III.    **HONEYWELL FAILED TO PROVE THAT THE TRUST HAS INSTITUTED A "BLANKET REFRACTORY INFERENCE."**

24.    Honeywell offered no evidence supporting Count II, which alleged that the Trust "re-instituted a blanket refractory inference" in violation of the Stipulation and Order.  (Honeywell Compl. ¶¶ 224-28.)  The Stipulation and Order provided that "the Trust will not, as a matter of blanket policy, accept a bare assertion that the claimant worked around refractory products as

sufficient to meet the exposure standard under the [TDP]" and that "the Trust will evaluate claim submissions on a case-by-case basis, considering the totality of evidence that is presented in support of the claim and drawing inferences therefrom." (Ex. 112 at Trust-Trial-02838.) The evidence at trial confirmed the Trust has honored this commitment in all respects.

25.    Mr. Gleason testified that the Trustees have not "as a matter of blanket policy . . . ever accept[ed] a bare assertion that the claimant worked around refractory products as sufficient to meet the exposure standard[.]" (5/25 PM Tr. 43:6-11.) He explained that some claimants "can still prove that they were exposed to a NARCO asbestos-containing product even if they can't identify the specific product," but it is "just not acceptable" to approve a claim based solely on a statement that the claimant "worked around refractory products." (*Id.* at 46:4-19.)

26.    The only claimants who are potentially eligible for an inference are those who worked on an Approved Worksite during the stipulated date range. (5/25 PM Tr. 47:10-48:19, 161:10-168:17.) Nicole Snyder, the Trust's consultant, walked through the case-by-case evaluation of such claims. The Trust's worksheets first ask whether the claim "include[s] allegations of exposure to one or more asbestos-containing products of the same types as NARCO asbestos-containing products." (Ex. 305, Trust-Trial-07224.) The claims reviewer next determines whether "the documents indicate that the injured party was exposed to the identified NARCO asbestos-containing product(s) in an area where such products are known to have been used, or otherwise provide credible evidence of exposure to a NARCO asbestos containing product." (*Id.*) If the answer to that question is also yes, the claims reviewer then determines whether, "after review of all of the exposure evidence submitted in support of the claim," it is "likely that the claimant was exposed to a NARCO asbestos containing product." (*Id.*) Instead of producing evidence that the Trust has a "blanket policy" that violates the Stipulation and Order,

Honeywell introduced a *single claim*, of the approximately 21,000 unique claims that have received offers since the so-called "resurrection of the refractory inference" (5/23 AM Tr. 12:13-14), for which the claimant did not reference the specific NARCO product by name.  That claimant worked at an Approved Worksite and identified work with a product of the same type as a NARCO asbestos-containing product in a high-heat area.  (5/24 AM 102:4-107:7; Ex. BU, HON Tr. 02534; Ex. 1, Trust-Trial-00130.)  All this evidence proved is that a claims reviewer, after considering all of the exposure evidence submitted in support of the claim, determined the claimant was exposed to a NARCO asbestos-containing product based on the totality of the circumstances, not that any "blanket refractory inference" exists.

## IV. HONEYWELL FAILED TO PROVE THAT THE TRUST HAS "ACCEPTED" NARCO EXPOSURE AFFIDAVITS WITH MATERIAL INCONSISTENCIES.

27.      Honeywell has also failed to prove Count III of its Complaint, which alleged that the Trust violates the Trust Agreement and TDP and commits an abuse of discretion by accepting "affidavits containing material inconsistencies" that "do not reflect 'competent' and 'credible' evidence of exposure."  (Honeywell Compl. ¶ 231.)

28.      Before trial, Honeywell promised evidence of: (i) the "investigations" conducted by Honeywell's attorneys at McDermott to determine the "scope of the inconsistency problem;" and (ii) certain statistical analyses by Honeywell's expert witnesses, Katheryn McNally and Dr. William Choi, based on McDermott's investigation.  (Dkt. 334-1 at 13.)  At trial, Honeywell offered a *single example* of a potential inconsistency between an exposure affidavit filed with the Trust and that affiant's testimony in the tort system.  (5/24 AM Tr. 97:2-100:14; Exs. CO, CP.) Yelena Bekker testified that this single example was indicative of the Trust accepting materially inconsistent affidavits because, in the Trust affidavit, the personal representative swore that her mother worked with "castable and gunnite materials manufactured by NARCO," including

"NARCOLITE," but in a deposition taken six years earlier, that same personal representative disclaimed personal knowledge of the specific products to which her mother was exposed.  (5/24 AM Tr. 97:2-100:14.)

