FILED
12/8/22 10:49 am
CLERK
U.S. BANKRUPTCY
COURT - WDPA

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

IN RE:

| | | |
|---|---|---|
| ALL MATTERS RELATED TO NORTH | : | Misc. Case No.  15-204-TPA |
| AMERICAN REFRACTORIES COMPANY, | : | |
| et al. in Case No. 02-20198, as affected by the | : | |
| May 24, 2013 Order Entering Final decree | : | |
| entered at Doc. No. 7940, | : | Adv. No. 21-2097-TPA |
| *Debtors* | : | |
| | : | Related to Doc. No. 449 |
| HONEYWELL INTERNATIONAL, INC., | : | |
| *Plaintiff* | : | |
| | : | |
| v. | : | |
| | : | |
| NORTH AMERICAN REFRACTORIES | : | |
| COMPANY PERSONAL INJURY | : | |
| SETTLEMENT TRUST, | : | |
| *Defendant* | : | |

## MEMORANDUM OPINION AND ORDER

*Appearances:* Michael Kruszewski, Esq. for the Plaintiff
David Ross, Esq. for the Defendant
Jennifer Richnafsky, Esq. for Lawrence Fitzpatrick, Future Claimants' Representative (FCR)
George Snyder, Esq., for NARCO Trust Advisory Committee (TAC)
Eileen Bradley, Esq. for the Limited Intervenors (Insurers)
Courtney M. Helbling, Esq., for Certain London Market Insurers

## INTRODUCTION

It has been more than 20 years since the North American Refractories Company ("NARCO") filed a Chapter 11 bankruptcy petition in this Court, primarily to deal with thousands of pending and anticipated asbestos-related personal injury claims against the company. It has been almost 15 years since a plan was confirmed in the case calling for the creation of a trust and the

1

issuance of a channeling injunction to direct all of those claims to the trust for resolution, as authorized under *11 U.S.C. §524(g)*. *See* November 13, 2007 Order, Main Doc. No. 5508.[1] It has been more than 9 years since a final decree was entered and the case closed on the basis that the confirmed plan was substantially consummated. *See* May 24, 2013 Final Decree, Main Doc. No. 7940.

While the asbestos settlement trust that was thus created has been functioning and paying claims for a number of years now, it is fair to say that its existence has not been a tranquil one. Rather, from almost the very inception of the trust there have been ongoing disputes between the trustees and the party responsible for funding the trust over how the trust should be operating and evaluating claims. The present case is but the latest skirmish in this ongoing war, as will be described more fully below.

An extensive trial was conducted in late May 2022, with numerous exhibits admitted and numerous witnesses presented by the Parties. The usual post-trial briefing and argument occurred thereafter, but the Court delayed in issuing its decision at the request of the Parties because they reported that they were engaging in settlement discussions (as encouraged by the Court) that could potentially resolve the matter on amicable terms. The Court was willing to go along with this delay because it believed a negotiated settlement would be in the best interest of all concerned,

---

[1] It will be noted from the caption that there are three separate proceedings involved here, the main NARCO bankruptcy case, Case No. 02-20198-TPA, a miscellaneous proceeding, Misc. Case No. 15-204-TPA, and an adversary proceeding, Adv. No. 21-2097-TPA. For the sake of convenience, and to avoid confusion, the Court will identify items on the main bankruptcy case docket as Main Doc. No. ___, on the miscellaneous case docket as Misc. Doc. No. ___, and on the adversary proceeding docket as Adv. Doc. No. ____.

2

though as the post-trial months dragged on without a settlement the Court indicated to the Parties that

it would not wait much longer before rendering a decision.  The Court therefore recently gave the

Parties an informal final deadline for proposing a settlement.

This forbearance has finally borne fruit, with the Parties having filed a ***Motion for

Entry of an Order (i) Approving the NARCO Asbestos Trust Amended Buyout Agreement and

Amended Agreements, (II) Declaring the Amended Buyout Agreement is Consistent with the Plan

and Does Not Affect the NARCO Channeling Injunction, and (III) Approving the Form and

Manner of Notice of the Amended Buyout Agreement*** ("Motion") at Doc. No. 449 on November

21, 2022.  As its title implies, the *Motion* reports that the  Parties to this action, including the

Intervenors, have reached an agreement that, if approved, will result in a settlement of their current

dispute, and ultimately a "divorce" that will end the entire "war" described above.

Argument on the *Motion* was heard on December 7, 2022, and for reasons to be

explained the Court will grant it and approve the settlement.  After appropriate notice no objections

to the proposed settlement were filed, though a ***Response of Certain London Market Insurance

Companies*** ("Response") was filed at Doc. No. 455.  The *Response* does not object to the proposed

settlement, but it does ask that any order approving it include a couple of provisions to protect the

interests of the filing insurance companies with respect to a confidential settlement agreement they

have with Honeywell.  The *Response* will be addressed *infra*.

Even though no objection to the *Motion* was filed, given the unique nature of the

situation presented, and the possibility that this decision will nevertheless be appealed, the Court does

not believe that the typical *Martin* factor analysis[2] standing alone would be sufficient to paint a full picture to explain the basis for this decision. Instead, the Court will preface that analysis with considerable detail showing the background information leading up to the current dispute and going through each of the claims and counterclaims in the case in light of the evidence that was presented at trial. Because of the posture of the case and the pending *Motion*, this prefatory material is not intended to be construed as constituting findings of fact and conclusions of law under *Fed.R.Bankr.P. 7052* as though the Court were actually ruling on the merits of the case, but rather as findings that support the *Martin* factor analysis that follows and help to provide a more complete context for that analysis.[3]

## FACTUAL BACKGROUND

Because of the nature of the dispute between the Parties it is necessary first to go into some detailed history in order that the issues presented may be better understood. The main Parties in the case are Honeywell International, Inc. ("Honeywell") and the North American Refractories Company Personal Injury Settlement Trust ("the Trust" or "the NARCO Trust"). The Trust is an

---

[2]

See *In re Martin*, 91 F.3d 389 (3d Cir. 1996) (setting forth the criteria that bankruptcy courts should consider in deciding whether to approve a proposed settlement). The *Martin* test remains the applicable law for evaluating a proposed bankruptcy settlement. *See e.g., In re Washington Mutual, Inc.*, 848 Fed. Appx. 84 (3d Cir. 2021) (applying *Martin* factors on appeal of order approving bankruptcy settlement)*, In re ICL Holding Co., Inc.*, 802 F.3d 547 (3d Cir. 2015) (same).

[3]

The Court has jurisdiction to hear and decide the *Motion* pursuant to *28 U.S.C. §§157* and *1334. See also* §11.2 of the Confirmed Plan (providing the Court will have exclusive jurisdiction to interpret, enforce and administer Trust documents) and the Final Decree entered at Main Doc. No. 7940 (similar). This is a core proceeding under *28 U.S.C. §157(b)(2)(A), (B), (L)*, and *(O)*.

asbestos settlement trust that was created pursuant to *11 U.S.C. §524(g)*, as will be discussed further

below, and Honeywell is the entity that is obliged to fund the Trust on an ongoing basis.  Also

permitted to intervene in the case were the NARCO Trust Advisory Committee ("TAC") and

Lawrence Fitzpatrick, Future Claimants' Representative ("FCR").  The TAC and the FCR represent,

respectively, current and potential future claimants against the Trust.

### A.    The NARCO business and its product line

The Parties have stipulated to the following brief sketch of the corporate history of

NARCO:

> The first North American Refractories Company, a Delaware
> corporation based in Cleveland, was formed in 1928. From 1928 to
> 1968, NARCO operated as an independent corporation. In 1968,
> NARCO was acquired by and merged into Eltra Corporation ("Eltra").
> Eltra continued the NARCO business as an unincorporated division
> for approximately 18 years. Eltra was acquired by and became a
> wholly-owned subsidiary of Allied Chemical Corporation in 1979.
> Allied Chemical Corporation changed its name to Allied Corporation
> several years later. In October 1985, the managers of Eltra's NARCO
> division and Allied Corporation agreed to a leveraged buyout of the
> NARCO business by NARCO management, and a new corporation,
> NARCO Investors, Inc., was formed to acquire the assets and assume
> the liabilities of the NARCO business, a transaction that closed on
> January 17, 1986. NARCO Investors, Inc. later changed its name to
> North American Refractories Company. Allied Corporation later
> changed its name to Allied Signal Inc., and in 1999 Allied Signal Inc.
> acquired Honeywell, Inc., and changed its name to Honeywell
> International Inc.

*See The Parties' Stipulated Facts*, Adv. Doc. No. 347 at footnote 1 (hereinafter "*Stipulations* at __").

NARCO specialized in the manufacture of "refractories," which are products such as bricks, castables and gunning mixes[4] designed for high temperature applications like furnace linings and vessels used for molten metals. *Stipulations* at ¶1. The steel, aluminum and glass-making industries were the largest customers for the products. NARCO manufactured more than 2,000 different products, approximately 30 of which included asbestos as an ingredient (hereinafter sometimes referred to as "NARCO ACP," short for NARCO Asbestos Containing Product). NARCO stopped intentionally making any NARCO ACPs in 1980. *Id*. at ¶2.

The first asbestos personal injury tort suit arising out of the NARCO product line was filed in 1983. The number of such tort cases grew steadily over the following years through 1997, at which point a rapid acceleration in the number of case filings began. The cost of defending and resolving such tort suits grew in a similar pattern, from below $10 million per year in the period prior to 1998 to $100 million by 2000 and to $175 million in 2001. *Id*. at ¶4. This increasing financial burden was accompanied by disputes as to where liability rested for particular claims. The 1986 purchase agreement referred to above had placed responsibility for addressing each particular asbestos claim on either Honeywell or NARCO, depending on which specific NARCO ACP was involved in the claim. However, many of the tort plaintiffs never identified the specific NARCO ACP to which they were allegedly exposed, making it impossible to determine who was responsible. Because of these factors, and a perception that courts in the tort system were allowing claims to proceed with minimal exposure evidence, a strategy was implemented to seek bankruptcy protection

---

[4]  "Gunning" mixes are refractory materials designed to be applied onto surfaces subjected to high temperatures, primarily to extend the life of those surfaces, such as previously installed refractory bricks and concrete.

for NARCO followed by the creation of an asbestos trust and issuance of a channeling injunction that

would direct all asbestos claims to the trust for resolution,  as contemplated by *11 U.S.C. §524(g).*

### B.   *Bankruptcy and plan confirmation*

NARCO filed for bankruptcy protection on January 4, 2002.  *See In re North

American Refractories Company*, Case No. 02-20198 (hereinafter, "NARCO Bankruptcy").  As of

that date approximately 290,000 plaintiffs had filed suit against NARCO for personal injury claims

based upon alleged exposure to asbestos in NARCO ACP.  Of that amount, roughly 75,000 of the

claims had already been dismissed, mostly for lack of evidence as to exposure, 100,000 of the claims

had been settled, and 116,000 were still pending and unresolved.  The bankruptcy automatic stay

acted to stay all of the pending claims against NARCO, and the Bankruptcy Court also entered a

temporary restraining order extending the stay to any  NARCO ACP-related asbestos claims filed

against Honeywell.  *See generally, NARCO v. Abernathy, et al.*, Adv. No. 02-2004, *Stipulations* at

¶10.  The FCR was appointed in December 2002.  *Id*. at ¶11.

The first attempt at a plan was filed on July 31, 2003.  *See* Main Doc. No. 1255.[5]  A

First Amended Plan was filed on September 15, 2005, *id.* at Doc. Nos. 3477, 3480-81, followed by

a Second Amended Plan on October 19, 2005, *id*. at Doc. Nos. 3552-53.  A Third Amended Plan was

filed on December 28, 2005, *id*. at Doc. Nos. 3888-89.  Prior to and after the submissions of these

---

[5]

The initial and succeeding plans involved not only NARCO, but also various NARCO
subsidiaries that had filed their own bankruptcies, as well as another bankruptcy debtor known as
Global Industrial Technologies, Inc. and its subsidiaries or affiliates, all of which cases were being
jointly administered in the NARCO Bankruptcy.  This fact is not relevant for present purposes and
the Court disregards it.

various versions of a plan extensive negotiations took place involving Honeywell, FCR, and the

Asbestos Claimants' Committee or "ACC" (a forerunner of TAC that had been appointed by the

United States Trustee) concerning not only the plan itself, but associated documents that would

implement the asbestos trust that would be the centerpiece of the plan.  Among the most significant

associated documents were a "Trust Agreement" and a "Trust Distributions Procedures", or "TDP."

These documents went through a number of versions, both before and after confirmation.  The

Parties agree that the currently operative versions are the April 30, 2013  Trust Agreement and the

October 4, 2017 TDP.  *Stipulations* at ¶¶31, 32.  *See* Ex. B (TDP) and Ex. 2 (Trust Agreement).

The Third Amended Plan (hereinafter, "the Plan"), including a number of

amendments, modifications and supplements, was confirmed on November 13, 2007, on an

uncontested basis.  *See* Main Doc. No. 5507. As noted by the Court in the *Revised Findings of Fact*

*and Conclusions of Law* that was attached as Exhibit 1 to the *Revised Memorandum Opinion* which

confirmed the Plan, the Plan contemplated the creation of the NARCO Trust as a vehicle for the

payment of an estimated 100% of the value of "NARCO Asbestos Trust claims" established

according to the TDP.  In support of the *Plan* and the proposed NARCO Trust, the expert opinion of

Dr. Francine Rabinovitz was presented to the Court by Honeywell.  The estimate that Dr. Rabinovitz

provided to the Bankruptcy Court was based on NARCO's and Honeywell's settlement history in the

tort system and it assumed that the  future experience would be similar to the past experience in terms

of rate of filings, types of filings, and disqualification rate.  *Stipulations* at ¶30.

Among the relevant findings of fact made by the Court in confirming the *Plan* based

on the expert opinions of Dr. Rabinovitz were the following:

8

- The estimated undiscounted value of future asbestos-related claims against NARCO was between $0.98 billion and $2.28 billion.

- The estimated discounted value of those future claims was from $0.55 billion to $1.29 billion.

- Under the Trust Agreement Honeywell committed to contribute assets with a nominal value of $6.32 billion and present value of $2.37 billion to the Trust to pay qualifying claims until 2050, an amount which was above even the highest estimated values of claims.

- The Trust would be in a financial position to pay every eligible claimant in accordance with the provisions of the TDP.

*Revised Findings of Fact* at ¶¶ 163-165.

Additional details as to the contents of the Trust Agreement and the TDP will be discussed further below in connection with the Court's legal analysis. For the time being, it may be noted that the Parties agree that the Trust is unique in the *Section 524(g)* universe, or at least highly unusual. Other trusts created pursuant to that provision have been funded by an equity stake in the reorganized debtor plus sometimes a one-time, lump sum payment made by or on behalf of the debtor, with the trust and payor thereafter going their separate ways. By contrast, the NARCO Trust is funded by the typical equity stake[6] plus future payments on an "evergreen" basis, with Honeywell obligated to make continuing payments on an ongoing basis over the life of the Trust, up to annual maximum.

---

[6] In addition to Honeywell's ongoing funding obligation to the Trust, the Trust is the owner of 79% of Harbison Walker International, Inc. stock – the reorganized entity that emerged out of the Plan. The Trust was to use dividends or sale proceeds from such stock to pay claims before Honeywell's funding obligation becomes operative. To the Court's knowledge, no other "evergreen" asbestos trust has ever been created pursuant to *Section 524(g)*.

As for the TDP, the key features  most relevant for present purposes are that Trust claimants must satisfy both a medical prong and an exposure prong in order to recover, and that the latter in turn has two components: presence of a NARCO ACP on the job site where the claimant worked, and the claimant's occupational exposure to the NARCO ACP, both of which must be shown by "competent and credible" evidence.  Additionally, as relevant here the TDP allows for two types of review for most claimants.   Under the Expedited Review ("ER") process successful claimants receive a fixed amount, called the "Scheduled Value," depending on the level of asbestos disease involved.  The ER process was designed to provide an expeditious, efficient and inexpensive method for liquidating all claims that can be easily verified.  *Stipulations* at ¶90.  Under the Individual Review ("IR") process claims receive more individualized consideration and evaluation and claimants can receive higher amounts than the Scheduled Value, up to a maximum set for each disease level, but can also receive less than the Scheduled Value.  IR is generally a lengthier and more involved process than is ER.

Although the Plan was confirmed on an uncontested basis it was the subject of an appeal by certain insurance companies and several years went by before the confirmation process was concluded, thus delaying final implementation of the Trust.  The Trustees of the NARCO Trust (Ken Kawaichi, Richard Schiro, and Mark Gleason), who were initially proposed as Trustees in 2005 were approved as part of the Plan Confirmation Order issued on November 6, 2007.  Main Doc. No. 5508.  They have remained as Trustees up to the present time.[7]  The Parties agree that the

---

[7]

Thomas Stephens had originally been proposed as a Trustee in 2005 but in 2007 his name was withdrawn and replaced by Mark Gleason.  *See* Main Doc. Nos. 4455 and 5145.

10

Plan was consummated in April 2013 when the Trust became effective. *Stipulations* at ¶27. A final decree was entered in the NARCO Bankruptcy on May 24, 2013 and the case was closed. Main Doc. No. 7940. The Trust began processing claims in April 2014. *Stipulations* at ¶28.

## C. *The 2015 Litigation*

From the very beginning of claims processing by the Trust there were fundamental disagreements between it and Honeywell as to how the Trust Agreement and TDP should be interpreted and implemented, and it did not take very long for the matter to come back before this Court following a failed attempt at an alternative dispute resolution. In June 2015 Misc. No. 15-204-TPA, styled *In re All Matters Related to North American Refractories Company*, was opened to serve as a vehicle for resolution of the Parties' dispute. On July 13, 2015 Honeywell filed a complaint against the Trust, as well as a motion for a preliminary injunction. *See* Misc. No. 15-204 at Misc. Doc. Nos. 61, 63.