29.    Honeywell's single example demonstrates that the Trust *rejects* claims supported by affidavits with material inconsistencies when they are identified.  On cross-examination, Ms. Bekker acknowledged that upon receiving Honeywell's complaints about "inconsistencies" in April 2017, the Trust initiated a targeted audit pursuant to the parties' agreed-upon Claims Audit Program ("CAP") of the very law firm that had filed the claim she testified about on direct.  (5/24 AM Tr. 120:24-121:1.)  The Trust's auditor determined that there were inconsistencies between that law firm's personal representative claims and testimony by those same personal representatives in the tort system.  (5/24 AM Tr. 126:15-127:25.)  The Trust has followed its auditor's recommendation and now flags such claims filed by that law firm.  The Trust provided the full expanded audit report for that law firm to Honeywell on January 25, 2021.  (5/24 AM Tr. 121:2-8; Ex. AX.)  Despite receiving the expanded audit report and testifying about one of the key issues it discussed, Ms. Bekker could not recall whether she personally reviewed that report when she received it.  (5/24 PM 1 Tr. 121:9-14.)  John Calandra, Honeywell's only other fact witness on purported "inconsistencies," did not testify about *a single claim* with a "material inconsistency."

30.    Honeywell presented no expert opinions concerning "material inconsistencies" in any claim files.  Before trial, Honeywell promised analyses from "statistician Katheryn McNally and economist Dr. William Choi" that extrapolated McDermott's inconsistency determinations to a broad population of Trust claims.  (Dkt. 334-1 at 13.)  But Honeywell (a) never offered its lawyers' study as expert evidence in accordance with the federal rules and were precluded from belatedly introducing their alleged findings at trial, (b) did not call Ms. McNally, who selected the

claim samples that McDermott reviewed to determine the "scope of the inconsistency problem," and (c) withdrew Dr. Choi's extrapolation analysis, which was based on McDermott's own irrelevant analysis.  (*Id.*; 5/26 AM Tr. 8:6-15; 5/24 PM 1 Tr. 62:14-63:4, 65:10-20.)

## V.    HONEYWELL FAILED TO PROVE THAT THE TRUST'S IR MODEL IS AN ABUSE OF DISCRETION.

31.    Honeywell presented no evidence supporting Count IV, which alleged that "[t]he Trust's IR Model is in breach of the Trust Agreement and TDP and constitutes an abuse of discretion" because it does not account for the fact that "[a] claimant seeking IR must demonstrate 'extenuating circumstances that he or she believes warrant a liquidated value above the applicable Scheduled Value.'"  (Honeywell Compl. ¶¶ 238-39.)

32.    Honeywell's expert, Dr. Choi, admitted that ***claimants*** (not the Trust) decide whether to pursue IR or ER.  (5/24 PM 1 Tr. 107:23-108:1.)  Honeywell's TDP negotiator likewise admitted that IR "is at the claimant's option."  (5/23 AM Tr. 166:3-7.)  For those claimants that elect IR, the TDP mandates that qualifying claimants receive "payments equal to the full liquidated value" of their claims, as opposed to the settlement value (*i.e.*, Scheduled Value) offered in ER.  (Ex. 1, TDP § 4.3(b)(1), Trust-Trial-00029-0032; 5/26 AM Tr. 55:20-23, 72:24-73:16.)

33.    The TDP sets a Scheduled Value for ER claims ($75,000 for mesothelioma) and an Average Value for IR claims ($200,000 for mesothelioma, before adjusting for inflation).  (Ex. 1, TDP § 4.3(b)(3), Trust-Trial-00034.)  Professor Abraham Wyner, the statistician who designed and updates the IR Model, explained that the TDP's Average Value—and not the IR Model's "Starting Value"—determines how much a claim is paid.  (5/26 AM Tr. 55:20-23, 72:24-73:16, 75:10-76:8; *see also id.* 63:16-64:15, 65:6-18.)  Professor Wyner also testified that it was unsurprising that "the majority of IR claimants get more than scheduled value" because they are entitled under the TDP to receive the full liquidated value of their claims and there is "an enormous

14

gap" between "the [IR] average value as determined by the TDP, and the [ER] scheduled value."
(*Id.* 72:24-73:16.)