The Honeywell complaint in Misc. No. 15-204, consisting of 356 paragraphs followed by a prayer for relief, was divided into nine (9) separate counts. Broadly speaking, Honeywell raised allegations to the effect that: the Trust was not properly applying the "exposure" standard under the TDP pursuant to which claimants are required to submit evidence of exposure to NARCO ACP (Counts 1, 2); the Trust was improperly applying the TDP requirement for claimants to submit "competent" evidence (Counts 3, 4); the Trust was violating the "consultation and consent" provision of the Trust Agreement and TDP by failing to consult with Honeywell and obtain its consent before unilaterally amending the TDP's exposure and evidentiary standards

11

(Count 5); the Trust was violating the TDP by failing to honor Honeywell's audit rights (Counts 6, 7); the Trust was violating the TDP by improperly administering the IR process (Count 8); and, the Trust was failing to properly recognize Honeywell's litigation rights under the TDP (Count (9). As will be seen, many of these same issues are present in the current litigation. In its motion for a preliminary injunction Honeywell sought an order enjoining the Trust from paying any claims on the basis of a "refractory inference," and from paying any claims that violated the "competent evidence" standard of the TDP.

Events moved briskly in the Misc. No. 15-204 case with respect to the preliminary injunction motion. Expedited discovery was permitted and an electronic discovery master was appointed to resolve disputes. The Parties voluntarily agreed to maintain the status quo as to claim payments pending a decision on the motion for preliminary injunction to avoid the need for consideration of a temporary restraining order in the interim. An evidentiary hearing on the preliminary injunction request was held on August 3-5, 2015. The main Parties filed post-hearing briefs thereafter, as did FCR and TAC on a joint basis. A closing argument was heard on November 23, 2015.

The Court issued a Memorandum Opinion on December 16, 2015. *See* Misc. Doc. No. 265. In denying a preliminary injunction the Court relied primarily on a finding that the potential unrecoverable monetary loss that Honeywell might experience if claims were improperly paid by the Trust during the case was not of a sufficient magnitude to establish that it would be irreparably harmed if an injunction were not granted. The Court also concluded that Honeywell had failed to show a likelihood of success on the merits – such conclusion being based in part on changes

in circumstances that had occurred since the case was filed such as a reduction in the number of

disputed claims, voluntary changes that were implemented by the Trust in its claim-processing

practices, and the creation of a "one-way mirror" by the Trust that allowed Honeywell to monitor

the progress of individual claims.

The Memorandum Opinion issued in late 2015 summed up the Court's view at the

time as follows:

> The Court believes the current manner in which the Trust is processing
> claims is at least minimally protective of Honeywell's rights so as to permit
> a denial of the Motion [for preliminary injunction], though this should by no
> means be taken as indicating one way or the other whether the Trust's
> procedures will be found to be in full compliance with the TA and the TDP
> once a full evidentiary record has been presented.

Misc. Doc. No. 265 at 35.

Following the issuance of the Memorandum Opinion denying Honeywell's motion

for a preliminary injunction, the 2015 litigation proceeded along in the normal course and a pretrial

scheduling order was issued setting a trial date of September 19, 2016.  As part of the pre-trial

discovery process the Parties requested that the Court appoint a mediator to assist in resolving any

discovery dispute and another mediator to address issues about the Trust's budget.  The Court agreed

to both of those requests and, with the consent of the Parties, on March 2, 2016, it appointed former

Judge Judith K. Fitzgerald as the  mediator for Trust budget issues.[8]  *See* Misc. Doc. No. 324.

---

[8]

Judge Fitzgerald had presided in the NARCO Bankruptcy prior to her retirement on May 31,
2013, following which it was reassigned to the Undersigned.  The Court suggested to the Parties at
a hearing held on January 28, 2016, that she might be a good choice for  mediator given her prior
role in the bankruptcy and the Parties agreed with that suggestion.

On March 17, 2016, the Court approved a stipulation submitted by the Parties which

stated as follows:

> The Trust stipulates that the Trust will not, as a matter of blanket
> policy, accept bare assertion that the claimant worked around
> refractory products as sufficient to meet the exposure standard under
> the First Amended North American Refractories Company Asbestos
> Personal Injury Settlement Trust Distribution Procedures ("TDP").
> Instead, the Trust will evaluate claim submissions on a case-by-case
> basis, considering the totality of evidence that is presented in support
> of the claim and drawing inferences therefrom. Nothing contained in
> this stipulation precludes or authorizes the Trust's use and drawing
> of inferences from competent and credible evidence from any source
> in evaluating and resolving individual claims.

*Stipulations* at ¶58.  On April 15, 2016, the Parties then filed a *Joint Stipulation of Dismissal*

*Without Prejudice* which was granted by the Court three days later.  *Id*. at Misc. Doc. Nos. 385, 386.

The 2015 litigation case in this Court was then closed on June 1, 2016, with no final decision on the

merits having been made in the case.

### D.   *Mediation and Standstill Agreement*

The Parties agreed to a dismissal of Misc. No. 15-204 because they had decided to

try to resolve their disputes through continued mediation with Judge Fitzgerald ("Mediator") rather

than through further litigation.   The Parties' understanding regarding this mediation was

memorialized in a "Standstill Agreement" that was signed by them on  April 12, 2016. *See* Exhibit

384. It provided for an 18-month period of mediation and the Parties agreed to abide by the

mediator's rulings during this "Standstill Period."   *Stipulations* at  ¶¶59-60.  (This period of

mediation will henceforth be referred to as the "Standstill Mediation" to distinguish it from other

mediations that the Parties have engaged in over the years).

Attached to the Standstill Agreement was a document known as the "April 2016

Directives," which were directions that the Trust issued to the company it had hired to act as a claim

processor, an entity known as CRMC.  Of  relevance for present purposes is "Directive 7" which

provided examples of evidence that would raise competence or credibility concerns with respect to

a submitted claim.  Even more specifically, Directive 7(a) provided that claims reviewers were not

to consider exposure allegations that "use identical descriptive language as the language highlighted

in the  exposure affidavit(s) attached hereto as Exhibit B (as may be  supplemented from time to

time)." *Stipulations* at ¶62.  Section 9 of the Standstill Agreement provided that the Trust would not

alter any of the April 2016 Directives during the Standstill Period unless one or more of them were

determined to be "impracticable" after consultation with the other Parties and a favorable ruling by

the Mediator on a proposed amendment.  *Stipulations* at ¶64.

During the course of the Standstill Mediation the Parties brought a number of matters

before the Mediator for a ruling.  Among these was a submission by TAC and FCR made on October

31, 2016 asking that she find Directive 7(a) to be impracticable because of the restrictions it placed

on the use of  "form" affidavits to support claims made to the Trust.  *Stipulations* at ¶65. The Trust

and Honeywell were permitted to respond and on May 16, 2017, the Mediator issued her final ruling

on the matter.  *See Stipulations* at ¶¶66-74 and Exhibit AA.  The Mediator's ruling is not binding

on the Court, but it was freely referenced at trial and the Court finds that it is worthy of some

consideration, especially given the Mediator's prior intimate involvement in the bankruptcy process

that led to confirmation of the Plan and creation of the Trust Agreement and TDP. As it happens,

the ruling has elements favorable to both sides of the current dispute.

On the one hand, the Mediator found that form affidavits are not inherently unreliable

just because they are  prepared by a lawyer who copied the "latest and greatest" version of the

affidavit as a starting point.  In a footnote the Mediator explained as follows:

> A "form" affidavit means an affidavit that contains exposure
> allegations that use identical descriptive language as the language
> contained in other exposure affidavits submitted to the Trust,
> including but not limited to those affidavits currently listed on
> Exhibit B to the Directives. Ultimately, it is the Trustees' decision in
> an exercise of their discretion, whether an affidavit is a "form"
> affidavit that lacks sufficient indicia of reliability to be considered by
> the claims processor.

Ex. AA at n. 5. On the other hand, she also stated that her decision was not intended as a blanket

endorsement of the use of form affidavits and cautioned that the Trust must take heed of evidence

showing that particular form affidavits may have indicia of unreliability.  The ruling also directed

that after September 30, 2017, unless exceptional circumstances existed, any new form affidavit

submitted to the Trust as proof of exposure to a NARCO ACP "shall not be considered by the claims

processor." *Stipulations* at ¶73.  The Trust published new Directives in June 2017 implementing the

Mediator's ruling in that regard.  *Id*. at ¶75. The Standstill Period and Standstill Mediation ended

in October 2017.

### E.   Post-standstill

Following the Standstill Period the Trust published new directives in February 2018

that allowed for the consideration of form affidavits in certain circumstances, which was a change

from what the Mediator had previously ruled and what had been embodied in the June 2017

Directives for the post-October 2017 period. *Stipulations* at ¶75. The Trust again issued revised

Directives in January 2019. The January 2019 Directives are substantively identical to the February

2018 Directives with respect to matters involved in the present case, and they remain currently in

effect. Relevant portions of these various Directives will be discussed in more detail below.

Honeywell made known to the Trust its disapproval of the new Directives. The

Parties did make some attempts to resolve their differences but without success. In addition, during

this same general time period Honeywell entered into discussions with TAC and FCR for the

purpose of attempting to reach an agreement on a "buy out," whereby, broadly speaking, Honeywell

would pay a lump sum to the Trust to be used for all future claim payments and Trust administrative

expenses.

Both the future claims payments and future administrative expenses are a function

of the "evergreen" nature of the Trust. With respect to claim payments, as was indicated previously,

once the Trust exhausted the receipt of income from Harbison Walker International dividends for

use in paying claims – as has now happened, Honeywell became responsible to fund these claim

payments up to an annual maximum amount. Honeywell is also obligated to fund the

"administrative" expenses of the Trust each year and these are not subject to a maximum limit, only

a reasonableness standard. The Trust's administrative expenses include such things as legal fees,

Trustee compensation, claim processing expense, etc. These administrative expenses are themselves

substantial.[9]

---

[9]

    The Annual Reports filed by the Trust since the 2013 fiscal year show that the cumulative
legal expenses through 2021 have been $73,686,196 and cumulative Trustee disbursements during

Under the buy-out proposal that was being discussed the Trust would no longer be funded on an evergreen basis and would instead essentially be converted into something similar to other *Section 524(g)* asbestos trusts where there is no ongoing relationship between the trust and a funding party.  An initial agreement along those lines apparently with TAC and FCR was reached, but when presented with it the Trust did not agree and the current litigation soon followed.[10]

### F.  Current Litigation

The current litigation began on September 15, 2021, when Honeywell filed a motion seeking to reopen Misc. No. 15-204 so that it could file a new complaint against the Trust, which motion was granted by the Court on September 20, 2021.  Surprisingly, it was the Trust, and not Honeywell that first filed a complaint once the case was reopened, with Honeywell following suit shortly thereafter.  For the sake of clarity, the Court decided it would be better for the complaints to initially proceed as separate adversary proceedings rather than simply under Misc. No. 15-204, and as a result the Trust's Complaint was designated as Adv. No. 21-2096 in the Misc. Case and Honeywell's Complaint as Adv. No. 21-2097.  The two adversaries proceeded in tandem for a period of several months.  Eventually the Trust filed counterclaims against Honeywell in Adv. No. 21-2097 that mirrored the issues raised by the Trust in Adv. No. 21-2096.  At the urging of the Court for

---

the same period have been $14,066,981.  *See,* Main Doc. Nos. 7950, 7992, 8399, 8406, 8412, 8420, 8423, 8425 and 8509.  These figures do not even include expenses for 2022, when the bulk of the litigation involved here occurred, and which are thus surely substantial.

[10]

The Trust and Honeywell have strong disagreements as to how the "buy out" proposal was originally presented to the Trust and the discussions that took place thereafter.  The Court will comment further on this matter below.

purposes of economy, Adv. No. 21-2096 was closed on January 18, 2022 with the consent of the

Trust.

From the very inception of the current litigation the Court made known to the Parties

that it intended to have the case proceed to resolution as quickly as possible given the stakes

involved, particularly as regards the Trust claimants, many of whom are elderly and ill.  The Court

thus established an aggressive discovery schedule and indicated that trial would follow soon

thereafter.  The Parties engaged in extensive discovery and did so in a relatively short period of time.

While there were a few discovery disputes along the way brought before the Court, for the most part

the Parties proceeded cooperatively and were able to complete discovery and file their pretrial

statements with minimal involvement by the Court.

The trial was conducted from May 23 through May 26, 2022.  Time limits for trial

were established in advance by the Court for each of the Parties, but none of them reached their

allotted limit and there was no complaint by any of the Parties of insufficient time to present their

respective cases.  At the close of Honeywell's case the Court granted the Trust's oral motion for

judgment as a matter of law with respect to Counts  V and VI of the Honeywell complaint, and as

to a part of Count VII.  *See* May 31, 2022 *Post-Trial Order*, Doc. No. 386 at ¶1.  Those matters are

therefore not addressed in this Memorandum Opinion.

As noted above, the rather long delay in issuing a decision on the remaining counts

following the trial was primarily the result of an accommodation to the  Parties who indicated to the

Court that they continued to talk about a possible settlement along the lines of a "buy-out"following

the trial – which the Court had encouraged.  The complexity of the subject matter was also a factor,

since the volume of exhibits and trial testimony that required consideration would have taken a fair amount of time even if there had been no ongoing settlement talks between the Parties.  In any event, the Court was pleased to hear that they were talking and making progress and for several months after the trial it received periodic informal updates from the Parties

Finally, at an informal update held on October 17, 2022, the Parties reported that they had reached an agreement on a buy-out "number," which was a major breakthrough.  The Parties did not inform the Court what that number was, or of any further details of their settlement discussions.  They did indicate there remained a disagreement to be resolved, with FCR believing that the buy-out would need to be accompanied by certain changes to the TDP and Trust Agreement to reflect a  change in the Trust's nature, and the Trust disagreeing that any such changes were needed.  The Court instructed the Parties that they should keep on talking, but that the time it was willing to delay rendering a decision was almost over.  The Court suggested that if the Parties were unable to resolve this apparent last hurdle to a negotiated settlement a motion should be filed by the FCR setting forth the changes it was proposing to the Trust documents, whereupon the Trust could promptly respond and an expedited hearing on the matter could be scheduled.

Following yet another informal conference held on October 28, 2022, the Court imposed a deadline of November 14, 2022, for a settlement motion to be filed or else a decision on the merits would be issued.  On that date the Parties did not file anything, but Counsel did contact Chambers and reported that they had an agreement but simply  needed "a little extra time" to complete the required documents.  While the Court was disappointed to hear that the deadline would not be met, on the strength of the representations that were made, it agreed to extend the deadline

20

until November 18th at Noon.  A settlement motion was filed on the 18th, albeit several hours past

the deadline, but more importantly it indicated that the TAC and FCR were still not completely "on

board" due to some unspecified remaining issues.  That result was unacceptable to the Court and

therefore it convened a telephone discussion with local Counsel for the Parties late in the afternoon

on November 18th, followed by two further such discussions also involving Lead Counsel, the last

of which took place in the evening of that same day, and which finally resulted in an apparent

settlement to which all Parties agreed.  The unacceptable settlement motion that had been filed

earlier that day was therefore withdrawn, and the *Motion* under present consideration was filed on

the morning of Monday, November 21st.


### *SUMMARY OF THE CLAIMS*


As stated in its complaint, Honeywell's first claim  is that the Trust is now accepting

form affidavits that do not meet the competent and credible evidence standard in violation of the

Trust Agreement and the TDP.  Its second claim is that the Trust has reinstituted a "blanket

refractory inference" in violation of the March 17, 2016 Stipulation and Order that was entered as

part of the 2015 litigation.  The third claim  by Honeywell is that the Trust has accepted affidavits

from claimants that contain material inconsistencies with representations made by the same claimant

in other matters, which Honeywell alleges does not meet the competent and credible evidence

standard in violation of the Trust Agreement and the TDP. Honeywell's fourth claim is that the IR

model which the Trust uses is in violation of the Trust Agreement and the TDP because it does not

properly factor extenuating circumstances of the claimant.  The fifth claim by Honeywell is that the

Trust's budget is excessive and unwarranted. Honeywell sought declaratory relief as to all of these

matters.

The Trusts's first counterclaim against Honeywell is that Honeywell has in various respects attempted to exercise contractual rights that it does not have under the Trust Agreement and the TDP by unreasonably withholding consent, by attempting to settle claims outside of the Trust claim process, and by attempting to negotiate a buyout agreement.  The second Trust counterclaim is that Honeywell has attempted to usurp the powers of the Trust and its Trustees in violation of the Trust Agreement and the TDP.  The third Trust counterclaim is that Honeywell has violated *Section 524(g)* by its actions.   The Trust sought declaratory relief as to these counterclaims, and in its fourth counterclaim sought permanent injunctive relief on the same basis.

### *Legal Discussion re Governing Law*

The Trust Agreement and the TDP provide that the Trust is to be a statutory trust under the *Delaware Statutory Trust Act* ("DSTA"), *12 Del. C. §3801, et seq.*, and that the Trust documents are to be construed in accordance with the law of that state.  None of the Parties has contested  Delaware law as being the proper choice of law for construing and implementing the Trust documents.  The DSTA provides:

> Except to the extent otherwise provided in the governing instrument of a statutory trust or in this subchapter, the laws of this State pertaining to trusts are hereby made applicable to statutory trusts

*12 Del. Code  § 3809.*  None of the Parties has argued that there is anything in the Trust Agreement or the TDP, or in the DSTA  itself, that would  alter Delaware law as to a court's role in reviewing the actions of a trust, so the general Delaware law pertaining to trusts is the law that would be applied.  The Court agrees with this view of applicable state law.

The  most recent statement from the Supreme Court of Delaware as to the law on interpretation of trust agreements is as follows:

> Delaware courts apply a "seminal" rule of construction when interpreting trust agreements: "the settlor's intent controls the interpretation of the instrument. Such intent must be determined by considering the language of the trust instrument, read as an entirety, in light of the circumstances surrounding its creation. If this analysis fails to resolve the conflict, we resort to rules of construction." Accordingly, we determine the settlor's intent based on the specific language of the trust instruments.