## VI. HONEYWELL FAILED TO PROVE THE TRUST MISUSES ITS FUNDS.

34.     Count VII of Honeywell's Complaint, titled "Misuse of Trust Funds," sought relief
based on hyperbolic allegations about the Trust's finances, including that the Trustees are
"misusing Trust assets through wasteful spending and self-dealing" and have engaged in
"profligate spending on law firms and consultants," "forc[ed] Honeywell to engage in unnecessary
litigation," and created "an obvious conflict of interest" by retaining two consultants employed by
Mr. Gleason's consulting firm.  (Honeywell Compl. ¶¶ 22, 204, 208, 210, 212, 263-67.)  The Court
dismissed Honeywell's scandalous allegations concerning the consultants—an obvious tactic
taken by Honeywell in bad faith to intimidate a fiduciary—at the close of Honeywell's case-in-
chief because it presented *zero evidence* to support them.[6]  (5/25 AM Tr. 63:13-15.)

35.     With respect to Honeywell's remaining Count VII allegations, Honeywell not only
failed to prove that the Trust "abused its discretion by mismanaging its expenses," it offered
***absolutely no evidence*** of the wild financial mismanagement accusations that it leveled.  Robert
Kelly, the only Honeywell employee who testified at trial, did not testify that the Trust's budgets
were "excessive" or constituted a "misuse" of Trust funds, nor did he challenge a dime of the
Trust's expenses as improper.  (5/24 AM Tr. 10:10-24:23.)  Mr. Kelly also admitted on cross-
examination that: (i) he has never reviewed the annual financial reports that the Trust files with
this Court; (ii) he has never reviewed the annual reports or financial statements of any other

---

[6]      That Honeywell kept alive its baseless personal attacks against Mr. Gleason and his firm until the
close of its case-in-chief, despite offering no evidence or argument in support of the claim, should not go
unaddressed.

bankruptcy trusts; and (iii) to his knowledge, nobody at Honeywell has reviewed other publicly available information about other 524(g) asbestos trusts.  (*See* 5/24 AM Tr. 45:25-46:15.)

36.     Louis Dudney, Honeywell's financial expert, also did not point to a single Trust expenditure that was excessive or improper.  Mr. Dudney's minimal testimony was limited to comparing the Trust's budget to the budgets of three other distinguishable 524(g) asbestos trusts that Honeywell's counsel selected.  (5/24 PM 1 Tr. 115:14-116:5; 5/24 PM 2 Tr. 19:23-20:14.) Mr. Dudney did not know, for any of those three trusts, the trust's total assets, the number of trustees, whether the trust has a funder with audit rights, the trust's reporting obligations (if any), or whether the trust has a TDP that dictates the criteria by which claimants are paid.  (5/24 PM 2 Tr. 20:15-22:13.)  Mr. Dudney also aggregated the various trusts' legal expenses into a single category for each trust, but did not know whether any of his three examples had either litigation that drove up costs or a constituent that could challenge the trust's decisions and threaten litigation on a regular basis.  (5/24 PM 2 Tr. 20:15-23:20.)  As the Court observed, Mr. Dudney's testimony provided "absolutely no evidence of misuse" of Trust assets.  (5/25 AM Tr. 63:5-7.)  In fact, Robert Kelly conceded that Honeywell's litigation drove a steep increase in ***this Trust's*** external legal costs and Trustee fees between 2014 and 2015, and that Honeywell threatened to sue the Trust in every year between 2017 and 2021.[7]  (5/24 AM Tr. 46:16-18, 47:22-48:1, 48:15-49:1.)

37.     If Honeywell actually believed that the Trust's past annual budgets or operating expenses were excessive or evidence of misuse, it could have petitioned this Court for a ruling

---

[7]     The Trust Agreement mandates that the Trustees be paid in the amount of "$65,000 per annum, plus $550 per hour," both adjusted for inflation, so Honeywell's litigation, litigation threats, audit requests, letter-writing, activities with respect to the management of HarbisonWalker International, and other activities have a direct impact on the Trustees' annual fees.  (Ex. 2, Trust Agr. § 5.5, Trust-Trial-00148.)

under Section 3.4 of the Trust Agreement.[8]  (Ex. 2, Trust-Trial-00166-0167.)  Since the end of the

Standstill Period, Honeywell has not challenged in this Court ***any*** of the budgets submitted by the

Trust or the other Constituents or ***any*** amounts the Trust has paid to ***anyone***.