*In re Peierls Fam. Inter Vivos Trusts*, 77 A.3d 249, 263 (Del. 2013) (quoting *Annan v. Wilmington Trust Co.*, 559 A.2d 1289, 1292 (Del. 1989).

Under the Trust Agreement, the settlors of the Trust are identified as NARCO, Honeywell, and ANH.[11]  *See* Trust Agreement at  Art. 2.1, Ex. 2.  However, as the Court noted back in the 2015 litigation, this is not the prototypical trust situation in which the settlor(s) created the trust in a unilateral fashion without having to satisfy the concerns or desires of others.  The Trust was created as part of a bankruptcy proceeding whose main purpose was to address the flood of asbestos-related tort litigation that was affecting NARCO, and by direct extension, Honeywell.  It was the product of extensive negotiations and mediation among Honeywell, the Asbestos Claimants Committee ("ACC"), and the FCR as to what would be the terms of the then-anticipated *Section 524(g)* trust.  Without the approval of the ACC and FCR it is fair to say the NARCO Plan would not

---

[11]

ANH is the entity designated under the Plan to be the owner of the reorganized Debtors in the "NARCO Reorganized Debtors." *See* Revised Memorandum Opinion, Main Doc. No. 5507 at ¶ 137.

have been confirmed and the Trust would not have been created.  Additionally, representations as

to the functioning and expectations of the proposed trust were made to the Bankruptcy Court to

secure its approval of what was being proposed.  These are all certainly "circumstances surrounding

[the Trust's] creation" that the Court would be required to consider under Delaware law when

interpreting the Trust Agreement and the TDP.

### Discussion of the Claims and Counterclaims

Having now set forth the applicable law, the Court may turn to a discussion of the

individual claims made by Honeywell that survived the trial, and the individual counterclaims made

by the Trust.

### (A)   Honeywell Claims

### (i)   Count I – Form/check-the-box affidavits

Honeywell's first claim is that the Trust is breaching the Trust Agreement and the

TDP, as well as committing an abuse of discretion, by its current Directives which permit the

acceptance of "form" affidavits and "check-the-box" affidavits in support of claims.  Honeywell

asserts that such affidavits do not constitute "competent and credible" evidence of exposure to a

NARCO ACP as required by TDP §4.7(b)(1), and therefore they cannot be relied upon to state a

valid claim.  Honeywell further notes that following the 2015 preliminary injunction proceedings,

and as part of the understanding between the Parties leading to the Standstill Agreement and the

Standstill Mediation, the Trust itself issued 2016 Directives that recognized that such affidavits raise

competence and/or credibility concerns and prohibited their consideration by claims examiners, but that the Trust has reversed course and, beginning with the 2018 Directives, now allows consideration of such affidavits.

A starting point in considering this claim is a firm understanding as to exactly what is meant by the terms "form" and "check-the-box" affidavits, and that has proven surprisingly elusive. It was noted above that during the Standstill Mediation the Mediator referred to a form affidavit as one that "contains exposure allegations that use identical descriptive language as the language contained in other exposure affidavits submitted to the Trust." *See* Ex. AA at n. 5, *supra*. That comment was made, however, in her May 26, 2017 decision at a time when there were only a handful of designated form affidavits attached as Exhibit B to the 2016 Directives, and in fact the Mediator's decision was prompted by a complaint by the TAC and FCR to the Trust's addition of "more than 30" new affidavits to Exhibit B. *See* Ex. AA at Bates No. 1160. Since that time, and largely at the behest of Honeywell, the Trust has developed a computer program whose purpose is to review all affidavits that are filed with the Trust for the purpose of identifying potential form affidavits based on the use of identical language from previously- filed affidavits.

As was described at trial, when a claim comes in and the computer program flags an affidavit as possibly being of the form variety it generates a list of possible matching form affidavits with a "confidence of the match" number for each one on the list. The final decision on whether a particular affidavit should be treated as a form affidavit is made by the CRMC human claim processor, who actually reviews the affidavit in question and compares it with the designated forms identified by the program. There was scant testimony as to precisely how this computer

program works, or how close of a match there must be for identification as a form, beyond the fact

that the focus is on common exposure language across affidavits.  Such information would have

been helpful but neither side presented it.  In any event, since the computer program was

implemented it has functioned as the method by which form affidavits are recognized (in

conjunction with claim processor review), and the number of forms has ballooned to over 300 at

present with the number continuing to grow as claims are filed.  Honeywell has been given full

access to all of the identified form affidavits and it actually maintains them in a "Book of Forms"

that is available to its claim review team (discussed further below).[12]

There was even less information provided at trial as to how "check-the-box"

affidavits are identified.  Apparently the term was assumed by the Parties to be so self-explanatory

as to require nothing further for sufficient understanding.  Again, it would have been helpful to have

been given more to go on, but in the absence of that the Court will rely on its own common sense

when determining just what is meant by a check-the box affidavit and will treat it as referring to any

affidavit that provides the affiant with a number of pre-printed options for exposure allegations and

allows him or her to select one or more by simply indicating with a mark rather than using the

affiant's own language.

---

[12]

The entire process of employing a computer program to identify potential form affidavits strikes the Court as bordering on the absurd.  Apparently, if any newly-filed affidavit is sufficiently close in its exposure language to one that was previously filed (though exactly how close that means was not explained), a potential new "form" affidavit is identified.  Fortunately a human claim administrator makes the final call which presumably screens out at least some of the more questionable "hits" raised by the computer program.

Given the lack of evidence presented at trial as to the basic question of how it is determined as to what constitutes a form affidavit, the Court has some question whether it is even appropriate to treat all 300 or so of identified form affidavits as being in a single category.  There is, in the Court's view, a significant difference between affidavits with extensive identical exposure language and those with only the bare minimum of identical language to trigger the computer program being used.  There is also a significant difference between affidavits that generously supplement any identical language with personalized language particular to the affiant, and those that do not supplement at all, or only minimally.  Another significant difference is between the identified form affidavits that have been submitted hundreds or thousands of times versus those used much less frequently.  Despite all these differences the Court is thus faced with deciding a claim that seeks to treat them all as equivalent in the sense that all are "form" affidavits. That in itself gives the Court pause in whether it would be wise or desirable to implement a "one size fits all" bright line rule applicable across the board to all "form" affidavits.

The Court also finds it to be important that neither the Trust Agreement nor the TDP say anything about form affidavits and there is no evidence that the subject of the use of form affidavits in claim submissions ever came up as a subject of discussion during the negotiations that led to their creation  and the confirmation of the Plan.  Craig Zimmerman, formerly an attorney with the law firm of McDermott, Will and Emery ("MWE"),was the chief negotiator for Honeywell on the Trust Agreement and the TDP.  Zimmerman testified as follows at trial:

Q.  If you – did the specific topic of form affidavits come  up during negotiation of the TDP?

A.  I don't recall that it did.

27

Q.  Okay. So if you didn't discuss form affidavits specifically, how can somebody tell under the TDP whether they are sufficient evidence?

A.  Well, it would be like any other evidence that you have to look to the standard of 4.7(b) and assess whether that particular individual's submission satisfies what the – what that standard means, whatever they have submitted, be it a – an affidavit or a collection of affidavits.

*Trial Transcript* at 106:4-14, Adv. Doc. No. 399  (hereinafter cited as "*Tr. Trans.* at —").[13] Zimmerman further testified that neither Honeywell nor anyone else ever said during the negotiations that form affidavits would not be acceptable evidence under the TDP.  *Tr. Trans.* at 125:20 to 126:22.

In other words, the issue of form affidavits *per se* played no role whatever in the settlors' intent in creating the Trust and there is no basis for concluding that it was their intent to render their use as being in violation of the Trust Agreement or the TDP.  That being so, it is difficult to see a valid basis for Honeywell's request for the Court to declare just that on a blanket basis and to enjoin the Trust from accepting all form affidavits as credible and competent evidence of exposure.  *See* Adv. Doc. No. 99, Amended Complaint at ¶222.  The only way such a sweeping request for relief could be granted is if evidence had been presented showing that form affidavits are so inherently unreliable that, as a class, they can never provide credible and competent evidence in support of claims.  No such evidence was presented at trial, not even close, hence the requested relief could not be granted.

---

[13]

Because of the length of the transcript it appears in ten separate segments in the record at Adv. Doc. Nos. 399-408.  However, the pages of the  transcript are numbered consecutively in one continuous sequence from start to finish rather than starting a new sequence with each segment.

That being said, it is nonetheless also clear that form affidavits do in general provide some competence and credibility concerns going beyond those raised by individually customized affidavits. It was expressed at trial, and the Court agrees, that the use of form affidavits, especially those with extensive identical language and heavy usage, could be subject to abuse and could raise questions as to whether the recitations set forth therein represent the real recollection of the affiant. Indeed, all three of the Trustees themselves acknowledged at trial that they had, and still have, concerns about the credibility of form affidavits. *See Tr. Trans.* at 943: 12 - 22 (Gleason); 1316: 7 - 15, 1320: 8 - 11 (Kawaichi); and 1360:19 - 1361:6 (Schiro). Given that, it is fair to ask why the Trustees would have changed the Directives following the Standstill Mediation to allow for the consideration of form affidavits in certain circumstances rather than maintain the complete exclusion of them from consideration that had been in place.

The Trustees answer to that question was twofold. First, as explained by Trustee Gleason, when the Directives were originally adopted as part of the Standstill Agreement and the Standstill Mediation the Trust was still in its infancy, with little understanding of how the claim processing procedures that had been adopted would work in actual practice. Second, as time then went on and the Trust accumulated actual experience in processing claims some factors became apparent that prompted the Trustees to consider making a change regarding the treatment of form affidavits once they were free to do so following the termination of the Standstill Agreement.

One such factor was the complete preclusion of consideration of form affidavits submitted by a claimant or an affiant who had subsequently died or become incapacitated. In such circumstances it was impossible to correct or rehabilitate the affidavit by requiring it to be

29

personalized and then resubmitted because the person who had sworn to it was no longer available

to do so. The Trustees believed that to be an unfair result. Another factor was the very high rate

of claim deficiencies based on form affidavits that resulted under the original Directives issued in

April 2016. As early as October 2016, the TAC and the FCR joined in by the Trust, filed a request

with the Mediator to make a finding that Directive 7(a) was impractical and should be changed.

From the start of the Standstill Agreement in April 2016 until the Mediator's decision was issued

in May 2017 the Trust paid only 695 ER claims while over 24,000 such claims had been issued

deficiency notices, a significant number of which deficiencies were for simply having affidavits with

form language.

In the Court's view these were legitimate concerns of the Trustees. Just as it would

be wrong to have claim review standards for the Trust that are so unreasonably low that objectively

invalid claims are routinely accepted and paid, so too it would be wrong to have standards

unreasonably high such that objectively valid claims are routinely denied or given deficiency

notices. The Trustees, having as constituents both Honeywell on the one side and FCR/TAC on the

other, quite correctly had to take into consideration both of these extremes. In the exercise of their

discretion, the Trustees decided that the complete exclusion of form affidavits from consideration

when evaluating claims resulted in a standard that was too high. In order to correct this perceived

problem they issued a revised Directive that does allow consideration of form affidavits, in certain

circumstances. This Court's task would be to determine whether the Trustees' action in this regard

was an abuse of their discretion by acting in bad faith or in an arbitrary or unreasonable manner.

*See,* e.g., *McNeil v. Bennett*, 792 A.2d 190, 210-11 (el. Ch. 2001) (citing cases), aff'd in part, rev'd

in part, *McNeil v. McNeil*, 798 A.2d 503 (Del. 2002).

30

As an initial matter, the Court believes that the Trustees do have the power to

establish procedures for the evaluation of claims submitted to the Trust. *See*, *e.g*., Trust Agreement

at Art. 3.1(a) ...

> Subject to the limitations set forth in this NARCO Asbestos Trust
> Agreement, the Trustees shall have the power to, take any and all
> actions that, in the judgment (sic) of the Trustees, are necessary or
> proper to fulfill the purposes of the NARCO Asbestos Trust,
> including, without limitation, each power expressly granted in this
> Section 3.1, any power reasonably incidental thereto, and any trust
> power now or hereafter permitted under the laws of the State of
> Delaware or such other state as may be the Trust's state of domicile.

and the TDP at §6.2 ...

> Notwithstanding any provisions of this NARCO Asbestos TDP to the
> contrary, the Trustees shall always give appropriate consideration to
> the cost of investigating and uncovering invalid NARCO Asbestos
> Trust Claims so that the payment of valid NARCO Asbestos Trust
> Claims is not further impaired by such processes with respect to
> issues related to the validity of the medical or exposure evidence
> supporting a NARCO Asbestos Trust Claim. The Trustees shall also
> have the latitude to make judgments (sic) regarding the amount of
> transaction costs to be expended by the NARCO Asbestos Trust so
> that valid NARCO Asbestos Trust Claims are not unduly further
> impaired by the costs of additional investigation.

The inclusion of the original Directives as part of the Standstill Agreement, with an obligation that

the Trust not alter them during the Standstill Period except to comply with any rulings by the

Mediator, or upon consultation with the other Parties and submission of a proposed amendment to

the Mediator, is further confirmation that the general power of the Trustees to implement Trust

policy respecting claim processing was recognized by the Parties.

So, it is clear the Trustees had the power to issue the modified Directives concerning

form affidavits with the remaining question simply being whether such power was properly

exercised by them.  On the question of a trustee's abuse of discretion in exercising a power the

Delaware courts have cited favorably to Restatement of Trusts, §187 ("Control of Discretionary

Powers"), which provides:

> Where discretion is conferred upon the trustee with respect to the
> exercise of a power, its exercise is not subject to control by the court,
> except to prevent an abuse by the trustee of his discretion.

*Id.*  (cited in *In re Young*, 1981 WL 88265 *2 (Del. Ch. May 14, 1981).  The longstanding and

consensus nature of this principle is attested to by the fact that substantially the same statement of

law can be found in *Restatement 2d of Trusts*, *§187* and *Restatement 3d of Trusts*, *§87*.  *See* also

*McNeil v. McNeil*, 798 A.2d 503, 512 (Del. 2002) (when an express power is conferred in trust

instrument court may disturb trustee's decision only if it was unreasonable under the circumstances,

i.e., lacking a basis in prudence and care).

As to <u>how</u> a court should go about determining whether a trustee has engaged in an

abuse of discretion in exercising a power, guidance is provided in Comment d. to Section 187 in

both the *Restatement* and *Restatement 2d*, which states:

> d.  Factors in determining whether there is an abuse of discretion. In
> determining the question whether the trustee is guilty of an abuse of
> discretion in exercising or failing to exercise a power, the following
> circumstances may be relevant: (1) the extent of the discretion
> intended to be conferred upon the trustee by the terms of the trust; (2)
> the purposes of the trust; (3) the nature of the power; (4) the existence
> or non-existence, the definiteness or indefiniteness, of an external
> standard by which the reasonableness of the trustee's conduct can be
> judged; (5) the motives of the trustee in exercising or refraining from
> exercising the power; (6) the existence or non-existence of an interest
> in the trustee conflicting with that of the beneficiaries.

*Restatement 3d* does not include this same comment but notes that a finding of abuse of discretion can result from the exercise of discretionary authority done in bad faith, or done from an improper motive such as dishonesty, or done for a purpose other than to further the purposes of the trust, or done through a mistaken interpretation of the terms of the trust, or done unreasonably. *See* generally *Restatement 3d Trusts, §87* at Comments b. and c.

With the above material as guidance, the Court would conclude for a number of reasons that the Trustees did not abuse their discretion when they issued the modified Directives in early 2018. There was absolutely no record evidence presented to the effect that the Trustees acted with any sort of improper motive or out of self-interest when issuing the modified Directives. Rather, the evidence showed that they acted conscientiously and in what they believed to be in furtherance of the purpose of the Trust as set forth in Art. 2.2 of the Trust Agreement, i.e., to "promptly pay holders of valid NARCO Asbestos trust claims." Trustee Gleason credibly testified in detail about how the Trustees' decision to modify the Directives came about.

Under original Directive 7(a), once an affidavit that was submitted on behalf of a claim was identified as a form affidavit it was completely disregarded by the claim processor, even as to those elements of the affidavit that were not formulaic language, usually resulting in the issuance of a deficiency notice. The non-formulaic language in many of these affidavits included information that would be highly relevant for purposes of the exposure prong under the TDP, for example inclusion of the beginning and ending dates of exposure, but again, under original Directive 7(a) such evidence would have been entirely ignored. Because of this reality, shortly after the implementation of original Directive 7(a) the Trustees became concerned about the wisdom and

33

fairness of the approach embodied in it for the reasons stated above, i.e., the effect on deceased or incapacitated affiants and a  drastic lowering of the rate of claim payments.  Even so, the Trustees did not act rashly.  They conducted meetings with different parties and analyzed trends.  Bound by the terms of the Standstill Agreement to refrain from any unilateral action during the Standstill Period,  they joined in the process of seeking relief from the Mediator on the grounds that original Directive 7(a) was impractical, but with only limited success even though the Mediator did find that form affidavits are not inherently unreliable and that Directive 7(a) was impractical.

Following the Standstill Period, the Trustees observed that claim payment rates continued to be low and deficiency rates high.  For instance, at a meeting of the Trust constituents held in December 2017 the Trustees reported that 86% of claim submissions were being found deficient with many of those deficiencies related to the use of a form affidavit.  The Trustees found this to be unacceptable and not in keeping with the purposes of the Trust because they believed that even form affidavits could contain competent and credible evidence that was being excluded from consideration by virtue of the policy of completely disregarding the entire affidavit.  Being by then free of the strictures of the Standstill Agreement, in February 2018 the Trustees rightly decided within the bounds of their discretion to do something about the low claim payment rate by modifying the Directives so as to allow for the consideration of form affidavits in certain specific circumstances.