38.      In contrast to Honeywell's allegations, the Trust's witnesses demonstrated prudent

stewardship of the Trust and its finances.  Mr. Gleason testified at length about the Trust's efforts

to develop and refine its claims processing systems, foster transparency, and provide Honeywell

with all of the information that it requested following the 2015 litigation.  (5/25 AM Tr. 66:15-

82:22.)  Among other things, Mr. Gleason testified about the Trust's development and facilitation

of the: (i) One-Way Mirror and other tools for complying with Honeywell's audit requests, (ii)

written exposure directives, (iii) IR Model and IR claim form, (iv) CAP and many hundreds of

claims audits completed under the CAP, and (v) Trustees' efforts to supervise and provide

guidance to the Trust's claims processor.  (*Id.*.)  With respect to the Trust's budget in particular,

Mr. Gleason testified that the Trust provides "tons of financial information" supporting its budget

to Honeywell on a regular basis.  (5/25 PM Tr. 85:2-13; *see also* 5/25 AM Tr. 71:4-9.)  For

example, Mr. Gleason testified that the Trust provides detailed monthly financial statements with

budget-to-actual comparisons, cash flow forecasts, revised budget estimates, and valuations of the

Trust's equity interest in HarbisonWalker International.  (5/25 AM Tr. 71:4-9.)  Honeywell did

not ask Mr. Gleason a single question about the Trust's annual operating expenses during cross-

examination.  (5/25 PM Tr. 87:20-127:12.)

---

[8]      Section 3.4 of the Trust Agreement provides:  "If the Trustees receive Responses to the Proposed
Budget, such Responses shall be circulated to all Parties (the term Parties for the purposes of this Section
3.4 excludes the Delaware Trustee), and all Parties shall endeavor in good faith to resolve any concerns or
differences on or before November 15. If the Parties are unable to resolve such differences by November
15, the matter shall be submitted to the Bankruptcy Court for determination. The Final Administrative
Budget, as determined by agreement or by order of the Bankruptcy Court, shall be the amount funded by
Honeywell pursuant to Section 2.3(b) hereof." (Ex. 2, Trust-Trial-00145.)

39.     Honeywell similarly failed to ask Trustees Richard Schiro and Ken Kawaichi any questions about the Trust's operating expenses or any improper or excessive payments during their respective cross-examinations.  (5/26 PM Tr. 28:3-53:5; 73:3-93:10.)   Mr. Kawaichi nevertheless explained that he takes his role to oversee Trust operations and manage expenses seriously and that the Trustees instruct all of their vendors to "be as economically efficient as possible."  (5/26 PM Tr. 55:23-56:5.)  In particular, Mr. Kawaichi testified that the Trust obtained a discount from Mazars, the Trust's claims auditor, which Mr. Kelly had mentioned during his testimony concerning the Trust's expenses, as well as other Trust service providers.  (*Id*.; 5/24 AM 15:6-19.)

40.     In response to questions from the Court, Mr. Kawaichi also explained that the CAP, under which Mazars conducted its audits, was a negotiated document developed pursuant to Section 4.8(a) of the TDP with the consent of all constituents.  (Ex. AV, HON Tr. 01583.) Honeywell's counsel reluctantly admitted in response to the Court's questioning that Honeywell agreed to the CAP, including its provisions limiting Mazars' audits to "non-privileged" information and requiring the submission of a "law firm management representation letter in a form satisfactory to the Trust."  (5/26 PM Tr. 70:3-71:18; Ex. AV, HON Tr. 01588.)  Indeed, these facts were included in the parties' pre-trial stipulated facts.[9]  (Stipulated Facts ¶¶ 98, 104 & 107.) Far from supporting Honeywell's allegations concerning the Trust's budget, the Court's colloquy with Mr. Kawaichi and Honeywell's counsel concerning Mazars and the CAP illustrated how ***Honeywell's behavior*** towards the Trust has resulted in high costs.  Despite the fact that Honeywell consented to the CAP, received a copy of every single audit report that Mazars completed under the CAP, and had ample opportunities to consult with the Trust about the CAP's functioning,

---

[9]     Honeywell also agreed to the Trust retaining Mazars as claims auditor under the CAP.  (Stipulated Facts ¶ 102; 5/24 AM Tr. 39:19-40:1.)

Honeywell raised for the first time new issues about the CAP in this litigation. As the Court put it at the conclusion of Mr. Kawaichi's examination, "[r]ather than bringing a lawsuit," Honeywell could have simply talked to the Trust and "resolv[ed] these issues." (5/26 PM Tr. 70:3-71:18.) As it often does, Honeywell chose a different, more expensive path.

41.     In short, the Court has been given no basis to conclude the Trust made any improper or excessive payments to anyone.