The resulting modification, found at current Directive 16 and still substantially the same as what was adopted in February 2018, is not just some simple, knee-jerk 180 degree turn to a blanket acceptance of the use of form affidavits, but is instead a thoughtful and nuanced effort to

34

allow for their use in situations where there is good reason to believe they provide competent and

credible evidence of exposure or with an "indicia of credibility" as Trustee Gleason expressed it.

Directive 16 is worth quoting here in its entirety:

> (16)  The following further directives apply to review of exposure allegations:
>
> (a)     The claims reviewer should process the claim as if the form affidavit were not part of the claim file, except to the extent that a material inconsistency between the form affidavit and the rest of the exposure evidence undermines the credibility of the non-form evidence.
>
> (b)     The claims reviewer must review the exposure allegations in a form affidavit to determine if that evidence satisfies the TDP's exposure criteria if:
>
> > (i)      exposure occurred on an Approved Worksite during the stipulated time frame, or
> >
> > (ii)     exposure occurred on an Approved Worksite after the stipulated time frame, and the affiant was an eyewitness of the exposure, or
> >
> > (iii)    exposure occurred on a non-qualified site or on an Approved Worksite before the stipulated time frame, and the affiant was an eyewitness of the exposure, and the injured party had an SOE presumptive occupation when exposed.
>
> (c)     If none of the foregoing exposure allegation criteria apply, the claims reviewer shall:
>
> > (i)      issue a deficiency directing the claimant to supplement his or her claim if there is no exposure evidence in the claim file other than a form affidavit; or
> >
> > (ii)     refer the claim to Trust counsel if the claimant submits both a form affidavit and additional non-form exposure evidence, but such additional non-form exposure evidence on its own does not satisfy the TDP's exposure criteria.

*Stipulations* at ¶78.

The process engaged in by the Trustees with respect to the modified Directives strikes the Court as a measured and responsible one, though the question in any event is not whether the Court itself agrees with what was done, but rather whether it was reasonable in light of the purposes and the language of the Trust documents.  Comment d. in the *Restatement*, cited above, advises that it is helpful to have an "external standard" to assist in the judgement as to whether a trustee's action was reasonable.  In this instance, there is such an external standard available and it is favorable  to a finding of reasonableness, and therefore, of no abuse of discretion.

The Court is here referring to the estimated total payout of claims that would be made over the life of the Trust.  Such an estimate was submitted to the bankruptcy court by Honeywell back in 2006 to help secure confirmation of the Plan and the concomitant creation of the Trust.  *See* Main Doc. No. 4356.  More recently, in connection with the current litigation, both Honeywell and the Trust have retained experts to provide an updated estimate of this total payout figure.  The experts who provided these updated estimates had the benefit of the actual Trust experience to date in paying claims, including the considerable experience that has accrued since the adoption of the modified Directives in February 2018.  If the Trustee's adoption of the modified Directives was unreasonable as Honeywell contends, and if it thus has resulted in the payment of invalid claims that should not have been paid under the terms of the Trust documents, logic indicates  that would  be reflected by these updated estimates showing an increase in the anticipated payout over what had originally been predicted.  But that is not what they show.  Here is the relevant data:

| Expert | Opinion re total trust payout |
|---|---|
| Dr. Rabinovitz May 19, 2006 (Honeywell pre-confirmation expert) | $980 million to $2.28 billion |

|  |  |
|---|---|
| Dr. Horewitz March 18, 2022 (Honeywell trial expert) | $1.085 billion to $1.335 billion |
| Charles Finch February 28, 2022 (Trust trial expert) | $1.1 billion to $1.6 billion[14] |

*See* C.R. Ex. 6.  It is notable that the Rabinovitz estimate is much broader in range than the other two, and that is perhaps explainable by the fact that Horewitz and Finch had some actual Trust experience they could use in their calculations, enabling them to  narrow their estimates.  There is, however, no indication of any overall increase in estimated total payout by the Trust between the original and updated estimates.  The median estimate figures for the experts are $1.63 billion for Rabinovitz, $1.21 billion for Horewitz, and $1.35 billion for Finch.  Thus, after now several years under the Trust's current procedures the expected total payout to claimants has actually decreased slightly, contrary to Honeywell's assertion that those procedures unreasonably favor claimants.

Another piece of evidence as to reasonableness along these lines may be likened to the famous clue of the "dog that didn't bark in the night."[15]  During the discovery phase of this case Honeywell engaged in  serving subpoenas on 13 different law firms that regularly submit claims to

---

[14]

It should also be noted that Mr. Finch presented an alternative scenario involving the addition of 25% of "ballot" claims being submitted to the Trust.  *See Tr. Trans.* at 1157:16 to 1161:19.  This had the effect of raising his anticipated total payout range to $1.37 billion to $1.87 billion.  *See* CR. Ex. 22.  The Court did not find this portion of his testimony persuasive and disregards it.

[15]

*See The Adventure of Silver Blaze*, a Sherlock Holmes short story by Arthur Conan Doyle. *See also Thomas v. Pierce, Hamilton, and Stern, Inc.*, 967 F. Supp. 507, footnote 2 (N.D. Ga. 1997) ("It is now relatively common to refer to 'the dog that didn't bark' as a way of describing the inferences that flow from the failure of the expected to happen.").

the Trust seeking extensive documentation from them related to such claims.  After the Trust moved

for a protective order regarding these subpoenas, Honeywell filed a response stating that it was

seeking documents from these firms "to further substantiate its allegations that form affidavits are

not competent or credible evidence of exposure to a NARCO asbestos-containing product."  *See*

Adv. Doc. No. 148 at ¶2.  It further stated that "[e]vidence of inconsistencies in documents obtained

from the Law Firm Subpoenas will support Honeywell's arguments that form affidavits are not

competent, credible or reliable and, thus, cannot be accepted under the TDP."  *Id*. at ¶21.

Honeywell was largely able to secure the documents it had sought from the claimant

law firms pursuant to the subpoenas and it had considerable time to review and digest them prior

to trial.  It does not appear, however, that any of the evidence introduced at trial by Honeywell

consisted of anything  it obtained  from the law firms through these subpoenas.  Given this lack of

evidence related to the subpoenaed material, the Court can only conclude that Honeywell's efforts

were unable to establish wrongdoing or sharp practices by the firms with respect to their use of form

affidavits which would call into question the competence and credibility of such affidavits.  *See*, *e.g*.,

*In re Richard Buick, Inc*., 126 B.R. 840, 851 (Bankr. E.D. Pa. 1991) ("... a party's failure to produce

documentary evidence in its possession and control which would properly be part of its case permits

an inference to be drawn that the evidence, if produced, would have been unfavorable to that

party.").  In the Court's view this provides further justification for  the action of the Trustees in

modifying the Directives so as to permit consideration of form affidavits under certain specific

conditions.

To sum up, while there was evidence presented to indicate that allowing a

freewheeling use of these types of affidavits to support claims made to the Trust could raise serious

questions of competency and credibility, that does not appear to be what has occurred. The Trustees have taken a measured step to allow consideration of such affidavits to a certain extent and in certain well-defined circumstances. No evidence of any widespread fraud attending this procedure was shown and if required to do so the Court would likely conclude that Honeywell had failed to meet its burden of proof to show an abuse of discretion by the Trustees in implementing the current Directives.

### (ii)   Count II – refractory inference

At the inception of the 2015 litigation the Trust's claim processors used an "exposure decision tree" to guide them through the claim evaluation process. Under that decision tree if a claimant was on an "Approved Worksite"[16] but the claimant was not also in a presumptive NARCO occupation or industry, the claimant would not be required to identify a specific NARCO product to satisfy the exposure requirement, but rather only to provide a generic product name that fit the description of a NARCO ACP, for example brick, trowel or finishing cement. Honeywell referred to this as the "blanket refractory inference." As was indicated above, in the Stipulation and Order of March 17, 2016 arising from the 2015 litigation the Trust agreed that it would no longer accept a "bare assertion" that a claimant had worked around refractory products as sufficient to meet the exposure requirement, but would instead "evaluate claim submissions on a case-by-case basis, considering the totality of evidence that is presented in support of the claim and drawing inferences therefrom." Misc. Doc. No. 376.

---

16

An "Approved Worksite" is one on a list attached to the TDP which the Parties agreed would allow the Trust to presume had NARCO ACPs present on it during the specified time period as shown on the list.

As its second claim Honeywell asserts that the Trust has breached the 2016 Stipulation and Order, as well as the TDP which requires claimants to submit evidence of exposure to a "specific asbestos-containing product manufactured, sold or distributed by NARCO or its predecessors," by effectively reinstituting a "blanket refractory inference." Honeywell argues that, while in 2016 the Trust complied with the Stipulation and Order by issuing an amended worksheet for its claim processor to use that did not permit claimants to establish exposure simply by stating that they worked with refractory products of the "same type" NARCO made, in 2019 it reversed course and issued new amended worksheets that again permit a refractory inference.

The relevant material is found in Section K of the "Exposure Review Worksheet" ("Worksheets") beginning with question K-3.[17]  That question, which has remained substantively unchanged, asks whether the documents submitted with the claim indicate that the party was exposed to a NARCO ACP by name or to NARCO ACP generally.  If the answer to K-3 is "no," the claim processor is to proceed to K-4.  In the 2016 version of the worksheet K-4 stated:

> 4.    Do the documents nonetheless include sufficient evidence of
>        exposure to a NARCO asbestos-containing product?

If the answer to that question was "yes" the claims processor was to refer the claim to the Trustees using referral code "TNNN"[18] and also to proceed to K-5.  If the answer to K-4 was "no," the claims

---

[17]

The Worksheets are a guide created by the Trust for claim processors to follow in implementing its various policies while reviewing claims.

[18]

Testimony at trial indicated that this code means the claim does not refer to a NARCO product.

40

processor was directed to issue deficiency code "ADD."  The revised worksheet in 2019 changed

K-4 to the following:

> 4.      Do the documents nonetheless include allegations of
> exposure to one or more asbestos-containing products of the
> same types as NARCO asbestos-containing products?

If the answer to that question was "yes," the claims processor was to continue to K-5 and if "no" to

issue deficiency code "ADD."   K-5 remained the same in both versions of the worksheet, stating:

> 5.      Do the documents indicate that the injured party was exposed
> to the identified NARCO asbestos-containing product(s) in an
> area where such products are known to have been used, or
> otherwise provide credible evidence of exposure to a NARCO
> asbestos-containing product?

In both versions if the answer was "yes" the claims processor was to "continue," and if "no" to issue

deficiency code "ZON."   What it meant to "continue" changed from 2016 however, because the

2019 version of the worksheet introduced a new question K-6 (with the prior K-6 redesignated as

K-7) asking:

> 6.      If after review of all of the exposure evidence submitted in
> support of the claim, do you consider it likely that the
> claimant was exposed to a NARCO asbestos containing
> product?

If the answer is "yes" the claim processor is to continue, and if "no' to issue deficiency code "ZON."

Finally, in a revision to the worksheet made in 2020 a note was added to the new K-6, reading:

> Note: When relying on Third party testimony or Co-Worker
> testimony as proof for the injured party and/or occupationally

41

> exposed person's manner of exposure, the exposure date range identified by the Third party or Co-Worker must overlap with the alleged exposure period for the Injured party or Occupationally Exposed person but need not encompass the entire exposure period.

*See* generally Exhibits BA at Bates 2098-99 and 305 at Bates 7313-14.

As previously indicated, Honeywell contends that the changes noted above violate the 2016 Stipulation and Order and the TDP as they allow for claims to be approved where no specific NARCO ACP has been identified. Honeywell's evidence on this point was presented primarily through the testimony of Yelena Becker ("Becker"), an attorney with the MWE firm. Becker oversees a group of attorneys, paralegals and data analysts at the firm, called the "Claim Review Team," whose task is to review claims processed by the Trust on behalf of Honeywell. She testified that her understanding of a "refractory inference" is when a claim is approved and paid where there is no mention of a NARCO product.

As an example of how she determines whether a refractory inference has been applied, Becker identified and reviewed Exhibit BU, Bates Nos. 2534 - 2608, which is the file for a claim that was designated by the Trust as No. 1816680. She explained that her team reviews the entirety of the claim file, starting with the exposure affidavits, to see whether there are any allegations about NARCO exposure. In this instance, the exposure affidavits have no such allegations, only a reference to the claimant having worked with "refractory insulation." Nowhere else in this claim file is there any reference to NARCO exposure, and a document in the file titled "HFiler Exposure Review" prepared by the claim processor indicates "No Product Identified" and the code TNNN. Despite the lack of NARCO product identification, Claim No. 1816680 was

42

approved and paid in the amount of $1,200 on August 14, 2020.  Bekker testified that by using the

above approach she and her team have identified "over 1,000" of these "no product

identified"/TNNN claims that have been approved and paid by the Trust.

        The Trust denies that as a matter of blanket policy it ever accepts a bare assertion that

a claimant worked around refractory products as sufficient to meet the exposure standard, and

therefore denies that it is in violation of the 2016 Stipulation and Order or the TDP.  Trustee Mark

Gleason again credibly testified that a claimant who simply makes a generic assertion of having

worked around refractory products, without identifying any NARCO ACP by name or providing

some additional description consistent with a NARCO ACP, will never be found to have met the

exposure standard.  As he described it, claims are reviewed on a case-by-case basis, and based on

the complete claim form.  The "inference" permitted by way of questions K-3 through K-6 of the

current worksheet  comes into play primarily in the subset of claims where the claimant worked on

an Approved Worksite during the stipulated time period when NARCO ACPs were known to be

present.  According to Gleason, in such circumstances, even if the claimant does not identify a

specific NARCO ACP, the claims processor may nevertheless  infer that the claimant was exposed

to a NARCO ACP if the industry and occupation in which the claimant was engaged are consistent

with having had such exposure, and if the product as described fits within the known universe of 27

NARCO ACPs.[19]

---

[19]

        Gleason testified, without contradiction, that NARCO had made thousands of different
products over the years, only 27 of which have been stipulated to have contained asbestos, and to
thus be NARCO ACPs.  The claims processors have available resources that describe each of the
NARCO ACPs, their purpose, and where they were used.

After considering all of the rather scant evidence that was presented at trial on this issue, the Court is of the view that Honeywell failed in its burden of proof to show that the Trust is violating the 2016 Stipulation and Order or the TDP, or otherwise abusing its discretion in how it is processing claims in this regard.  The 2016 Stipulation and Order committed the Trust to not "as a matter of blanket policy, accept bare assertions that the claimant worked around refractory products" as sufficient to meet the exposure standard under the TDP, and instead to "evaluate claim submissions on a case-by-case basis, considering the totality of evidence that is presented in support of the claim and drawing inferences therefrom."  That is what the evidence shows the Trust to be doing.

As Honeywell would have it, the new claim processor Worksheets implemented beginning in 2019 allow a claimant to meet the exposure standard under the TDP merely by alleging that he or she worked around refractory products like the ones NARCO manufactured.  However, as explained by Gleason, that is not an accurate characterization of the claim review process.  In order for a claimant to possibly obtain  an inference of exposure to NARCO ACP without actually identifying a specific product, the totality of circumstances must be considered, such as whether the claimant has described a type of product that falls within the group of 27 recognized NARCO ACPs, whether the use of such product would be consistent with the industry and occupation in which the claimant worked, and perhaps most importantly whether the claimant worked at an Approved Worksite during the stipulated time period when it was agreed that NARCO ACP was present.  After taking all that information into account, Gleason testified that the claims processor is in effect permitted to infer that the claimant was exposed to NARCO ACP if he or she considers it likely that such exposure occurred.

44

The only example provided by Honeywell at trial of the purported blanket refractory inference being employed by the Trust is actually consistent with the process as described by Gleason. The claimant in that example stated in an exposure affidavit that:

> At the Minot AFB, I set support and bearing rings at the bottom of silos at the missile sites. During revisions, I would chip off refractory insulation from supports so I could weld and grind the area.

Exhibit BU at Bates No. 2535. In the Court's view this is a fairly-detailed description, not just a bare assertion of exposure to a refractory product. It is detailed enough for the claims processor to determine whether the type of product described falls within the NARCO ACP group. Furthermore, another sworn affidavit in the same claim file indicates that the claimant in question was employed at Minot AFB as a welder/ironworker from 1962 to 1963. Minot AFB is on the Approved Worksite list and the stipulated time period for the presence of NARCO ACP there was from August 18, 1961 through October 31, 1980. *See* TDP, Attachment C, Ex. B at Bates No. 0130. In other words, this claimant was in an industry and occupation consistent with the use of NARCO ACP, worked at an Approved Worksite during the stipulated time period, and has provided a general product description consistent with a NARCO ACP.

It would not be unreasonable to infer that the claimant involved in the example was actually exposed to NARCO ACP given these facts.[20] If Honeywell's argument were accepted it

---

[20] The Court recognizes that the example presented was but one of "over 1,000" claims where the purported "blanket refractory inference" was applied by the Trust according to testimony from Honeywell's witness. It obviously would have been impractical for Honeywell to have elicited testimony as to all of those claims on an individual basis, though it could have summarized salient features of them pursuant to *F.R.E. 1006* but apparently chose not to do so. The Court is thus left

would seem to require that all claimants be able to state the trade name of a specific NARCO ACP

before they could make a recovery from the Trust.  That would be a very high standard considering

that many claimants were exposed decades ago and under circumstances where they may not have

known the trade name of the product around which they were working.