## VII.   HONEYWELL IS NOT ENTITLED TO A DECLARATORY JUDGMENT.

42.     Honeywell has also failed to prove that it is entitled to a declaratory judgment under Count VIII of its Complaint because it failed to prove that any of the Trust's actions violate the Trust Agreement or TDP, or constitute an abuse of discretion. The issuance of a declaratory judgment is only appropriate where the "legal status of the parties must be changed or clarified by the declaration" and would be "of some practical help to the parties." *See Travelers Ins. Co. v. Obusek*, 72 F.3d 1148, 1155 (3d Cir. 1995). Here, Honeywell failed to prove Counts I-VII of its Complaint, and thus failed to prove it is entitled to any declaratory relief.

## VIII.  THE TRUST PROVED ITS ENTITLEMENT TO A DECLARATION AND INJUNCTION CONCERNING HONEYWELL'S FUTURE CONDUCT.

43.     The Trust established at trial its entitlement to a declaration that Honeywell is: (i) attempting to exercise contractual rights to which it is not entitled, (ii) interfering with and impairing the Trust's and Trustees' contractual rights, and (iii) violating Section 524(g) of the Bankruptcy Code. The Trust also established that Honeywell should be enjoined from engaging in the misconduct detailed in the Trust's Counterclaims (Dkt. 171.)

44.     Honeywell's own witnesses testified that Honeywell has either filed litigation or threatened litigation against the Trust in each year Honeywell was not bound by a standstill agreement since the Trust began processing claims. (*See, e.g.,* 5/23 PM 2 Tr. 42:22-43:14, 46:18-

51:12; 5/24 AM Tr. 47:19-49:1.)  In fact, Honeywell determined that its disputes with the Trust and its "vigilance" were *so disruptive* to the Trust's operations and claim filing trends that it disclosed those disruptions to the SEC.  (Ex. 237 at Trust-Trial-05597; 5/24 AM Tr. 41:17-45:9.) The evidence also showed that Honeywell used these litigation threats as an intimidation tactic. At one point over four years ago, Honeywell threatened to name the Trustees as defendants *personally*, in part on the unfounded accusation that the Trustees were allowing an "obvious conflict of interest to continue" through the Trust's engagement of consultants employed by Gleason & Associates.  (Ex. 222 at Trust-Trial-05458-5459.)

45.     Mr. Calandra also admitted at trial that, while Honeywell was disrupting Trust operations and threatening litigation, it was making "extensive" efforts to strike "inventory settlements with the claimant firms, particularly the ones that did forms." (5/23 PM 1 Tr. 123:22-125:6.)  According to Mr. Calandra, the effect of such settlements would be to "dismiss all claims currently against the Trust by a particular firm[.]" (*Id.*)  Mr. Calandra also conceded that Honeywell "paid $10 million to take out an entire inventory of claims" filed by a particular law firm, after telling that law firm that Honeywell would take its name out of a draft complaint that it was about to send the Trust.  (5/23 PM 2 Tr. 36:7-37:7.)  That law firm was simultaneously not cooperating with the Trust's efforts to complete an expanded audit that Honeywell had demanded (and which the firm ultimately failed).  (5/23 PM 2 Tr. 31:15-32:6.)  In short, the Trust has proven that it is entitled to the relief sought by its Counterclaims.

## **CONCLUSION**

46.     For the foregoing reasons, the Trust respectfully requests that the Court deny Honeywell's Complaint in its entirety and grant the relief sought by the Trust's Counterclaims.

Dated: June 14, 2022
      Pittsburgh, Pennsylvania

BABST, CALLAND, CLEMENTS & ZOMNIR, P.C.

/s/ David W. Ross
David W. Ross, Esquire
PA ID No. 62202
dross@babstcalland.com
Erica Koehl Dausch, Esquire
PA ID No. 306829
edausch@babstcalland.com
Two Gateway Center, 7th Floor
Pittsburgh, PA 15222
Telephone: (412) 394-5400
Fax: (412) 394-6576

- and -

WILLKIE FARR & GALLAGHER LLP

Joseph T. Baio (admitted *pro hac vice*)
Rachel C. Strickland (admitted *pro hac vice*)
Jeffrey B. Korn (admitted *pro hac vice*)
Daniel I. Forman (admitted *pro hac vice*)
Stuart R. Lombardi (admitted *pro hac vice*)
Philip F. DiSanto (admitted *pro hac vice*)
787 Seventh Avenue
New York, NY 10019-6099
Telephone: (212) 728-8000
Fax: (212) 728-8111

*Attorneys for North American Refractories Company
Asbestos Personal Injury Settlement Trust*