    Nor does the TDP mandate such a strict standard.  Section 4.7(b)(1) of the TDP

provides in relevant part that "the claimant must submit requisite evidence of exposure to a specific

asbestos-containing product manufactured, sold or distributed by NARCO or its predecessors, which

includes demonstrating both the presence of such product at a particular site at a particular time and

the claimant's occupational exposure to the product."  This does not explicitly require the claimant

to provide  a product's trade name.  Section 4.7(b)(3) of the TDP sets forth the type of evidence the

Trust may consider in making the exposure decision, and Section 4.7(b)(3)(A) provides that the

Trust "shall consider that there is a limited universe of occupations in a similarly limited range of

industries in which claimants are likely to have been either directly or indirectly exposed to NARCO

or its predecessors' asbestos-containing refractory products."  The structure of the Worksheets being

employed by the Trust's claims processors mirrors this, with the final question being whether it is

likely the claimant was exposed to NARCO ACP considering all the evidence presented.

    It is also interesting to note that Honeywell itself has not always taken the view that

it is espousing in this case.  During the 2015 litigation Honeywell and the Trust communicated with

---

to conclude that the chosen example was typical, and that the remaining relevant claims for which
no evidence was provided would likewise have sufficient information to support an inference of
exposure to a NARCO ACP.  In fact, if anything, the Court would assume that if Honeywell was
going to detail just one of the claims as an example of an impermissible blanket refractory inference
at trial it would choose one it thought was strongly supportive of its position.

each other concerning some then-pending claims.  Of particular interest here is an October 14, 2015

letter from Sarah Glickman, Honeywell VP of Corporate Audit, to the Trustees that states in relevant

part:

> The remaining five claimants (Claims # 1792765, 1783814, 1901807, 1898752, 1721301) though not mentioning NARCO (except for one that did so but in a conclusory way) — set forth particular facts relating to their exposures and activities from which an inference can be fairly drawn that they were likely regularly exposed to "NARCO asbestos-containing products." In this regard, it was also relevant to Honeywell that these claimants worked at sites that are not only Approved Sites, but worked at sites at which we could confirm, through sales records, that  NARCO actually sold products to, and that those sales matched the type of products that the claimants described being exposed to. Confirmed presence at a sales site eliminates one concern we otherwise have — the layering of one inference (exposure) on top of another inference (presence). Additionally, Honeywell took into consideration whether the claimant was at least in a presumptive industry or occupation, how long the claimant was at the relevant site during the approved timeframe, and how often the claimant was in a specific location at the Approved Site where exposure to NARCO products was most likely. Please note that in no case did Honeywell conclude that the requisite exposure existed based only on the fact that a claimant was exposed to refractory products. That inference is not proper and is completely unjustified.

Exhibit 99, Bates No. 2621.  Again, Honeywell's thought process as described in the letter quoted

above sounds very similar to what the Trust is doing here and the Court believes it to be a proper

exercise of discretion by the Trustees.

One of Honeywell's key trial witnesses also acknowledged that there was no outright

prohibition against the Trust ever being able to infer that a claimant met the exposure standard even

though not naming a specific NARCO ACP.  MWE attorney John Calandra ("Calandra") testified

under cross-examination as follows:

Q.    Let me ask you first a foundational question. Honeywell always recognized that the Trust could infer from a claimant's file that he or she satisfied the exposure standard, even if the claimant did not mention NARCO, correct?

A.    Yes.

Q.    They had the ability to infer, even if the person did not use the word NARCO or identify a specific NARCO asbestos containing product. Yes?

A.    Yes. In appropriate circumstance.

*Tr. Trans.* at 403:23 to 404:6.  The question then is whether Section K of the Worksheet sets forth appropriate circumstances for exercising this acknowledged right of inference, and the Court believes it does.  *See also* testimony of Sarah Wetherald, Operations Manger at CRMC, *Tr. Trans.* at 1264:10 to 1270:22 (explaining how Section K is implemented by CRMC claim processors).

For all of the foregoing reasons, if required to decide the Court would likely have concluded that Honeywell failed to show that the Trust breached the 2016 Stipulation and Order, or that any abuse of discretion was otherwise involved in connection with the revision to Section K of the Worksheet that allows an inference of exposure to a NARCO ACP in certain limited circumstances even though the claimant does not specifically identify it by trade name.

### (iii)   *Count III - exposure evidence with material inconsistencies*

Count III of the Honeywell Amended Complaint seeks a finding that the Trust is breaching the Trust Agreement, and the TDP abusing its discretion, by accepting affidavits from claimants that contain "material inconsistencies" with other representations made elsewhere by the

same claimant.  Amended Complaint at ¶¶229 - 235, Adv. Doc. No. 99.   Honeywell argues that affidavits with these material inconsistencies do not constitute competent and credible evidence necessary to create a valid claim.  Honeywell also asks that the Court order the Trust to request from claimants copies of claim filings made by them elsewhere as part of the ER claim form so the Trust can identify instances where the exposure allegations made to the Trust are inconsistent with allegations the claimant has made in other settings.

       The evidence provided at trial concerning these alleged inconsistencies was to the effect that a company called Bendix is affiliated with  Honeywell.  Bendix has been sued numerous times on tort claims in various courts over asbestos claims.  Because of its relationship with Bendix, Honeywell has access to documents such as answers to interrogatories and deposition testimony given by these claimants in the Bendix tort cases.  Many of the same claimants who sued Bendix have also filed claims against the Trust. Honeywell thus has access to both the Bendix materials and the Trust claim materials, the latter via the "one-way mirror," a feature provided by the Trust and its claim representative in response to the 2015 litigation, that allows Honeywell or its designee to electronically access and review in real time all of the documents and actions in individual claims being handled by the Trust.  *See also* n. 21*, infra*.  Honeywell is thus able to do searches to identify such claimants and to compare the representations made by them in the two claim venues, looking for inconsistencies.

       At Honeywell's direction this task was assigned to the Claims Review Team  at the MWE law firm  that reviews claims paid by the Trust looking for any red flags or issues they believe may merit attention.  A first review was done focusing on claimants represented by the Zamler law

firm, followed by a review focusing on claimants represented by the Goldberg law firm.

Inconsistencies were found and were reported to the Trust. A letter was sent by Honeywell to the

Trustees on April 25, 2017, reporting on the results of these reviews and requesting that an audit of

the law firms be conducted.  *See* Exhibit AO.  The letter included 34 "examples" of claims that had

been paid by the Trust and compared language that had been included in those claims with materials

from the Bendix tort claim by the same claimant.  These examples highlighted inconsistencies

between the two filings, and some of them were quite striking.

Take "Example 1: Claim # 1736344" from Ex. AO for instance.  An individual

identified as "J.C." filed that claim with the Trust seeking compensation for injuries to her husband

who worked for Ford Motor Company.  J.C. submitted an affidavit signed on October 29, 2009,[21]

in which she stated she was providing information based on her own personal knowledge.  That

affidavit includes the following statements about her husband:

- "... personally worked with asbestos containing products including asbestos insulating cement, firebrick and similar asbestos-containing material"

- "... was exposed and did breathe the asbestos dust from various asbestos-containing pipecovering, cement and block for a period of at least six (6) months or more ..."

- "... was personally exposed and breathed in the asbestos dust from asbestos-containing pipecovering, cement and other asbestos containing products ...for a cumulative period of (5) five years or more ..."

---

[21]

The 2009 date is a little puzzling since the Trust did not begin processing claims until 2014. No explanation was provided.  The Court can only assume that J.C. gave the affidavit in 2009 to the law firm representing her but it was not actually submitted to the Trust until at least several years later.

Ex AO, Bates No. 01474.  The Trust approved the claim and made an $18,000 payment on it.

However, in a Bendix tort claim, this same J.C. had given deposition testimony on December 15,

2006 that included the following exchanges:

> Q.   Do you have any reason to believe your husband was exposed
>      to asbestos during his career?
>
> A.   I have no idea.
>
> Q.   Okay.  And do you have any reason to believe he was
>      exposed to insulation products during his career?
>
> A.   I don't know
> ...
> Q.   Did he describe his working conditions to you?
>
> A.   What do you mean, like what he did?
>
> Q.   No, what the environment was like where he worked.
>
> A.   No.
>
> Q.   He kept that stuff to himself?
>
> A.   Yes.

*Id*.  It is certainly difficult to square the Bendix deposition testimony from 2006 with the Trust

affidavit from 2009, unless J.C. recovered memory in the interim, which frankly seems unlikely.

Following the focused Zamler and Goldberg reviews, Honeywell continued the

process, this time focusing on claims filed by the Nicholl law firm, the largest Trust filer.  In

additional  letters that Honeywell sent to the Trustees it pointed out 77 examples of inconsistencies

between Nicholl filings with the Trust and materials from Bendix claims from the same claimants.

*See* Ex. AQ (letter dated October 5, 2017, identifying 36 claims), and  Ex. AS (letter dated October

31, 2017 identifying 41 claims).  The first such letter noted, for instance, that in all 36 of the  claims

identified therein the Trust affiant had alleged to recall working around bags with the name NARCO

and a large drawing of an Indian head on them,[22] but such information was not included in answers

to interrogatories from a Bendix claim verified by the same person.

On January 18, 2019, Honeywell sent another letter to the Trustees, this one

identifying an additional 738 claims said to have inconsistent information, such claims having been

filed by the Nicholl and Zamler firms and 5 other law firms.  *See* Ex. AU. This letter itself did not

include a detailed explanation of the identified inconsistencies for each claim (though it indicated

the backup material would be provided), but did state:

> In the majority of affidavits that Honeywell reviewed, a NARCO
> Trust affiant would mention NARCO or a specific NARCO product
> line in his or her affidavit submitted to the Trust, but there was no
> similar mention of NARCO in his or her tort system interrogatory or
> deposition.

*Id*. at Bates No. 01579. Affidavits in Nicholl filings with the Trust (roughly 25% of the total) were

noted to generally  have the additional inconsistencies of identifying a specific NARCO product in

detail whereas there was a failure to mention NARCO in answers to open-ended  tort interrogatories

seeking exposure information, and of using "may have been exposed to NARCO" language in

---

[22]

It was not made entirely clear at trial, but as the Court understands it, one of the NARCO
ACP, called "Narcolite," came in a bag with an Indian head drawing logo on it.  *See Tr. Trans.*
273:20-25; Ex. AQ.

answers to tort interrogatories but more definite exposure language in Trust affidavits.[23]

Honeywell complains that the Trust has not done enough to address these inconsistencies.  Honeywell urged the Trust to take various measures such as requiring claimants to  submit tort claim-related documents along with their Trust claims so inconsistencies could be detected, or for the Trust  to interview affiants to test the veracity of the allegations that are set forth in Trust affidavits.  The Trust has not adopted any of these measures, however the Trust and the Intervenors respond to this "inconsistency" issue in a number of ways.

For one thing, they criticize the quality of the evidence that was produced in support of Honeywell's position, noting that no expert testimony was provided to establish the fact or extent of inconsistencies despite a suggestion by Honeywell in the Consolidated  Pretrial Statement that Katheryn McNally ("McNally"), a statistician, and Dr. William Choi ("Choi"), an economist, had analyzed the information obtained by MWE and used it to calculate alleged "overall" inconsistency rates.  This is certainly true.  The participation of both of these individuals in the analysis of the MWE information was mentioned in the pretrial statement, and both were listed as potential witnesses by Honeywell.  Despite that,  McNally was not called to testify at trial and  Choi testified

---

[23]
As part of its review, Honeywell also identified another type of inconsistency, this one involving so-called "cure" affidavits.  As the Court understands it, these were all in Nicholl cases where the claimant  filed a first affidavit which was challenged for some reason by CRMC, following which the claimant filed a second, or "cure", affidavit.  Honeywell found inconsistencies between the two affidavits.  680 such cure affidavit inconsistencies were identified by Honeywell and reported to the Trust.  *See* Ex. AR (letter dated October 18, 2017) and Ex. AT (letter dated March 16, 2018).No further explanation was provided at trial as to what sort of inconsistencies were allegedly involved in these cure affidavits.

but did not provide any testimony as to his analysis of the extent of inconsistent filings.[24]

The Trust and Intervenors further note that the only evidence provided by Honeywell in support of this claim was the factual testimony of MWE attorneys Becker and Calandra. They argue that this evidence was weak and insufficient to carry Honeywell's burden of proof. Calandra testified generally as to the review that was made by the Claims Review Team at MWE and as to the communication of the results thereof to the Trust, but he did not go through any individual claim in detail. Becker gave similar testimony, though she did go through one of the individual claims in detail. The Intervenors point out that the single claim which Becker discussed, as well as most of the claims identified by Honeywell in its letters to the Trust, had already been paid by the Trust years earlier by the time that Honeywell provided any evidence of inconsistency.

The Trust and the Intervenors also argue that the evidence showed the Trust to be responsive to any indication of inconsistencies brought to its attention by Honeywell. This included, for example, that the Trust reached out to the Goldberg and Nicholl law firms and asked them to respond to the information concerning inconsistencies that Honeywell had provided. Additionally, the Trust directed Mazars to conduct audits pursuant to the "Claim Audit Program," or "CAP," which all the Parties had agreed to, and ordered a temporary halt on payment of claims pending an

---

[24]

To be more strictly accurate, Choi did testify on the subject of inconsistent filings and his extrapolation of an overall inconsistency rate based on the information from the MWE Claims Review Team, but such testimony was the subject of a subsequent request by Honeywell to "withdraw" that portion of the testimony, a request to which the Trust agreed, and which the Court granted. See *Tr. Trans.* at 1140:7 - 1142:15. In light of this withdrawal the Court treats that portion of Choi's testimony as being outside the record.

outcome of the audits.[25]

In the Court's view, by relying simply on the aforementioned evidence, Honeywell failed to meet its burden of proving that the Trust has abused its discretion or breached any duties under the Trust Agreement or the TDP with respect to the payment of claims that contain inconsistencies with other filings made elsewhere by the same claimant.  This is not to say, however, that the Court perceives no problems associated with the possibility of inconsistent filings – because it does, as will be discussed below.  It is to say only that Honeywell has not established that there is currently such a widespread incidence of inconsistent filings that would be sufficient to justify an intrusion by the Court into the Trustees' operation of the Trust.  Several things lead to this conclusion.

First, the Court agrees with the Trust and the Intervenors that the overall quality of evidence presented by Honeywell as to alleged inconsistencies is somewhat suspect.  The lack of any expert evidence to show that the review performed by the Claim Review Team at MWE was conducted in a statistically sound manner and based on objectively applied criteria means the Court cannot draw any larger conclusions from it or assume that it is a representative sampling of the entire claim pool handled by the Trust.[26]  In other words, the MWE results as communicated to the Trust,

---

[25]

After the Parties agreed to creation of the CAP it was necessary to retain an auditing firm to conduct any audits that would be performed pursuant to the CAP.  The Trust interviewed a number of auditors and selected Mazars, a large auditing, accounting and consulting firm for that role.  Honeywell was involved in that selection process and it agreed with the choice of Mazars. *Tr. Trans.* 461:3 to 462:1.

[26]

Healthy skepticism as to how much reliance should be placed on the MWE review results is also warranted by the fact that the review was conducted not by some ostensibly neutral third party, but rather by a law firm representing the interests of Honeywell.

and as presented at trial, essentially amount to anecdotal evidence.  Furthermore, it is not particularly strong anecdotal evidence.  Honeywell's communications to the Trust regarding the inconsistent claim filings occurred between April 2017 and January 2019, *i.e.*, from roughly 3 ½ years ago to over 5 years ago.  This is stale evidence.  While many things have happened in the last 3 ½ years that might be expected to reduce the number of filings with inconsistencies, Honeywell provided no evidence concerning any allegedly more recent inconsistent filings.

There is also reason to question whether it is accurate to say that all of the alleged inconsistencies identified by MWE actually represent material inconsistencies.  The Court is inclined to disregard any of the alleged inconsistencies involving "cure" affidavits given the lack of any explanation as to how those were determined.  *See* n.23, *supra*.  As to the remaining alleged inconsistencies detected by MWE, an incident at trial amply demonstrated the need for caution before accepting all of them at face value.

Louis Dudney ("Dudney"), a CPA, testified as an expert witness at trial on behalf of Honeywell.  Part of his testimony concerned  15 claims filed by the Nicholl law firm with the Trust that were purportedly inconsistent with earlier filings in the tort system, with the alleged inconsistency being that the Trust claims named specific NARCO ACPs while interrogatory answers filed in the tort cases did not name a specific product and only referred to "Allied" or "Allied Signal" as being the company who had made the unidentified product causing asbestos exposure. These 15 claims were part of the focus of the Mazars firm in its targeted audit of Nicholl as based on Honeywell's MWE Claim Review Team information.  On cross-examination, however, it developed that Allied Corporation actually owned NARCO from 1979 to 1986, so the alleged

inconsistencies may not have been inconsistent at all. Just how widespread this sort of potential mischaracterization may be among the universe of inconsistencies identified by MWE is unclear. The lack of any evidence presented from the law firm subpoenas issued on behalf of Honeywell, as discussed previously, also suggests the problem with inconsistencies may have been overstated.

A second reason why the Court would not interfere with the Trustee's operation of the Trust at this time is that it was impressed by evidence of their responsiveness to concerns raised by Honeywell, including concerns related to inconsistencies identified by MWE.  It should not be overlooked that the one-way mirror that the Trust has in place provides complete transparency to Honeywell from the standpoint of claims processing and allows Honeywell and the MWE Claim Review Team  to closely monitor exactly what is going on in real time.[27]  The Trust also provides Honeywell with weekly, monthly, and quarterly claim reports, including background materials and analysis trends.  When issues have been brought to the attention of the Trust by Honeywell, the Trust generally has responded to them on a timely basis rather than just ignoring them, though such responses have not always been to the satisfaction of Honeywell.  In the specific case of the alleged inconsistencies identified by MWE the Trust appears to have responded appropriately by invoking the CAP, to which all Trust constituents had agreed, and employing Mazars to conduct audits, both random and targeted.

---

[27]  It is worth noting that the one-way mirror allows access to claims at all stages of their processing, not just once they have been approved for payment and paid.  According to testimony at trial, however,  the MWE Claim Review Team generally only reviews paid claims. *Tr. Trans.* at 590:17-21.  It strikes the Court that an alleged inconsistency identified before a claim has been paid may be addressed more readily than one identified only after payment has already been made.

In its Amended Complaint, Honeywell asks that the Trust be ordered to  go even
further and require  as part of the claim form that all claimants must provide copies of filings they
have made in other matters so that the Trust can identify instances where the exposure allegations
made to the Trust are inconsistent with allegations the same claimant has made elsewhere.  Adv.
Doc. No. 99 at ¶235.  This approach would seem on its face to have some merit but, once again, it
would not be for this Court to interfere in the Trustees' management and oversight of the Trust
except insofar as they are shown to have abused their discretion or violated the Trust Agreement or
TDP.  With respect to the  payment of claims based on affidavits that are alleged to be inconsistent
with prior filings made elsewhere by the same claimant, Honeywell did not convince the Court that
the problem is so pervasive as to support such a finding.  The Trustees have broader interests to
consider than just the parochial interest of Honeywell to pay as little as possible in claims.  The
Court finds that given the evidence of record the Trustees could reasonably conclude that making
the claim application process too demanding, as Honeywell requests be done, would not be in
harmony with the Trust's purpose to function as a settlement trust and could deter valid claims from
being filed.

All of the above having been said, the Court must also note that there is some cause
for concern regarding the potential for abuse disclosed in the MWE Claim Review Team's findings
regarding inconsistencies.  It is jarring to compare affidavits or depositions from  two places by the
same  individual  with  diametrically  opposed  content  concerning  obviously  material  exposure
allegations.  If the existence of such an inconsistency comes to the Trust's attention during the
claims processing procedure the Court would expect the Trust to demand a reasonable  explanation
from the claimant and not to approve the claim unless and until it receives one.  Inconsistencies that

58

only come to light after a claim has been paid are more difficult to deal with.  An audit of claimant firms that file such inconsistent claims is one way to address that circumstance, though at least with respect to the Nicholl targeted audit the effectiveness of it was compromised by the firm's invocation of privilege to avoid having to turn over requested materials to the auditor.  Honeywell was quite outspoken in questioning the reliability of the audit for that reason, but the ability to assert a privilege as the Nicholl firm did is expressly provided for in the CAP, to which Honeywell agreed.  Had there been no settlement it would be productive for the Parties to confer and see if they can agree on revisions to the CAP which would strengthen the ability of the auditor to secure requested materials from the target of an audit, and indeed going forward the Trustees may want to revisit that matter themselves as a guard against abusive filing practices.

### (iv)  Count IV – IR model

Honeywell's claim in Count IV is that the IR (Individual Review) model adopted and used by the Trust violates the TDP and results in excess payments going to claimants, at Honeywell's expense. Some preliminary explanation of how IR fits into the overall process of the Trust as provided in the TDP is necessary before considering the merits of Count IV.

The TDP provides for two basic types of claims review.  ER (Expedited Review) is "designed primarily to provide an expeditious, efficient and inexpensive method for liquidating all claims that can be easily verified by the [Trust] as meeting the presumptive Medical/Exposure Criteria for the relevant Disease Level."  TDP at Section 4.3(a)( 1).  ER is intended to provide claimants with a "substantially less burdensome process," and to provide qualifying claimants with

a "fixed and certain claims payment." Only some types of claims are eligible to proceed under ER, for example claims for "lung cancer 2", i.e., a diagnosis of primary lung cancer but without evidence of any underlying bilateral asbestos related nonmalignant disease, are not permitted to do so. Approved claims under ER are paid at a fixed or "Scheduled Value," which ranges from $75,000 for mesothelioma down to $1,200 for "other asbestos disease."

IR, by contrast, "provides a claimant with an opportunity for individual consideration and evaluation of a [Trust] claim, which meets the presumptive Medical/Exposure Criteria for Disease Levels III - VII where the claimant has extenuating circumstances that he or she believes warrant a liquidated value above the applicable Scheduled Value." TDP at Section 4.3(b)(1). (The two most mild disease categories, "other asbestos disease" under Disease Level I and 'asbestosis/ pleural disease" under Disease Level II are thus excluded from participation in IR). IR is generally a lengthier and more intensive process than ER, with the claimant expected to submit additional evidence in support of the claim which will be subjected to a "detailed examination and valuation process." *Id*. The end result for an approved claim is intended to be "equal to the full liquidated value" for the claim, though that value may be determined to be greater than, less than, or equal to the Scheduled Value the claimant would have received had ER been chosen. *Id*.

The TDP identifies a number of factors that "affect the severity of damages and values within the tort system" that the Trust is to consider in conducting IR. *See* TDP at Section 4.3(b)(2). The non-exhaustive list provided in the TDP includes the degree to which the characteristics of a claim differ from the presumptive medical/exposure criteria for the disease level in question, the claimant's personal circumstances such as age, disability, and employment status,

the strength of the evidence of the claimant's exposure to a NARCO ACP, and settlements and verdicts in the claimant's jurisdiction for similarly situated claims.

Importantly, in administering IR the Trust is constrained by TDP Section 4.3(b)(3) which provides both an "average value" and a "maximum value" for each of the disease levels for which IR is available.  For example, for mesothelioma claims, Disease Level VII, the TDP directs that IR payments have an average value of $200,000 and a maximum value of $1,000,000.  The maximum value is easy to apply and sets an absolute limit on what the Trust can pay for any single IR claim in a given disease level, regardless of the circumstances involved.[28]  The average value figure is more complicated and is the subject of the following footnote in the TDP:

> The Trustees, in evaluating these NARCO Asbestos Trust Claims, shall use their best efforts such that the amounts offered through Individual Review for each Disease Level shall annually arithmetically average the "Average Value" per claim set forth herein. However, in making the determination of whether the amounts offered for claims processed through Individual Review arithmetically average such "Average Value," the NARCO Asbestos Trust shall exclude from its computations any amounts that were at or below the Scheduled Value for the relevant Disease Levels of such claims, but shall include all amounts awarded to claimants pursuant to the arbitration procedures described in Section 4.10 below.

TDP Section 4.3(b)(3) at footnote 8.  Also, unlike the scheduled values in ER, the average value in IR is periodically inflation adjusted and, for example, the average value figure for mesothelioma claims had risen to approximately $220,000 as of the time of the trial.

---

[28]

Strictly speaking it is not accurate to say that the maximum value may <u>never</u> be exceeded since if a claim is determined to be "extraordinary" it can result in a payment of up to three times the otherwise applicable maximum value. *See* TDP Section 4.4(a).  That, however,  would appear to be a rare circumstance that is not implicated in the present case.

The Trust had not yet implemented the IR program as of the time of the 2015 litigation.  In around 2016-17 the Trust hired Dr. Abraham Wyner ("Wyner"), a professor of statistics and data science at  the University of Pennsylvania,  to construct an IR "model" that the Trust could use in processing IR claims.  Wyner testified at trial as to his expertise in analyzing asbestos claims and in "asbestos modeling."   He stated that in his work on the project for the Trust he employed the TDP as the "guiding document" that he followed, with a goal of liquidating claim values reflective of the individual factors as described in the TDP (as previously noted above).  He described the process behind the model he constructed as first assigning a number for the relevant attributes of the IR claimant, some of which like age are easily accomplished, some of which are based on a binary question such as dead or alive, and some of which involve more complexity such as how the jurisdiction and law firm involved may affect the claim value.  Taking all of those now-quantified factors,  the model would then be used to integrate them and arrive at a value for the claim.

The actual construction of the IR  model was not accomplished in one fell swoop, but rather was an ongoing process involving an initial  draft by Wyner that was submitted to the Trustees for discussion and feedback from them, revisions by Wyner, further discussion and feedback, etc. As described by  Wyner:

> I would give them different – different amounts.  And we would go back to the –  I would go back to my computer and I  would change the values and bring them back to them, and then we would settle on a way of what I would describe as measuring the effect of each factor that was consistent with their  judgment (sic) and my experience, and that's how we arrived at a model. Of course, the dollar values themselves have to comport  with the instructions of the TDP. So we don't have unlimited freedom. We have to match what the guidance is from the TDP.

*Tr. Trans.* at 1192: 17-25.  Various iterations of the model were run against a "test bed" of IR claims

and the model was adjusted to meet  the requirements of the TDP. The model was also required to

be able to separately address claims in all of the different disease levels that are eligible to pursue

IR.

The initial process of creating the IR model took 3 or 4 months and the model was

implemented by the Trust sometime in 2017 or 2018.  Since then it remains subject to being

monitored for continued compliance with the TDP, including inflation adjustments to the required

average value for claim payments.  Periodically the value of the claims being paid under the IR

model is analyzed and if there is a significant divergence from what the TDP requires  Wyner looks

into it to determine whether it involves just chance variation or is indicative of something more

serious that  may require an adjustment to the model.

It is against this backdrop that Honeywell's claim is made.  As a starting point for

further discussion  it is important to be clear on exactly what Honeywell's objection is.  At an earlier

stage in the case the Court was of the impression that Honeywell took the position that claimants

in Disease Levels III - VII do not have an absolute right to choose IR, but rather that only such

claimants with objectively determined  "extenuating circumstances" were entitled to obtain IR, and

thus that the Trust's IR model was flawed because it did not screen out such ineligible claimants at

the outset  and require them to use ER instead.  Whether or not Honeywell ever did actually hold

such a view, it is now clear  that it no longer does so as Honeywell  acknowledges that it is the

claimant's choice whether to seek IR. *See*, *e.g.*, *Tr. Trans.* at 700:25 - 701:3 (testimony of Dr.

William Choi).

What Honeywell does argue is that the IR model being used by the Trust is flawed because it does not properly take into account "extenuating circumstances" when setting claim values.  Recall that Section 4.3(b)(1) of the TDP provides that IR is available "where the claimant has extenuating circumstances that he or she believes warrant a liquidated value above the applicable Scheduled Value."  Honeywell is of the view that this language means that, while all claimants are free to choose IR if they wish, there is nevertheless a requirement for the Trust to determine whether each IR claimant in fact objectively has such "extenuating circumstances" and to take that into account when setting a value for the claim." Honeywell argues that the IR Model being used by the Trust fails to do so, and that as a result IR claimants with "typical" claims are rewarded by receiving payments  that are far above what they would have received as the Scheduled Value under ER.

In support of this interpretation Honeywell presented Zimmerman as a witness, the former MWE attorney who represented Honeywell in the negotiations of the Trust Agreement and the TDP.  Zimmerman testified that:

> Individual  review was intended to be for those claimants who had some – form of extenuating circumstance or some reason to believe that their claim was more valuable, in terms of the factors  important to liquidation, than others. So that involved and contemplated the submission of an additional quantum of  evidence on those other factors and then the trustee's evaluation of those factors to determine whether extenuating  circumstances were there and then, if so, set the value – or propose the value, actually.

*Tr. Trans.* at 108:23 - 109:7.   Zimmerman pointed to an e-mail that he sent to Attorney Ed Harron, representing the FCR, on May 25, 2005 as evidence of this intent.  *See* Trust Ex. 49.

64

The Court does not consider Zimmerman's testimony on this point persuasive to show a settled intent among the Trust settlors. There was no evidence presented to show that there was any response to the e-mail by the FCR or its representative indicating agreement with what the e-mail stated. Furthermore, when the actual TDP and the e-mail are compared there is reason to conclude that the version of an IR as described by Zimmerman was not reflected in the TDP as adopted. The proposed TDP footnote set forth in the e-mail is substantially different than the actual footnote 8 in the TDP, quoted above. While the former includes the phrase "claims for which the Trustees conclude there are no extenuating circumstances justifying an award in excess of the Scheduled Value," the latter has no such language.

Given the lack of evidence as to a common intent among the Trust settlors on how the IR should be administered with regard to the "extenuating circumstances" matter, the Court is left to consider the language of the TDP itself. The Parties have diametrically opposed views of the meaning of the key phrase "where the claimant has extenuating circumstances that he or she believes warrant a liquidated value above the applicable Scheduled Value." As indicated, Honeywell argues that even though it includes a reference to the belief of the claimant, this provision incorporates an objective standard of what constitutes such an extenuating circumstance, imposing an obligation on the Trust to determine whether that standard has been met before offering anything above the Scheduled Value. The Trust, on the other hand, argues that it is the claimant who gets to choose whether to take the IR option, and if they do and prove their claim they are to receive full liquidated value, not the Scheduled Value as under ER.

Both of these are plausible interpretations of the relevant TDP language. The Court's role here would not be to determine which of these interpretations is best, or which one it would

65

prefer, but rather to determine whether the approach adopted by the Trust is an abuse of discretion.

Thus stated, the Court believes the IR model being used by the Trust to be well within the bounds

of permissible discretion given the applicable TDP language.  To the extent this may be considered

an issue requiring expert testimony for resolution, the Court was more impressed by the testimony

of Wyner than that of Choi.  Wyner provided a cogent and thoughtful explanation as to how the IR

model implements the requirements of the TDP, whereas Choi criticized the model without

providing a workable alternative.

The expert testimony was not the only reason for the Court's conclusion.  It is

interesting to note, for example, that the term "extenuating circumstances" is not defined anywhere

in the TDP.[29]  The Trustees could therefore reasonably conclude that they would have no firm basis

on which to make a preliminary determination whether a claimant meets Honeywell's  purported

objective standard before allowing an IR claim to proceed.  The Trustees could reasonably conclude

that their role is just to evaluate each IR claim in accordance with the factors set forth in TDP

Section 4.3(b)(2), while observing the average value and maximum value parameters  as set forth

in TDP Section 4.3(b)(3).

---

[29]

The Court must also comment that the use of the term "extenuating circumstances" seems like an odd choice in the context of the TDP.  Black's Law Dictionary (11th ed. 2019) provides that extenuating circumstances are the same as mitigating circumstances, which it defines as "1. A fact or situation that does not justify or excuse a wrongful act or offense but that reduces the degree of culpability and thus may reduce the damages (in a civil case) or the punishment (in a criminal case).  2.  A fact or situation that does not bear on the question of a defendant's guilt but that may bear on a court's possibly lessening the severity of the judgment."   *Id*. (definition of "mitigating circumstance" under entry for "circumstance").  Standard dictionaries convey this same sense . *See*, *e.g*., definitions at www.merriam-webster.com ( "Tending to lessen the real or apparent seriousness of something"), www.collinsdictionary.com ("Circumstances that render conduct less serious and thereby serve to reduce the damages to be awarded or the punishment to be imposed").   Based on these definitions it seems incongruous to refer to extenuating circumstances when speaking of a claimant who is seeking an increase in damages from the Scheduled Value of ER.

The Trustees could also reasonably conclude that taking it upon themselves to make a preliminary determination whether each IR claimant satisfies some amorphous extenuating circumstances hurdle before proceeding further to value the claim is fundamentally inconsistent with the  principle that it is the claimant's choice whether to pursue IR or ER.  They could also reasonably conclude that the approach urged by Honeywell is inconsistent with the provision in TDP Section 4.3(b)(1) that an IR claim value may be determined to be less than Scheduled Value, since the logical result of a finding that an IR claimant did not meet the preliminary extenuating circumstance standard, and was therefore "typical," would be to assign the Scheduled Value to such claim.

Finally, there are some practical considerations that would lead the Court to conclude that the Trustees have not abused their discretion by their adoption of the current IR model. Despite Honeywell's attempt to portray the outcome of IR claims under the model as something of a windfall to undeserving claimants, the undisputed evidence showed that only a fairly small percentage of claimants choose to apply under IR while the large majority proceed under ER.  Other factors must be at work here and the Defendants have rightly pointed out that IR claimants must present additional evidence to support their claims, face additional scrutiny in the claim review process, and can expect to wait much longer to receive approval and payment of their claims.  On top of that, under the IR model a claimant is not even assured of receiving at least Scheduled Value and may receive less depending on the individualized characteristics of that claimant.  All of this suggests that claimants face some difficult choices in deciding how to proceed rather than the seemingly obvious choice to proceed under IR that would obtain if the IR model were as abusive and flawed as Honeywell portrays.

For the above reasons the Court would conclude that the IR model which the Trust has adopted is  within the acceptable limits established by the TDP and the Trustees have not abused their discretion.

### (v)   Count VII – misuse of funds

The final substantive claim of Honeywell to be considered is that the Trust is breaching the Trust Agreement and the TDP by misusing funds.  In the Amended Complaint Honeywell made some rather strong allegations in that regard, contending that the Trust's budget was "excessive and unwarranted," that it had incurred "improper and excessive" legal fees, and that it had mismanaged assets and created a conflict of interest by employing consultants from a firm owned by one of the Trustees.  *See generally* Amended Complaint, Doc. No. 99, at ¶¶ 262 - 270. These charges have been considerably toned down following trial, with the Honeywell Post-Trial Brief focusing on only two points in connection with Count VII of the Amended Complaint.

First, Honeywell argues that for years the Trust has failed to provide it with an operating budget that sets forth in reasonable detail the proposed Trust expenses for the upcoming year as required by Section 3.4 of the Trust Agreement.[30]  Honeywell points out that the Trust's annual operating budget often exceeds $20 million, but that it supports such budget only with a two-page summary of "projected costs by vendor." Robert Kelly ("Kelly"), the former assistant corporate

---

[30]   At issue here is only the operating budget for the Trust, which as previously noted Honeywell is currently obligated to fund due to the "evergreen" nature of the Trust.  Honeywell also currently has an obligation to provide funds to the Trust which are used to pay claims, but that is a completely separate process.  *See Tr. Trans.* at 453:5 - 7.

controller for Honeywell, testified that until his recent retirement he had the responsibility to work

with the Trustees on the annual operating budget for the Trust.  He  identified Exhibits JS,  DP, and

DQ as  examples of the "typical budget submission"  made by the Trust in support of its annual

budget.  These are proposed Trust budgets for, respectively, 2018 (approx. $22.2 million), 2019

(approx. $18.7 million), and d 2020 (approx. $18.6 million).  These exhibits can  indeed be aptly

described as only bare-bones, two-page summaries for the proposed expenses making up the Trust

budget.  Kelly further testified that the amounts in question would be considered a large expenditure

by Honeywell, and that Honeywell would not approve an expenditure of this magnitude simply

based on such a summary,  but would also require supporting detail for the individual budget items.

The Court agrees that the two-page summaries as represented by the Exhibits noted

above are insufficient to provide the reasonable detail to which Honeywell is entitled.  On the other

hand, the Court is not at all convinced that the Trust has been acting out of a spirit of defiance or

arrogance in making its budget requests based only on these summaries.  Indeed, the evidence

showed that in the one instance involving the 2018 budget where Honeywell did ask for further

supporting detail the Trust supplied it.  One would think that Honeywell could have made similar

requests in other years, or that at least following 2018 the Trust could have supplied the additional

detail as a matter of course without needing to be asked for it, but neither seems to have occurred.[31]

---

[31]

The failure for either to have occurred is beyond puzzling to the Court. Trustee Gleason
testified to having had an excellent working relationship with Robert Kelly, the Honeywell
controller who was in charge of overseeing the Trust's operational budget.  He also testified that up
until the 2018 year Kelly had accepted the simple two-page budget summary without question, but
that for year 2018 Kelly asked for more supporting detail, which was then supplied.  Gleason further
testified that he did not recall Kelly ever again asking for such supporting details in the following
years, though if he had done so it would have ben supplied.  *See Tr. Trans*. at 1046:9 to 1047:12.
The Court found this testimony credible and so is at a loss to understand why this ever became an
issue serious enough to warrant litigation.  It can only conclude, sadly, that the main reason must
have been the very poor relationship between Honeywell and the Trust on the institutional level.

In any event, Honeywell has raised this issue now and if required to decide the Court would find that the Trust should be supplying detailed supporting information for its budget.

The second point still pursued by Honeywell post-trial in connection with Count VII is the contention that the Trust's budget is higher than it should be and must be reduced. The only evidence presented along those lines by Honeywell was through the testimony of Dudney, as mentioned previously a certified public accountant who testified as an expert. Dudney compared the expenses incurred by the Trust with the expenses of three other asbestos-related trusts and concluded that the Trust's expenses were substantially higher than those of the others. However, the three other trusts on which the comparison were done were not chosen by Dudney himself, but rather by Honeywell. Furthermore, the three other trusts were not established to be sufficiently similar to the Trust so as to make an expense comparison meaningful. Dudney himself did not know if these other trusts were similar to the Trust in important respects such as total assets in trust, number of trustees, available audit rights, relationship with the party funding the trust, or litigation experience. He did confirm that none of the other 3 trusts is of the "evergreen" variety like the Trust is, something the Court finds to be quite significant given that the evergreen feature seems to be one of the main drivers of expense by the Trust in the present case.

The Court would thus give little credence to the expense comparison provided by Dudney as being probative on the question of whether the Trust's expenses are unreasonable or excessive. No other evidence of any kind was provided on this issue so the Court would conclude that Honeywell failed to meet its burden of proof and would therefore not be entitled to any relief finding current expenses to be an abuse of discretion by the Trustees and requiring the Court to

direct them to reduce the Trust's expenses.  Such conclusion should not be viewed as equivalent

to a finding that the Trust's expenses to date have been entirely reasonable because evidence was

not presented that would enable the Court to reach that conclusion.  In other words, the Trust should

not view the result here as the Court believing the Trust to have a blank check to spend whatever

it wishes.  A number of the expenses the Trust has been incurring strike the Court as excessive on

their face just based on common experience, but in the absence of any positive evidence presented

to demonstrate that in the context of comparable asbestos settlement trusts the Court wold not be

willing to make the leap to reach that result in the context of Honeywell's Count VII.  The Court

also notes that it is sympathetic with the statement made by Honeywell in its post-trial brief that

"with years of experience paying claims, the Trust can and should run at greatly reduced cost."  Doc.

No. 392 at 18.  If nothing else, the winding down of this litigation, the institutional experience the

Trust has accumulated in the years since it began operations, the Court's final comments in entering

judgment, and most importantly the Parties' settlement and impending "divorce," should be a reason

to anticipate lower yearly expenses by the Trust going forward.

### (B)   Trust Counterclaims

The Trust has set fourth four separate counterclaims against Honeywell.  All of the

counterclaims, however, are variations on the same theme.  Namely, that certain actions taken by

Honeywell with respect to the Trust and the Trustees is violative of the Trust Agreement, the TDP,

and/or *11 U.S.C. §524(g)*.  The Trust has set forth a number of these allegedly improper actions in

each of the counterclaims.  *See* Amended Complaint at ¶¶ 139 (Count 1), 148 (Count 2), 153 (Count

3), and 159 (Count 4).  The Court need not go through all of these allegations individually because,

based on their post-trial briefs, both the Trust and Honeywell seem to agree that a decision on the

Trust counterclaims really comes down to the propriety of two actions taken by Honeywell. *See*

Doc. Nos. 392 at 18 - 20 and 394 at 19-20. *See also Tr. Trans.* at 44:19 - 45:21 (opening statement

of Trust attorney).

The first action in dispute is Honeywell's threatened or actual litigation against the

Trust over the manner in which the Trust is operating. The second is with respect to Honeywell's

attempt to negotiate a "buyout" agreement with the FCR and TAC that would replace the current

evergreen feature of the Trust, and its efforts to strike settlements with claimant law firms outside

of the Trust process. Absent the pending settlement, the Court's task in considering the Trust's

counterclaims would be to examine Honeywell's actions and decide whether they violate the Trust

documents or statute as alleged.

### (i)   *Honeywell's Threatened and Actual Litigation*

The most evident feature of this case from the Court's perspective is the contentious

nature of the relationship between Honeywell and the Trust that has existed from the outset. The

Trust became effective on April 30, 2013, and already by November 14, 2014 Honeywell had

initiated non-binding arbitration against the Trust with respect to certain disputes related to the Trust

Agreement and the TDP. *See* Complaint in Misc. No. 15-204, Doc. No.61 at ¶¶20, 63. The 2015

litigation in this Court was initiated by Honeywell in mid-2015 and proceeded for approximately

a year until the Parties agreed to mediation and concurrently entered into the 18-month Standstill

Agreement. That provided some measure of peace between them during the scope of the Standstill

Agreement, though as noted, even then the Mediator was also asked to decide several disputes during that mediation process in addition to the Mediator's original charge.

Following the maintenance of the "status quo" during the pendency of the Standstill Agreement, Honeywell made a number of threats against the Trust to resume litigation.  On May 19, 2018, Honeywell sent a draft complaint to the Trust and indicated it would be filed with this Court within the next day or two.  That draft complaint included as Count 7 a request to remove the Trustees "for good cause," including allegations that they had mismanaged trust assets, failed to exercise due care, engaged in or allowed a conflict of interest, failed to apply a consistent uniform standard of exposure, and delayed in hiring an auditor to review claims.  *See* Exhibit 222 at ¶¶182-234.  That draft complaint, which alleged Honeywell was being irreparably harmed in several respects by the actions of the Trust and the Trustees, was never filed.

On February 6, 2019, Honeywell sent another draft complaint to the Trust.  This one was in many ways similar to the one that had been sent in 2018, though it deleted the claim seeking a removal of the Trustees and added a new law firm on behalf of Honeywell.[32]  *See* Exhibit 272. Again, this draft complaint was never filed. On December 23, 2020 the Honeywell General Counsel for Litigation sent a letter to the Trustees setting forth a number of matters involving the ongoing dispute between the Parties indicating that Honeywell was giving the Trustees 30 days advance notice that it intended to commence litigation against the "Trust and/or its Trustees on or after January 25, 2021."  *See* Exhibit BB.  The current litigation was actually initiated on September 15,

---

[32]

Prior to February 2019 the MWE firm had been the sole lead counsel for Honeywell in the ongoing disputes with the Trust. The 2019 draft complaint added the Kirkland & Ellis law firm as an additional lead counsel.

2021 when Honeywell filed a motion to reopen Misc. No. 15-204 and the present adversary proceeding was filed a few days later to serve as a vehicle for the litigation.

Trustee Gleason credibly testified that he does not think there has been a moment of peace between the Trustees and Honeywell since 2014. *Tr. Trans.* at 1045: 14 - 15. He also described the threat in 2018 to seek removal of the Trustees as "particularly disturbing" and "gut-wrenching." *Id*. at 1044:16, 19. In the Trust's view Honeywell's threatened and actual litigation has been so pervasive and out-of-bounds as to constitute a violation of the Trust documents and *Section 524(g)* itself.

The Court agrees that Honeywell at times has acted aggressively in seeking to advance its position vis-a-vis the Trust, at least until fairly recently.[33] It may even be that such approach was unwise and so bold as to be counterproductive and cause the Trustees to "dig in" more than they otherwise would have done. Nevertheless, the Court would be unable to say that it exceeded bounds making it wrong or improper in any legally recognized sense.

The Court would begin with the basic principle that the right to petition the government for a redress of grievances is protected by the Bill of Rights and is therefore not something to be invaded lightly. This right to petition extends to all departments of the government, and one of its aspects is the right of access to the courts. *See California Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972).

---

[33]

Much to the Court's appreciation, the tenor of the current litigation was markedly less vituperative than was the 2015 litigation. The Parties engaged in very extensive discovery over a relatively short period of time yet needed very little involvement by the Court to resolve disputes.. The trial and other hearings in the current case have all proceeded in a dignified and professional manner, as have post-trial proceedings.

74

Clearly, therefore, the Trust would have the burden of showing why this general principle should be set aside in this particular instance.  The Trust has not cited to any authority in support of its position and the Court itself has found little in the way of case law dealing with whether any legal consequences may flow when one party to an existing contract threatens to take legal action against another party to that same  agreement. Despite the lack of cited authority, the Court will assume for the moment that in such circumstances there is some line which may not be crossed.  In deciding where that line should be drawn, the Court finds it helpful to take some guidance from the law of contracts under which it is sometimes possible for a  contract to be avoided for duress based on threats that allegedly preceded the contract and  induced the complaining party to enter into it.  In that regard, one leading treatise states:

> A threat to do that which one has the legal right to do does not constitute duress unless the right is abused or the threat made in bad faith.  Stated conversely, duress requires proof of a threat to do something that the threatening party has no right to do.  The law provides creditors certain means for the enforcement of their claims and it is not duress to threaten to resort to these measures. Therefore, a threat to bring a civil action or to resort to remedies available under a contract is not such duress as will justify rescission of a transaction induced by the threat.

28 *Williston on Contracts* § 71:26 (4th ed. 2022)(footnotes omitted).

Further insight can be gained from the Restatement 2d Contracts, §176, entitled "When a Threat is Improper."  Of particular relevance here is *Section 176(1)(c)* which provides that a threat of legal action is improper if what is threatened is the use of civil process and the threat is made in bad faith.  Comment d to that provision states in relevant part:

> *d. Threat of civil process.* The policy in favor of free access to the judicial system militates against the characterization as improper of threats to commence civil process, even if the claim on which the process is based eventually proves to be without foundation. Nevertheless, if the threat is shown to have been made in bad faith, it is improper. Bad faith may be shown by proving that the person making the threat did not believe there was a reasonable basis for the threatened process, that he knew the threat would involve a misuse of the process or that he realized the demand he made was exorbitant.

*Id.*

The Court would find that the Trust has not provided sufficient evidence that any of the threats of litigation made by Honeywell rose to the level of bad faith. No record evidence exists supporting the notion that Honeywell lacked a belief that there was an arguable basis for the litigation it was threatening even though the Court believes the measures it took could have also been accomplished if pursued in a less confrontational manner. The Court's observation is that Honeywell and its attorneys believed and still believe very strongly in the validity of the basic claims that they have threatened or asserted against the Trust over the years. Thus, while Honeywell was no doubt engaging in hardball tactics, to say the least, in some of its dealings with the Trust and the Trustees, it did not cross the line into legally impermissible conduct or in bad faith concerning any of the threats that were made thereby furnishing a basis for relief to the Trust on its Counterclaim.

The Restatement also provides in Section 176(1)(d) that a threat is improper if it is a breach of the duty of good faith and fair dealing under a contract with the recipient. Under Delaware law the doctrine of the implied covenant of good faith and fair dealing attaches to every contract. *See In re FAH Liquidation Corp.*, 581 B.R. 98, 115 (Bankr. D. Del. 2017). It requires that

a party in a contractual relationship refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain. *In re Zohar III, Corp.,* 631 B.R. 133, 201 (Bankr. D. Del. 2021). However, this implied covenant should be invoked cautiously, rarely, and only "when the contract is truly silent concerning the matter at hand." *Id*.

Here, the Trust Agreement was not silent concerning the matter at hand. Rather, it clearly contemplates that Honeywell and the Trust may be involved as litigation adversaries in disputes regarding its implementation. Trust Agreement at Section 3.2(f). It further explicitly provides for the right of the Parties to seek relief from this Court. *Id*. at Section 8.14. Such relief could include removal of a Trustee for "good cause." *Id*. at Section 5.2(c). For Honeywell to threaten what it had a right to do under the Trust Agreement was not a breach of the implied covenant of good faith and fair dealing.

Finally, and as somewhat of an aside, the Court would also note that the Trust and the Trustees have by no means been in a helpless position in their dealings with Honeywell. The Trust has had the benefit of excellent legal counsel every step of the way in their ongoing dispute with Honeywell – paid for by funds that ultimately came out of the pocket of Honeywell, not the Trust. The Trustees have considerable collective litigation experience and obviously were not intimidated by Honeywell, as demonstrated by the fact that they have felt free to change Trust policies as they saw fit despite any litigation threats. As Trustee Gleason testified, they did not acquiesce to Honeywell but instead "carried on" and have now "come through this and I think we're in a good place." *Tr. Trans.* at 1044:22, 1045:18.

77

For the above reasons the Trust's counterclaims based on threats of litigation and actual litigation by Honeywell would be denied.

### (ii)   Honeywell Attempts to Settle Claims Outside Trust
### and to Negotiate a Buy-out

The remaining Trust counterclaim relates to two discrete activities undertaken by Honeywell in furtherance of its ongoing concerns as to how the Trust has been operating. The first concerns the Trust's counterclaims against Honeywell with respect to Honeywell making efforts to reach agreements with law firms who represent claimants to the Trust. Such efforts are focused on so-called "inventory" agreements whereby Honeywell would directly pay the law firm a lump sum amount in exchange for a withdrawal and release of all the pending claims by that law firm's clients with the Trust. The law firm would then somehow allocate the sum, minus its fees, among its individual clients who are claimants. Honeywell focused these efforts on law firms who submitted "form" affidavits to the Trust to support the claims that they were filing, viewing an inventory settlement as one way to address the problems with form affidavits that Honeywell perceived and which it believed the Trust was not addressing.

Only one such inventory settlement was ever actually concluded, that with the Goldberg law firm. Negotiations between Honeywell and Goldberg started in early 2018. An agreement in principle was reached in May 2018 and it was reduced to a written settlement agreement around August/September 2018. Honeywell kept the Trust apprised of these developments by sending a copy of the settlement agreement to one of the Trust's attorneys, who

78

responded not with any objection, but with a request to be kept informed of any similar negotiations with any other law firms.  Honeywell did have some negotiations with other firms prior to the agreement with Goldberg, but none ever resulted in an agreement.  Since the Goldberg agreement was reached Honeywell has had a few more inquiries from law firms along these lines but it has responded to them by indicating it has no interest in negotiating any kind of inventory agreement with them.

The Trust vaguely claims that Honeywell's Goldberg agreement and its failed negotiations for a similar agreement with other law firms violate the Trust Agreement and the TDP by, in effect, infringing on the Trust's exclusive power to determine compensable claim values.  However, none of the TDP Sections cited by the Trust in its pretrial brief for this proposition states that the Trust has this exclusive power as claimed.  *See* Doc. No. 337 at 16 (citing TDP Sections 2.2, 4.3(a)(1), 4.3(a)(2), and 4.3(b)(2)).  Even assuming the Trust does have such exclusive power it would obviously be limited to claims that are actually brought before the Trust for such a valuation determination to be made.  If a potential claim is never submitted to the Trust, or is submitted but then withdrawn by the claimant before the Trust has acted to value the claim, it is difficult to see how that could be viewed as an infringement on the Trust's power.  The Court thus does not accept the Trust's characterization of what Honeywell did as being in violation of the Trust Agreement or the TDP.

There does remain a question whether the sort of activity engaged in by Honeywell with respect to Goldberg and the other law firms might be considered to be in violation of *11 U.S.C. §524(g)*, and if so whether that statute can serve as the basis for a private cause of action by the

Trust.  In *In re Joubert*, 411  F.3d 452 (3d Cir. 2005) the court stated that it had never addressed

whether *11 U.S.C. §524* implies a private right of action, either alone or through *11 U.S.C. §105(a)*,

but that the weight of circuit authority is that it does not.  The court then cited a string of circuit

court decisions finding no private right of action under *Section 524* and stated that "[w]e agree with

the reasoning of these cases." *Id*. at 456.

In *In re Bonanno*, 2009 WL 8556815 *4 (Bankr. W.D. Pa. March 24, 2009) former

Judge Markovitz of this Court found this statement by the *Joubert* court to be binding authority and

not mere dictum because there would have been no rationale for the holding in *Joubert* had the Third

Circuit not adopted the principle that there is no private right of action under *Section 524*.[34]  The

Court would likely agree with *Bonanno* and find that there is no right to bring a private action under

*Section 524(g)* for an alleged violation of an injunction issued under that provision, and that

therefore this aspect of the Trust counterclaim would also be denied.

The final basis for the Trust's Counterclaim against Honeywell is Honeywell's

attempt to negotiate a "buy out" agreement involving Honeywell, TAC, FCR, and the Trust.  In

broad terms such an agreement would involve Honeywell paying a single set amount to the Trust

and in return being excused from any further funding obligations under the Trust Agreement.  In

practical effect, this would rescind  the unique "evergreen" feature of the Trust and turn it into the

standard sort of asbestos trust.  Once it made the agreed-upon buyout payment  Honeywell would

have no further oversight or involvement in the operation of the Trust.

---

[34]

The *Bonanno* court went on to assume that a violation of a discharge injunction under
*Section 524* might be remedied in a contempt proceeding.  The Trust has not pursued any contempt
claim in the present case.

Apparently the Trust took issue with the way Honeywell went about exploring this

option, complaining that Honeywell kept it in the dark by conducting secret discussions with TAC

and FCR and then presenting the Trust with a "take it or leave it" proposal once an agreement with

those parties had been reached.  Honeywell disputes that characterization, and in any event in the

Court's view the Trust effectively withdrew any counterclaim based on an attempted buy-out

agreement since all three of the Trustees conceded at trial that if such a buy-out could be negotiated

it would be an acceptable means of proceeding and resolving the longstanding disputes between the

Parties.  *See Tr. Trans.* at 1087:19 - 24; 1337:3 - 5; 1376:13 - 16.  Indeed, the Court itself expressed

the view that such an approach was a potential way out of what one of the attorneys referred to as

the "failed experiment"[35] of the evergreen trust.  And of course, following the conclusion of the trial

the Court urged the Parties to continue discussing a possible buyout, which they have done to a

positive result and to which the Court will now turn as it considers the *Motion*.  Thus, the Court

would find that Honeywell's previous efforts to initiate a buy-out agreement were not improper.

### *THE SETTLEMENT MOTION*

Having exhaustively laid out the underlying history behind this case, and its views

on the merits of the various claims and counterclaims that were the subject of the trial, the Court is

now in a position to analyze the *Motion* with some confidence that the interested public and any

future reviewing court will have a complete picture to help explain the decision that follows.  A

---

[35] This comment is joined in by the Court and was made during closing arguments by the FCR
which tracked an earlier observation of the Court during trial that the relationship of Honeywell and
the Trust was a marriage in dire need of a divorce.

summary of the key points of the proposed settlement will be set forth first, followed by an analysis as to whether the *Martin* factors and any other relevant considerations support an approval.

The proposed settlement in its basic form is much like the "buy-out" being explored by Honeywell prior to the inception of the current litigation. That is to say, its centerpiece is a conversion of the Trust from its present evergreen funding structure, with the accompanying obligation of Honeywell to make annual payments to the Trust for its operations and claims payments and its ongoing audit and oversight rights, to one of the more traditional fully-funded variety, in exchange for a one-time buy-out payment by Honeywell. The "base" amount of that payment, as set forth in an Amended and Restated Buyout Agreement ("Agreement") executed by the Parties on November 20, 2022,[36] would be $1.325 billion. *See Motion*, Exhibit "A". Other significant features of the Agreement include the following.[37]

- Closing on the settlement shall occur as soon as practically possible following January 1, 2023 once certain conditions precedent have been met, including but not limited to this Court's approval of the *Motion*.

- Honeywell will make the buyout payment to the Trust at the time of the closing

---

[36] The Agreement is a restatement and amendment of the Buyout Agreement dated November 18, 2022 which was the subject of the prior settlement motion filed on that date and subsequently withdrawn.

[37] The list that follows is the Court's simple paraphrase of complex provisions in the Agreement to give a general sense of the proposed settlement and is not intended as a binding interpretation of the Agreement for any other purpose.

- The Trust's current equity holding in HWI will be "monetized", and the base amount figure for the payout may be adjusted depending on dividends or sale proceeds realized in that process, with such adjustment to result in a reduction of the base amount if it occurs prior to the closing and a credit and payment back to Honeywell if it occurs thereafter.

- Honeywell will continue to fund the Trust's operational expenses until the closing and will continue to fund claim payments made by the Trust, though for the dollar amount of Trust claims entered into a payment queue after March 31, 2023 Honeywell will have a "dollar for dollar" credit against the buyout amount.

- The TDP, Trust Agreement, and Trust Bylaws will be amended as indicated and will automatically become effective as of the closing.

- The Parties will exchange releases that will become effective as of the closing.

- The Parties will cooperate in various respects to carry out the Agreement and related matters.

- The Bankruptcy Court will have exclusive jurisdiction over any claim or dispute arising out of the Agreement.

- This adversary proceeding will be closed by stipulation of the parties upon approval of the Agreement.[38]

- The Parties seek confirmation that the *Section 524(g)* channeling injunction previously issued by the Court remains in place and is unaffected by the Agreement.

In short, upon closing, the Agreement will essentially provide for a "divorce" between Honeywell and the Trust and a conclusion of the innovative "evergreen" approach which has in actual practice proven to be untenable.

---

[38]    The Parties have already filed a *Conditional Stipulation of Closed With Prejudice* to that effect at Adv. Doc. No. 450 pursuant to *Fed.R.Civ.P. 41(a)(1)(A)(ii),* to become effective upon a grant of the *Motion.*

The *Motion* was properly noticed and, aside from the *Response,* no objections to it were filed by the response deadline set by the Court.  Even so, the Court itself must evaluate the settlement to determine if it should be approved.

Under *Martin*, *Washington Mutual*, and *ICL Holding* when presented with a proposed compromise of a disputed claim a bankruptcy court  is required to assess and balance the value of the claim that is being compromised against the value to the estate of the acceptance of the compromise proposal.  *Id.* 91 F.3d at 393.  In doing so the court is to consider the following: "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors."  *Id*.  These factors apply regardless of whether the compromise concerns the settlement of a claim belonging to the  estate, or a claim against the estate. *In re Nutraquest, Inc*., 434 F.3d 639, 644 (3d Cir. 2006).

Application of the first factor in the present case is somewhat unusual in that the Court has actually already conducted two extensive evidentiary proceedings involving the Parties, those being the injunction hearing in connection with the 2015 litigation, and the trial held earlier this year in this adversary proceeding.  The experience from those two proceedings leads the Court to believe that under  the current structure of the Trust neither side (the Trust or Honeywell) has a good probability of achieving success in litigation that will put an end to their ongoing feud. As the extensive discussion above of the various claims and counterclaims in this adversary proceeding shows, were there no settlement, and aside from the *Response*, were the Court therefore required to rule on them, the end result would in all likelihood be to simply maintain the status quo, with

perhaps some slight relief provided at the margins – but without any final resolution that would diminish the prospect of yet further disputes in the future.

The same can be said concerning the outcome of the 2015 litigation. It appears to the Court that this is mainly a function of the ill-fated attempt to fashion a funding mechanism that required an ongoing relationship between Honeywell and the Trust, coupled with the extensive audit and oversight rights enjoyed by Honeywell. Perhaps such an approach could work with different personalities involved, but experience has demonstrated that it has not worked here. Instead, Honeywell and the Trust are like two boxers who are able to continue pummeling each other without being able to deliver a knockout blow.

The second *Martin* factor is of little relevance in considering the *Motion*. Neither side sought money damages as part of the case, so the prospect of there ever being a money judgment if the settlement were to be denied is slight. Funding of the Trust by Honeywell, either by ongoing annual payments as under the current structure, or by the lump sum payment contemplated by the settlement, appears to be virtually assured given the resources and stability of Honeywell.

The third *Martin* factor strongly points toward an approval of the *Motion*. The current litigation has been extremely complex, as reflected in the large number of attorneys involved, the extensive discovery engaged in by the Parties, and the thousands of pages of documents that were introduced into evidence at trial. Again, the same could be said about the 2015 litigation and the Standstill Mediation. In the absence of a settlement the Court would anticipate still further litigation between the Parties going forward because the current litigation would not resolve any of the systemic features that have precipitated the existing and past litigation.

The litigation has also been quite expensive, though since Honeywell ultimately picks up the tab for it that in itself is not a negative from the point of view of the Trust. Even though the Trust does not face a monetary cost due to the litigation, it does suffer inconvenience and delay. The considerable time and attention that the Trustees are required to devote to the litigation necessarily diverts their attention from what should be the overriding focus of implementing the Trust's purpose. This state of affairs, at varying levels of intensity, has been ongoing for nearly a decade – clearly an unacceptable "delay" under any standard of reasonableness.

The final *Martin* factor, the paramount interest of creditors, is in the Court's view the most significant one under the facts presented. *See*, e.g., *In re Filene's Basement, LLC*, 2014 WL 1713416 *13 (Bankr. D. Del., April 29, 2014) (treating fourth factor as providing the most important benchmark). This factor also happens to be the one that most strongly points toward a decision to approve the *Motion*. The "creditors" in this instance are the present and future claimants seeking a recovery from the Trust to compensate them for asbestos-related injuries suffered as a result of exposure to NARCO ACP. Providing for the fair and prompt processing and payment of such claims was the whole point of the NARCO bankruptcy filing and the extensive negotiations that preceded Plan confirmation. Thus, if the proposed settlement is in the best interests of these claimants that would go a long way toward concluding that the settlement should be approved.

An initial inquiry on this factor is to identify what benefits the claimants would stand to gain if the settlement is approved versus what they might expect if the settlement is rejected and the status quo maintained. The Court finds that an approval of the settlement would benefit the claimants in a number of ways. The termination of the present litigation, with a good chance of

86

avoiding any future litigation as well, would free-up the Trustees to concentrate solely on the operation of the Trust. Honeywell's exit from the picture would also mean the elimination of the one-way mirror and the Honeywell audit/oversight rights, current features that require time and attention from the Trustees and other Trust personnel even during times when there is no active ongoing litigation.

A settlement would also result in the Trustees having a more free hand in decision making with respect to claim-related policies and procedures. The evidence generally shows that attempts by the Trustees to implement policies which would appear to be favorable to claimants have been challenged by Honeywell, so it seems natural to conclude that if Honeywell is no longer involved the claimants will benefit.[39] Consideration of whether the settlement would be in the best interests of the claimant/creditors is considerably aided by the fact that FCR and TAC, who represent these people, are themselves Intervenors in the case. Both the FCR and TAC participated in the negotiations leading up to the settlement and both have expressed their support of the settlement.

In the Court's view, the only possible downside for the creditors if the settlement is approved would be if the buyout payment that Honeywell is to pay proves to be insufficient to cover the Trust's future claims liability. Predicting any future event has some uncertainty, but while it is possible the amount will not be sufficient, the risk of that happening is low enough that it does not overcome the positive benefits that creditors will definitely enjoy under the settlement. Attached

---

[39] In so commenting, the Court is also obviously aware that the Trustees are bound by their fiduciary obligations and the governing documents and must act within those limitations.

to the *Motion* are Declarations by Mark Gleason (Trustee), Charles Finch (economist employed by

Trust), Lynn Dummett (VP and General Counsel, Litigation at Honeywell), Jessica Horewitz

(economist employed by Honeywell),  Lawrence Fitzpatrick (FCR), and Steven Baron (member of

TAC).  All of these individuals have extensive experience with respect to the payment of asbestos

claims and all express the opinion under oath that the buyout amount to be paid by Honeywell is

sufficient to fund the Trust's future claim liability without any detriment to claimants.  The Court

would further note that the buyout payment amount was reached only after extensive, arms-length

negotiations among all the Parties.  Additionally, as was previously discussed, the two experts who

testified at trial, one for Honeywell and the other for the Trust, had very similar conclusions as to

the likely total trust payout, with Finch estimating a median figure of $1.35 billion and Horewitz

$1.21 billion.  The proposed buyout amount follows the more generous Finch estimate.[40]

        To sum up, the third and fourth *Martin* factors are strongly supportive of an approval

of the settlement.  The first factor is of uncertain relevance, though to the extent that it may be, the

Court believes it also supports the settlement.  The second factor is of no significance and can be

considered a wash.  The Court believes that the settlement is an appropriate resolution of what has

seemed at times to be an intractable situation.  However, before finally concluding such, another

matter must be considered, that is, the ***Response*** filed by the Certain London Market Insurance

Companies ("Insurers").

---

[40]

        The *Declaration* of Charles E. Finch dated November 20, 2022, and filed as an attachment
to the *Motion* places the estimated "high end" of the Trust claim liability at $1.13 billion well below
the buyout amount of $1.325 billion.  *See Motion* Doc. 449, *Declaration* p. 5 ¶II(a)(9)

While not per se objecting to the proposed settlement, the Insurers raise two issues that they would like to see addressed in any order granting the *Motion* and approving the settlement. The first issue relates to the concern that the Insurers have that the release Honeywell is granting to the Trust as part of the settlement could be construed as effecting a release of claims that the Insurers may have against the Trust, thereby constituting a non-consensual third-party release to which they object.  At the hearing on the *Motion*, Honeywell's Counsel assured the Court and the Insurers that the release in question is only intended to cover claims that the Insurers might have against the Trust based on their status as standing in the shoes of Honeywell and not any self-standing claims that the Insurers may have.  Honeywell and the other Parties nevertheless also agreed that they would not object if language to that effect was added to the Order to remove any doubt, and that will be done.

The second issue raised by the Insurers concerned a potential future dispute in another forum as to the use of information that Honeywell obtains from the Trust.  The Insurers raised a concern that it could face an argument in such future dispute that the Order approving the settlement somehow determines the issue regarding the scope of use of the information.  Honeywell opposed adding any language to the Order as to that point because of the speculative nature of the potential dispute as described by the Insurers.  The Court agrees with Honeywell that this is an inherently speculative matter that need not be addressed in the final Order.  Furthermore, the Insurers are now firmly on the record as opposing any interpretation of the Order that would result in a finding that this Court was somehow anticipating and deciding any potential future dispute between them and Honeywell and therefore, to that extent, are protected.

In light of the forgoing, the *Motion* meeting the *Martin* factors, as discussed above and the *Response* not raising an objection or any issue that would lead the Court to conclude that the *Motion* should nevertheless be denied, the *Motion* will be granted as set forth below.

## ORDER

*AND NOW*, this 7th day of ***December, 2022***, on consideration of the *Motion* filed at Doc. No. 449 on November 21, 2022, with the consent and full support of Honeywell, TAC, and FCR, it is hereby ***ORDERED, ADJUDGED AND DECREED*** as follows:

(1)      The relief requested in the *Motion* is ***GRANTED***.

(2)      Any objections to the *Motion* with respect to entry of this order (this "Order") that have not been withdrawn, waived, or settled, and all reservations of rights included therein, are hereby ***DENIED*** and ***OVERRULED*** on the merits.

(3)      The Notice attached to the *Motion* as ***Exhibit B*** is approved in all respects. Notice of the *Motion*, the Amended Buyout Agreement and the Amended Agreements was appropriate under the circumstances and sufficient and proper to provide timely notice of the *Motion*, the Amended Buyout Agreement, and the Amended Agreements therefore no other or further notice is required.

(4)      The Amended Buyout Agreement and the Amended Agreements, attached to the *Motion* as ***Exhibit A***, are approved in all respects, including for avoidance of doubt the releases contemplated by Section 8 of the Amended Buyout Agreement. The Parties shall implement

the terms of the proposed Amended Buyout Agreement and the Amended Agreements according to their terms.

(5)    The Court declares that the Amended Buyout Agreement and the Amended Agreements are consistent in all respects with NARCO's Third Amended Plan of Reorganization (the "Plan"), which was filed on December 28, 2005, confirmed by the Bankruptcy Court on November 13, 2007, and affirmed by the District Court on December 18, 2007.

(6)    The Court finds that entering into the Amended Buyout Agreement and Amended Agreements is a reasonable decision by the Trustees that ensures that the purposes and intent of the Plan and the NARCO Asbestos Trust will continue to be carried out.

(7)    The Court further finds that the Amended Buyout Agreement and Amended Agreements provide reasonable assurances that the NARCO Asbestos Trust will be in a financial position to pay current and future NARCO Asbestos Trust claimants the full liquidated value of their claims and to value and pay similar claims in substantially the same manner.

(8)    The Court further declares that:

(i)    the Amended Buyout Agreement and the Amended Agreements, and the transactions contemplated therein, do not modify, dissolve, terminate, or affect in any manner the NARCO Channeling Injunction effective as of April 30, 2013, the Effective Date of the Plan, and,

(ii)    upon and after the closing of the transactions contemplated by the Amended Buyout Agreement, the NARCO Channeling Injunction, which is a permanent injunction that stayed, restrained, and enjoined all past, present, and future holders of NARCO Asbestos Trust Claims or NARCO Asbestos Demands from taking any action for the purpose of directly or indirectly collecting, recovering, or receiving payments, satisfaction, or recovery from the

NARCO Protected Parties (as defined in the Plan) (including Honeywell) with respect to such Claims or Demands, will remain in full force and effect without modification, dissolution, or termination.

(9)     Upon agreement of the Parties and the London Market Insurers in resolution of the relevant issues raised in the ***Response of Certain London Market Insurance Companies to the Motion*** ("Response") filed at Doc. No. 455, notwithstanding anything to the contrary in the Amended Buyout Agreement or this Order, those certain London Market Insurers who filed the *Response* do not release any claims or rights they have arising out of the Confidential Settlement Agreement and Release between London Market Insurers and Honeywell dated February 10, 2004, as subsequently amended.

(10)     The United States Bankruptcy Court for the Western District of PA shall retain exclusive jurisdiction over any claims, disputes or other matters arising out of the enforcement of this Order, the Confirmed Plan, the Trust Agreement, the TDP, the Amended Buyout Agreement, the Amended Agreements, and all other related matters.

(11)     The Court believes it has the jurisdiction and power to issue this Memorandum Opinion and Order, but to the extent the rulings herein are found to be non-core, this Memorandum Opinion and Order constitutes this Court's recommendation to the United States District Court for the Western District of Pennsylvania for its final determination.

_____
Thomas P. Agresti, Judge
United States Bankruptcy Court

Case Administrator to serve:
    Michael Kruszewski, Esq.
    David Ross, Esq.
    Jennifer Richnafsky, Esq.
    George Snyder, Esq.
    Eileen Bradley, Esq.
    Courtney M. Helbling, Esq.